# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **RUSSELL BUCKLEW,** | ) | |
| *Plaintiff,* | ) | |
| **v.** | ) | **Case No. _____** |
| **GEORGE A. LOMBARDI,** | ) | |
| **DAVID A. DORMIRE,** | ) | <span style="color:red">**THIS IS A CAPITAL CASE**</span> |
| **And** | ) | <span style="color:red">**EXECUTION SET FOR**</span> |
| **TERRY RUSSELL,** | ) | <span style="color:red">**MAY 21, 2014**</span> |
| *Defendants.* | ) | |

## COMPLAINT

Plaintiff Russell Bucklew, scheduled to be executed on May 21, 2014, seeks both emergency and permanent relief, requesting this Court declare and enforce his rights under the First and Fourteenth Amendments and issue an injunction under 42 U.S.C. § 1983 and the Eighth Amendment commanding defendants not to carry out any lethal injection on Mr. Bucklew because Missouri's execution protocol and procedures will almost inevitably lead to a bloody, prolonged and excruciating execution because of substantial risks unique to Mr. Bucklew.

## INTRODUCTION

1

1. Mr. Bucklew suffers from a dangerous, and, at times, debilitating congenital condition – cavernous hemangioma -- that causes clumps of weakened, malformed vessels to grow in his head, face, and throat, displacing healthy tissue and rupturing under stress. Mr. Bucklew has had this condition since infancy, and his vascular malformations have grown steadily worse through adulthood, causing constant facial pain and pressure along with difficulty breathing.

2. Mr. Bucklew's vascular malformations have proved resistant to any form of treatment, and surgery has been rejected because the results would be both disfiguring and disabling. The only medical treatment in recent years has been pain management.

3. Mr. Bucklew's vascular tumor is massive, occupying his nose, throat, and airway passages. He hemorrhages on a regular basis, and sometimes experiences a major rupture with extensive bleeding.

4. The size of Mr. Bucklew's tumor and the weakness of his distended vessels create a very substantial risk that he will suffer excruciating, even tortuous pain during an execution.

5. Because the vascular tumor partially obstructs Mr. Bucklew's airway, he is at high risk of choking during an execution, particularly if distended vessels in

2

his mouth or throat rupture and bleed. This will cause gasping and coughing that Mr. Bucklew will experience as suffocation.

6. There is also a grave risk that, because of Mr. Bucklew's severe vascular malformations, the lethal drug will not circulate as intended, delaying the suppression of the central nervous system and prolonging the execution – which will likely cause excruciating pain to Mr. Bucklew. These risks are heightened by the use of a compounded drug, pentobarbital, in the absence of any disclosure about the drug's safety, purity and potency. In fact, the Department of Corrections will not even confirm whether the drug is subject to any laboratory testing whatsoever.

7. Mr. Bucklew cannot be executed under Missouri's protocol without inflicting cruel and unusual punishment in violation of the Eighth Amendment.

8. Mr. Bucklew's medical condition is well documented in the Department of Corrections' own records, which describe the hemangiomas as "very massive" and "extensive" with "bulging lesions." The hemangiomas cause chronic facial pain, frequent headaches and spells of dizziness and even loss of consciousness. Mr. Bucklew also suffers impaired hearing and vision.

9. Various therapies to treat the hemangiomas – including chemotherapy, radiation therapy and sclerotherapy -- have failed, and doctors have stated that any

3

effort to remove them surgically would be "mutilating and very risky as far as blood loss." Mr. Bucklew is on a regimen of several medications designed to ease nerve pain, prevent seizures and ease anxiety.

10. Although Mr. Bucklew's vascular tumors have grown throughout his adult life, including his 18 years in prison -- no imaging – neither a CT scan nor an MRI – has been conducted on Mr. Bucklew during the last four years. The report following a June 2010 MRI described the hemangioma as a "large complex right facial mass" that extended through the right-side nasal passages, sinuses, pharynx, jaw, palate and throat. As a result of the large mass, Mr. Bucklew's *"airway is severely compromised."* (emphasis added).

11. Two highly trained, board-certified physicians – an anesthesiologist who teaches at the Emory University School of Medicine and a neuroradiologist who practices at St. Luke's Hospital in St. Louis – have provided sworn statements stating that Mr. Bucklew's vascular malformations create a substantial risk that, during an execution, the lethal drug will not circulate properly. This will create a great risk of prolonging the execution and causing Mr. Bucklew to suffer excruciating pain.

4

12. Both doctors state in their affidavits that an examination of Mr. Bucklew and his vascular malformations is necessary to evaluate the specific risks to Mr. Bucklew during an execution.

13. Dr. Joel Zivot, the anesthesiologist who has examined Mr. Bucklew's medical records and imaging studies of his extreme vascular malformations, states in his affidavit (attached as Exhibit 1) that a substantial risk exists that Mr. Bucklew will suffer from extreme or excruciating pain as a result of "hemorrhaging or abnormal circulation of the lethal drug, leading to a prolonged execution." Dr. Zivot also states that "Mr. Bucklew has a partially obstructed airway, which raises a very substantial risk that during an execution he could suffocate." (Exh. 1 at ¶ 15).

14. A spike in blood pressure – a side effect of methylene blue, which is used to flush the IV line – could cause Mr. Bucklew's hemangiomas, already engorged with blood, to "rupture, resulting in significant bleeding in the face, mouth and throat." If blood enters Mr. Bucklew's airway, "it would likely cause choking and coughing, which Mr. Bucklew will experience as severe pain and suffocation." (Exh. 1 at ¶18).

15. Mr. Bucklew brings this lawsuit, as sole plaintiff, because his situation is unique and the risks to him during an execution are grave. The claims raised in

this suit are based on his unique medical condition and are separate and distinct from those raised in *Zink v. Lombardi*, Case No. 12-4209 (W.D. Mo). Mr. Bucklew's claims rest not on the inherent dangers in Missouri's protocol to any prisoner, or on the inherent risks in the use of compounded drugs generally, but on the *specific and unique facts* of Mr. Bucklew's serious medical condition.

## JURISDICTION AND VENUE

16. Jurisdiction is conferred by 28 U.S.C. §1331 and §1343, which provide for original jurisdiction of this Court in suits based respectively on federal questions and authorized by 42 U.S.C. §1983, which provides a cause of action for the protection of rights, privileges or immunities secured by the Constitution of the United States. Jurisdiction is further conferred by 28 U.S.C. §2201 and §2202, which authorize actions for declaratory and injunction relief.

17. Venue is proper in the Western District of Missouri under 18 U.S.C. §1391(b)(1)-(3) in that defendant Lombardi resides in the territorial jurisdiction of this district, and defendant Lombardi's decisions regarding Missouri's execution protocol are made within this Court's territorial jurisdiction.

## PARTIES

18. Plaintiff Russell Bucklew is a resident of the State of Missouri and presently resides at Potosi Correctional Center in Mineral Point, Missouri. He is

6

sentenced to death, and is scheduled to die by lethal injection on May 21, 2014. Mr. Bucklew has exhausted his claims administratively through Potosi's grievance procedures.

19.   Defendant George Lombardi is the Director of the Department of Corrections (DOC) of the State of Missouri.  His office is located at the DOC's central office at 2729 Plaza Drive, Jefferson City, Missouri.

20.   A Missouri statute, Mo. Rev. Stat. §536.720 authorizes and directs the Director of the DOC to prescribe and direct the means by which the Department carries out executions within the statutorily prescribed methods of lethal gas or lethal injection.  Director Lombardi fulfills that statutory role and carries out those responsibilities.

21.   Defendant David R. Dormire is the Director of the Division of Adult Institutions at the Department of Corrections of the State of Missouri.  His office is also at the DOC's central office in Jefferson City, Missouri.

22.   Defendant Dormire is the chief executive officer of the Division of Adult Institutions, and has command-and-control authority over the DOC officials, officers and employees who are involved, directly or indirectly, with carrying out executions.

23. Defendant Terry Russell is the Warden of the Eastern Reception and Diagnostic & Correctional Center (ERDCC), 2727 Highway K, Bonne Terre, Missouri. The State of Missouri has conducted its executions at ERDCC since April 2005.

24. By virtue of his authority over the staff at ERDCC, defendant Russell is responsible for the manner in which executions are conducted in Missouri.

25. All defendants are sued in their official and individual capacities. All actions taken by them are taken under color of state law.

## FACTUAL BACKGROUND

### Russell Bucklew's Medical Condition

26. Mr. Bucklew has suffered from the symptoms of congenital cavernous hemangioma his entire life, including frequent hemorrhaging through his facial orifices, disturbances to his vision and hearing, pain and pressure in his head, constant headaches, dizziness, and episodes of loss of consciousness. He frequently bleeds through his mouth, nose and ears, and has sometimes bled even through his eyes.

27. The hemangiomas—which are clumps of weak, malformed vessels – fill Mr. Bucklew's face, head, neck and throat, displacing healthy tissue and stealing

blood flow from normal adjacent tissues, depriving those tissues of necessary oxygen.

28.  The hemangiomas are vascular tumors, and it is in the nature of such tumors to continuously expand.  Although the tumors are classified as benign tumors, their growth is locally invasive and destructive.

29.  Over the years, doctors have attempted treatment on many occasions, only to conclude that the available treatments – chemotherapy, sclerotherapy, radiation therapy and surgery – hold no appreciable chance of success.

30.  In 1991, a specialist who examined Mr. Bucklew and treated his hemangioma for many years noted that any attempt to remove the vascular tumor "would require extensive surgery which would be mutilating and very risky as far as blood loss."

31.  Over the years, attempts at sclerotherapy, chemotherapy and radiation therapy all failed.  An April 2012 report notes the minimal success of prior therapies and states: "The large size makes the hemangioma not amenable to sclerotherapy."  The report also notes that surgery would result in "large concomitant disability and disfiguration."

32.  Doctors have described the hemangiomas as "very massive," "extensive" and a "large complex right facial mass."  In March 2003, a doctor who

9

examined Mr. Bucklew wanted him examined immediately by a specialist because of progression of the vascular tumor, which the doctor believed "could be potentially fatal to the patient." In June 2010, an imaging report stated that Mr. Bucklew's airway was "severely compromised." A July 2011 medical report noted there was "difficulty [with] bleeding management." Two months later, another doctor noted the alarming expansion of the lesion, stating it encompassed "the entire soft palate and uvula, which are impossible to visualize due to the expansion of the lesion."

33. Throughout the records, doctors employed or contracted with by the State of Missouri repeatedly warn of the expansion of the vascular tumor, stating in September 2011 "this has been present for 20 plus years, but has increasingly grown larger and larger."

34. The possibility of another attempt at treatment was dismissed in April 2011, when Mr. Bucklew's doctor observed "there was minimal benefit from the previous sclerotherapy" and the "large size" of the hemangioma precluded effective treatment with sclerotherapy.

35. Medical reports in March 2013 describe an episode of severe pain, lightheadedness and loss of consciousness. Doctors ordered narcotic drugs for pain.

36.  Periodically, the hemangiomas rupture, and Mr. Bucklew is given gauze and biohazard bags to keep with him to collect bloody discharge.  Mr. Bucklew frequently suffers from nausea, dizziness and bouts of excruciating pain.  He is treated with anti-epileptic and narcotic pain medication as well as medication to stabilize his mood.

## **Missouri's Lethal Injection Protocol.**

37.  Missouri's lethal injection protocol calls for the administration of 5 grams of pentobarbital, administered through an IV line into the execution chamber, where the prisoner is alone and strapped to a gurney.  No medical personnel are close at hand, and the prisoner is monitored remotely from the "execution support room."  Although medical personnel insert the IV lines at the outset, the lethal drug itself is injected by non-medical personnel pushing syringes into the IV line at a pre-determined flow rate.

38.  The procedure itself begins with the insertion of the IV lines – one in each arm (or a central line in the femoral, jugular or subclavian vein if venous access in the arms is limited).  About 15 to 30 minutes before the lethal drug is injected, a saline solution, which includes Methylene Blue, is injected into the prisoner to determine if the lines are clear.  The gurney is positioned so medical

personnel can remotely observe the prisoner's face, directly, "or with the aid of a mirror." Medical personnel "monitor" the prisoner remotely during the execution.

39. Non-medical personnel administer the lethal drug through syringes into the IV lines. After the administration of the initial 5 grams of pentobarbital, the non-medical personnel flush the IV lines with saline and Methylene Blue. Shortly thereafter, the execution chamber's curtains are closed and medical personnel check the prisoner to see if he is dead.

40. If the prisoner is not dead, then non-medical personnel then inject an additional 5 grams of pentobarbital through two additional syringes.

41. During the administration of the lethal drug, no one is in the execution chamber other than the prisoner, and no medical personnel are at hand. The prisoner is monitored only remotely from the "execution support room." The members of the execution team only enter the execution chamber when the curtains are closed and only to determine if the prisoner has died. They check after administration of the first 5 grams of pentobarbital, and then again after the administration of the second 5 grams of pentobarbital.

42. If the prisoner does not die after the administration of 10 grams of pentobarbital, Missouri's protocol provides no further guidance. The protocol is

completely silent on what procedures to follow in the event the lethal drugs do not properly enter the prisoner's body or do not properly circulate within the body.

43. If the prisoner is not killed by the execution, there is no protocol nor equipment for resuscitating the prisoner.

44. If the execution is halted, and the prisoner remains alive, the State of Missouri must resume medical care of the prisoner, as it is obligated to do so under the Eighth Amendment of the United States Constitution. Missouri's protocol is completely silent on this point.

45. An execution in Oklahoma was recently halted because the lethal drugs did not properly enter the prisoner's body and did not cause death. The prisoner, Clayton Lockett, reportedly died of a heart attack after the attempt to execute him failed. After Mr. Lockett groaned and writhed and it was clear he was still alive, Oklahoma officials hastily dropped the blinds on the execution chamber. They reportedly considered taking Lockett to the hospital to resuscitate, but it was too late.

46. Mr. Bucklew's medical condition creates a substantial risk that the execution will not proceed as intended, and that the lethal drug will not properly circulate in Mr. Bucklew's body, leading to a prolonged and excruciating execution or perhaps even a repeat of what happened to Mr. Lockett. Further, the

weak, malformed veins in Mr. Bucklew's head and throat could easily rupture – leading to bleeding, choking and suffocation.

47.   There is no aspect of Missouri's execution protocol that addresses how to handle the risks posed by a prisoner's unique medical or physical condition, particularly a congenital vascular condition such as Mr. Bucklew's, which creates very grave risks.

48.   Although Mr. Bucklew's medical records run into the thousands of pages, the "Pre-Execution Summary of Medical History – to be reviewed by medical personnel on the execution team – is merely one page, asking such simple questions as whether the "offender recently had a cold or flu" or suffered from "back pain."

49.   There is no consideration of adverse medication interactions, and "yes" answers to any of the screening questions are to be answered in three lines at the bottom of the page.

50.   Missouri's protocol is grossly inadequate to address the significant risks posed to Mr. Bucklew during an execution – risks that could cause a prolonged and excruciating procedure, in which Mr. Bucklew bleeds through his mouth, nose or ears, and possibly chokes or suffocates on his own blood.

51.  No medical assistance will be at hand – instead the "medical personnel" will be watching from the "execution support room," unable to lend any aid to Mr. Bucklew.

### **Affidavit of Dr. Gregory Jamroz**

52.  Gregory Jamroz, M.D. is board-certified radiologist.  He practices in the specialty of neuroradiology at St. Luke's Hospital in St. Louis, Missouri.

53.  After reviewing the medical records of Mr. Bucklew, he concluded that Mr. Bucklew could not be executed safely – that is, free of the substantial risk of serious pain -- without an examination of his vascular malformations because the malformations cause "shunting" of the blood, which would likely affect the circulation of the lethal drug.

54.  Dr. Jamroz opined that an examination was essential to determine the precise quantity of shunting.  But regardless of the "quantity of shunting, [the] presence of vascular malformations compromises the supply of blood to the brain." (Exhibit 2).  As a result, the ability to bring about a rapid death during the execution is threatened.

### **Affidavit of Dr. Joel Zivot**

55.  Dr. Joel Zivot is a board-certified anesthesiologist who teaches at the Emory University School of Medicine and serves as Medical Director of the Cardio-Thoracic Intensive Care Unit at Emory University Hospital.

56.  Dr. Zivot has reviewed Mr. Bucklew's medical records as well as the Missouri's Execution Protocol and related documents.

57.  Dr. Zivot identifies several substantial risks arising from any attempt to execute Mr. Bucklew under Missouri's protocol.   All of these risks create a great likelihood that Mr. Bucklew will suffer an excruciating and tortuous execution characterized by hemorrhaging, choking and straining to breathe through a constricted airway.  These risks also create a great likelihood that the execution will not only be extremely painful but will also be prolonged because the lethal drug will not circulate properly in Mr. Bucklew's malformed veins.

58.  Before the lethal drug is even injected, Mr. Bucklew is at risk from the use of methylene blue, which is part of the saline mixture used to check the flow in the IV line.   Dr. Zivot notes that methylene blue is a nitric oxide scavenger, which will "cause a spike in blood pressure if injected."  (Exhibit 1, ¶16).

59.  The use of methylene blue in Mr. Bucklew's execution raises a very substantial risk of hemorrhage, as the hemangiomas are a "plexus of blood vessels

16

that are abnormally weak and can easily rupture, even when the blood pressure is normal."  (Exhibit 1, ¶17).

60.   If Mr. Bucklew's "blood pressure spikes after the methylene blue injections, the hemangiomas, now further engorged with blood, are likely to rupture, resulting in significant bleeding in the face, mouth and throat."  If blood enters Mr. Bucklew's airway, "it would likely cause choking and coughing, which Mr. Bucklew will experience as severe pain and suffocation."  (Exh. 1, ¶18).

61.   As a result of his vascular tumors, Mr. Bucklew has a partially obstructed airway.  This further heightens the risk that Mr. Bucklew will suffocate during the execution.

62.   There is also a very substantial risk that, because of Mr. Bucklew's vascular malformations, the lethal drug will not circulate as intended.  The abnormal circulation will inhibit the effectiveness of the pentobarbital, thereby delaying the depression of Mr. Bucklew's central nervous system.

63.   The reduced effectiveness of the pentobarbital and the delayed depression of the central nervous system will create a substantial risk of a prolonged and extremely painful execution for Mr. Bucklew.  (Exhibit 1, ¶19).

64.  All of these risks are augmented by the fact that Mr. Bucklew takes several medications to manage his medical condition.  This creates a substantial risk of adverse events resulting from drug interactions.

65.  Pentobarbital is not an analgesic, but is an *antalgesic*, that is, it tends to exaggerate or worsen pain. The risks arising from drug interactions and the antalgesic effects of pentobarbital are further compounded by the use of the compounded lethal drug, which, unlike a manufactured drug, carries no guarantees of its safety, potency, or purity.  (Exhibit 1 at  ¶¶23-25; Exhibit 3, Declaration of Dr. Larry Sasich).

66.  To date, Defendants have given little or no attention to the risks that attend the execution of Russell Bucklew.  Belatedly, on May 7, 2014, counsel in the Missouri Attorney General's Office contacted counsel for Mr. Bucklew and inquired about conducting a venous study of Mr. Bucklew's arms.  There was no request to conduct any scans of the bloated vascular malformations in Mr. Bucklew's face, head and throat.

67.  Indeed, the Department of Corrections has obtained no imaging studies of Mr. Bucklew's cavernous hemangioma since 2010 when an MRI was performed.  The imaging report described Mr. Bucklew's hemangioma as "a large

complex right facial mass" and noted that Mr. Bucklew's airway was "severely compromised."

68. In order to evaluate whether Mr. Bucklew can be safely executed or what precautions must be taken, full and complete imaging studies must be conducted. The vascular malformations occupy much of the right side of Mr. Bucklew's head, extending into his nose, sinuses, jaw, mouth and throat. They put constant pressure on his face, and may extend into the brain.

69. To understand the full extent of the cavernous hemangioma, a high resolution scan of Mr. Bucklew's chest, neck, head and brain must be performed, with and without contrast. If the CT scan does not fully characterize the extent of the known soft tissue tumors, then an MRI should be performed. In addition, a venogram and ultrasound evaluation should be performed of Mr. Bucklew's upper extremities to determine venous patency and vascular access locations.

70. Although there are aspects of the lethal injection protocol that, superficially, appear to draw on medical expertise, lethal injection does not possess any of the safeguards of the practice of medicine and anesthesiology.

71. Execution team members either lack the necessary training to safely carry out lethal injection – particularly in the case of someone like Mr. Bucklew

19

who has a complex medical condition – or they are acting explicitly contrary to the dictates of safe medical practice.

72. Because of the numerous and immense risks to Mr. Bucklew during an execution, he should be monitored throughout by a qualified physician who is in the execution chamber for the purpose of being able to revive Mr. Bucklew in the event the execution is unsuccessful. The physician would not be a member of the execution team and would have no role or assignment in any way with lethal injection.

73. The State of Missouri has no plan for handling an execution that does not proceed as intended. Significantly, there is no equipment or protocol for resuscitating a prisoner who survives an execution.

74. The State of Missouri lacks any kind of back up or contingency plan for unanticipated events during an execution. Contingency plans are especially important given the likelihood of adverse events during an execution of someone like Mr. Bucklew who has a very serious medical condition. The risk of adverse events is furthered heightened by the use of compounded drugs that are not approved or reviewed by the FDA and which are not prepared in an FDA-regulated facility. The risk of contaminants, allergens, and improperly adjusted pH levels is particularly substantial with compounded drugs. Yet, the State of Missouri

provides no information whatsoever about its lethal drug and will not even confirm whether the drug is tested for safety, potency or purity.

75. The lack of transparency regarding the lethal drug, the flaws in Missouri's lethal injection protocol including its lack of contingency plans, and Mr. Bucklew's severe vascular abnormalities all create a situation of extreme risk to Mr. Bucklew, where he is highly likely to experience a prolonged, excruciating and tortuous execution.

## Count I

### Claim Against All Defendants Under the Cruel and Unusual Punishment Clause of the Eighth Amendment Based on Use of Missouri Lethal Injection Protocol on Mr. Bucklew

Plaintiff realleges the foregoing and further states as follows:

76. Defendants' flawed execution protocol, its use of secret, unregulated drugs, and its total failure to take any reasonable steps to evaluate whether or how Mr. Bucklew can be constitutionally executed will cause extreme and needless suffering to Mr. Bucklew, including but not limited to hemorrhaging during the execution; coughing, choking and struggling for air; and suffering a prolonged and excruciating execution because the lethal drug fails in its intended effect or fails to circulate properly in Mr. Bucklew's body.

77.  If Missouri proceeds with its scheduled execution of Mr. Bucklew, it will be conducting an unregulated experiment on a human subject, as there are no studies that support Defendants' use of Missouri's lethal injection protocol on an individual suffering from vascular malformations and prone to hemorrhaging.

78.  Missouri's lethal injection protocol, as applied to Mr. Bucklew, presents a substantial risk of causing excruciating or tortuous pain and needless suffering.

79.  Absent a thorough physical examination and complete imaging studies, it is not even possible to state whether a constitutional method of executing Mr. Bucklew by lethal injection exists.

80. Lethal injection is not one-size-fits-all.  There are individuals who, like Mr. Bucklew, have such severe and overwhelming physical vulnerabilities that death by lethal injection poses unacceptable and unconstitutional risks.

81.  Defendants' intended actions as set forth in this Complaint will inflict extreme, tortuous and unnecessary pain and therefore violate the Cruel and Unusual Punishments Clause of the Eighth Amendment of the United States Constitution.

**Count II**

**Claim Against All Defendants for Failure to Take Reasonable and Necessary Precautions with Regard to Mr. Bucklew's Execution, thereby Acting with Deliberate Indifference to Plaintiff's Serious Medical Needs in Violation of the Eighth and Fourteenth Amendments of the United States Constitution**

Plaintiff realleges the foregoing and further states as follows:

82. Defendants have taken no reasonable and necessary steps to assess the risks to Mr. Bucklew during an execution. They have not conducted a thorough physical examination or obtained up-to-date imaging studies to determine whether or how Mr. Bucklew can be executed without violating the United States Constitution.

83. Defendants' failures to take reasonable and necessary steps constitute deliberate indifference to Mr. Bucklew's serious medical needs.

84. As long as Mr. Bucklew is a prisoner within the custody and control of Defendants, they have a constitutional obligation to provide for his serious medical needs. Although they have the right to carry out a death sentence, Defendants may only do so consistently with the dictates of the United States Constitution, including the Eighth Amendment prohibition on Cruel and Unusual Punishment.

85. Defendants have not only failed to take reasonable and necessary steps to determine whether or how Mr. Bucklew may be safely executed, they have made no contingency plans in the event the lethal drugs fail to kill Mr. Bucklew. The

23

Missouri protocol is completely silent on such a possibility. There is no equipment or protocol for resuscitation.

86. Instead, Mr. Bucklew, an individual with a partially blocked airway and weak, malformed vessels, will be alone in the execution chamber, monitored only remotely by medical personnel who are not tasked with providing any assistance in the event of a botched execution.

87. Even if such an eventuality did not previously occur in the State of Missouri, the botched execution of Clayton Lockett in Oklahoma should have delivered the lesson that an execution can go tragically wrong when the lethal drugs either do not properly enter the prisoner's body or fail for some other reason. Despite the Oklahoma event, of nationwide prominence, Defendants have made no change to their execution protocol to address unforeseen or unintended events.

88. Defendants' failures and omissions constitute deliberate indifference to the serious medical needs of Mr. Bucklew, in violation of the Eighth Amendment.

89. Defendants' actions have caused, and will continue to cause, needless harm and extreme suffering to Mr. Bucklew, who faces undergoing lethal injection in the absence of necessary and proper precautions or preparations. Defendants' actions therefore violate the Eighth Amendment of the United States Constitution as well as the Due Process Clause of the Fourteenth Amendment.

## Count III

### Claim Against All Defendants for Violation of Mr. Bucklew's First Amendment Right to Petition the Government for Redress of Grievances and His Right to Due Process Under the Fourteenth Amendment

Plaintiff realleges the foregoing and further states as follows:

90. Defendants' execution practices and its use of a lethal drug are shrouded in secrecy.

91. Defendants refuse to provide any information whatsoever regarding the purported pharmacist or pharmacy that prepares the drug, or how or when the drug is prepared, or where or when the active ingredient is obtained, or whether the pharmacy is registered with or has ever been inspected by the Food and Drug Administration or even whether the compounded drug has been subjected to any testing for safety, potency or purity.

92. Defendants' utter failure to provide a single relevant fact about the provenance or safety of the execution drug prevents Mr. Bucklew, an individual whose vessels are weakened and prone to rupture, from petitioning the government for redress of grievances.

93. Because Defendants have refused to provide basic information about the provenance, purity, potency and safety of the drug, any allegations by Mr.

Bucklew about the compounded drug are vulnerable to being labeled "speculation."

94.   To effectively petition the government for redress of grievances, as is his right under the First Amendment, and to exercise his right of access to the courts under the Due Process Clause of the Fourteenth Amendment, Mr. Bucklew needs access to information about the safety, purity, potency and origins of the compounded drug.   Such information is now completely denied, as Defendants refuse to even state whether the drug is subjected to laboratory testing.

95.   Defendants' practice of shrouding the execution drug in extreme secrecy violates Mr. Bucklew's rights under the First and Fourteenth Amendments, causing him to be subjected to experimental and dangerous drug protocols with no ability to effectively challenge the drug protocol in court or to petition any agency of the federal, state or local government for redress.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Bucklew requests the following relief:

1.   That this Court assume jurisdiction of this cause and set this case for a hearing on the merits.

2.   That this Court issue a declaratory judgment declaring and enforcing the rights of Plaintiff Bucklew, as alleged above, and further issue a

26

temporary restraining order or preliminary or permanent injunction to enforce Plaintiff's rights under the First, Eighth and Fourteenth Amendments, commanding defendants to provide necessary information about the provenance, safety, potency and purity of the compounded drug so as to permit Plaintiff to petition for redress of grievances, and, further to permit Plaintiff access to the courts, consistent with the requirements of the due process clause.

3. That this Court issue a declaratory judgment declaring and enforcing Plaintiff's rights under the Eighth Amendment and, further, issue a temporary restraining order or a preliminary or permanent injunction commanding Defendants not to carry out any lethal injection on Mr. Bucklew until such time as Plaintiff has conducted discovery, reasonable and necessary medical tests have been performed, and reasonable and necessary steps have been taken to determine whether and how Mr. Bucklew may be executed in a constitutional manner – if that is possible -- and with reasonable and necessary adjustments made to the execution protocol.

4. Mr. Bucklew also seeks this Court's order under 42 U.S.C. § 1988 awarding him a reasonable attorneys' fee and costs, and such further relief as this Court deems just and proper.

WHEREFORE, Plaintiff Bucklew prays this Court for its order and

judgment as stated above.

Respectfully Submitted,

MORGAN PILATE, LLC
/s/   Cheryl A. Pilate
Cheryl A. Pilate Mo. # 42266
Lindsay J. Runnels #62075
926 Cherry Street
Kansas City, MO 64106
Telephone: 816-471-6694
Facsimile: 816-472-3516
cpilate@morganpilate.com
lrunnels@morganpilate.com

JOHN WILLIAM SIMON
7201 Delmar Blvd., Suite 201
St. Louis, Missouri  63130-4106
(314) 604-6982
Fax:  (314) 754-9083
simonjw1@yahoo.com