# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

RUSSELL BUCKLEW,         )
        *Plaintiff,*      )
v.                        )      **Case No. 14-cv-08000**
GEORGE A. LOMBARDI,    )
DAVID A. DORMIRE,      )      <span style="color:red">**THIS IS A CAPITAL CASE**</span>
and                     )      <span style="color:red">**EXECUTION SET FOR**</span>
TERRY RUSSELL,        )      <span style="color:red">**MAY 21, 2014**</span>
        *Defendants.*   )

## MOTION FOR STAY OF EXECUTION

Plaintiff Russell Bucklew, by and through his counsel, hereby moves this Honorable Court for a stay of execution to: (1) permit a thorough medical examination, including imaging studies, to be performed; and (2) permit the issues in this case to be fairly litigated with a full presentation of evidence regarding the *unique* risks faced by Mr. Bucklew during an execution by lethal injection. These risks are not speculative and remote, but rather are immediate and grave. *Lethal injection is not a one-size-fits-all procedure.* The clumps of weak, malformed vessels that fill Mr. Bucklew's face, head and throat could easily rupture during the execution – potentially causing him to cough and choke on his own blood. His vascular abnormalities could also impair the circulation of the lethal drug – leading to a prolonged and excruciating execution. Most disturbingly, Mr. Bucklew's airway is partly obstructed and any secretion seeping into it or any further swelling

1

of his hemangiomas could cause him to struggle for air, which would lead to a vicious cycle in which struggling for air causes further difficulty breathing, leading ultimately to Mr. Bucklew suffocating.

Mr. Bucklew has suffered from this dangerous and sometimes debilitating congenital condition – cavernous hemangioma – since infancy, and his vascular malformations have grown steadily worse through adulthood. He suffers from nearly constant pain and pressure in his face, and regularly bleeds from his facial orifices. Mr. Bucklew also has to sleep with his head propped up because of his airway obstruction. Despite these urgent medical issues, Mr. Bucklew has not had a CT scan or MRI in four years.

Belatedly, the Missouri Attorney General's Office and Missouri Department of Corrections (DOC) have apparently recognized the risks involved in attempting to execute Mr. Bucklew – even though the severity of Mr. Bucklew's condition has been known for many years. Shortly after undersigned counsel produced the affidavit from Dr. Joel Zivot (attached to the Complaint in this case) and sought access to Potosi Correctional Center so that Dr. Zivot could personally examine Mr. Bucklew, the Attorney General's Office and counsel for the DOC began suggesting imaging studies of Mr. Bucklew – initially proposing venous studies of Mr. Bucklew's arms in a phone call on May 7, 2014, then agreeing that an MRI of his head was necessary.

2

After 5 p.m. on Friday, May 9, 2014, DOC counsel and counsel in the Attorney General's Office both sent emails to Mr. Bucklew's counsel proposing an MRI and providing a scheduling number for St. Mary's Hospital in Jefferson City. (Exhs. A, B). But neither the DOC nor the AG's Office had any proposal for which doctor should order the test, who should interpret the test, when it should be done, or who should pay for it. It now appears that those tests may be performed at Barnes Jewish Hospital in St. Louis by specialists in the neuroradiology department. Again, when those tests may be scheduled, who will pay for them and who will interpret them remains to be decided. Mr. Bucklew's counsel is in constant communication with doctors and is attempting to get all medical testing done, but Mr. Bucklew's problems are so extensive that additional specialists, including an Ear, Nose and Throat specialist, are likely to be needed, particularly given the substantial degree of obstruction to Mr. Bucklew's airway.

A stay of execution is imperative so that these issues may be addressed. Although the State of Missouri has an interest in carrying out its sentence, it would appear to have an even stronger interest in avoiding an execution that is bloody, excruciating or prolonged. Such a botched execution runs the risk of repeating the horror of what happened in Oklahoma and would almost certainly undermine support for the death penalty. (Exh. C, NEW YORK TIMES editorial)

Executing Mr. Bucklew in a manner that would cause him to hemorrhage, choke on his own blood, suffocate or suffer through a protracted and excruciating execution would clearly violate the Eighth Amendment's prohibition on Cruel and Unusual Punishment. The likelihood of these horrific scenarios is substantial. Dr. Zivot, a board-certified anesthesiologist who teaches at the Emory University School of Medicine, concluded after reviewing Mr. Bucklew's medical records that a substantial risk existed that, because of Mr. Bucklew's vascular malformation, the lethal drug will likely not circulate as intended, creating a substantial risk of a "prolonged and extremely painful execution." (Exh. D at ¶19). Dr. Zivot also concluded that a very substantial risk existed that Mr. Bucklew would hemorrhage during the execution, potentially choking on his own blood – a risk heightened by Mr. Bucklew's partially obstructed airway. (Exh. D at ¶15). "If blood enters Mr. Bucklew's airway, it would likely cause choking and coughing, which Mr. Bucklew will experience as severe pain and suffocation." (Exh. D at ¶18).

The risks involved in executing Mr. Bucklew are readily apparent from the Department of Corrections' own medical records, which describe the hemangiomas as "very massive" and "extensive" and a "large complex right facial mass." (Exh. E). The last MRI, from June 2010, notes that Mr. Bucklew's airway is "severely compromised." (Exh. E at 1295).

4

Before any attempt is made to execute Mr. Bucklew by lethal injection, the risks must be properly assessed – which requires a thorough medical examination and appropriate imaging studies. Specific aspects of Missouri's protocol that increase the risk to Mr. Bucklew – such as the use of methylene blue in the intravenous fluids – must also be addressed. Methylene blue causes blood pressure to spike – a serious problem for someone whose veins are prone to rupture. Further, Missouri's execution team personnel have no training in executing an individual with a serious medical condition. The medical personnel do not closely monitor the prisoner during the execution; indeed, they are in a separate room and only watch the prisoner from a distance. Significantly, there is no flexibility in the protocol to address a threatened "botch" should a team member detect problems. The protocol is completely silent on how to handle unanticipated events, and no member of the team has any discretion to depart from the written protocol.

Regardless of whatever legal position the State of Missouri may assert in this litigation, it is clear that it has not properly prepared for Mr. Bucklew's execution. Although Mr. Bucklew's medical problems are well known to the DOC, it has not taken any steps to ascertain Mr. Bucklew's risks during an execution or to prepare for adverse events that might occur during the execution. The Pre-Execution Summary of Medical History, reviewed by medical personnel on the execution team, is a grossly inadequate one-page form that cannot convey

5

anything useful about Mr. Bucklew's medical history. (Exh. F). No physician for the DOC has conducted an examination to evaluate Mr. Bucklew's present condition in light of the pending execution, or to identify any risks posed by conducting the execution.

In addition to the enormous risk of hemorrhaging and impaired circulation of the lethal drug, one of the most troubling risks is posed by Mr. Bucklew's largely obstructed airway. Any secretions or swelling could totally cut off the airway. Yet, no steps have been taken to address this issue or to acknowledge that all of the typical equipment used to keep an airway open would only likely cause further bleeding and swelling of the airway. Further, Mr. Bucklew takes numerous daily medications, including narcotic pain medication and mood stabilizers. Nevertheless, there has been no consideration of medication interactions with the lethal drug, compounded pentobarbital.

All of these factors establish that the State of Missouri is simply not ready to proceed with Mr. Bucklew's execution and that a stay of no less than 60 days is necessary for appropriate medical exams and testing to occur and for the parties to have an adequate opportunity to present evidence and for the court to consider that evidence.

Even with the evidence *presently* known, it is clear that Mr. Bucklew is entitled to a stay of execution under *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Certainly, there is a very substantial likelihood he will succeed on the merits of his claims, and the relative harm to him is great as compared with the minimal harm to the State from staying the execution. Moreover, he has not unnecessarily delayed his claims, as he has attempted on seven occasions since 2008 to obtain funding for medical experts to render an opinion about risks attendant to executing him by lethal injection. *See, e.g., Bucklew v. Robinson*, Case No. 91556 (one of three mandamus actions before the Missouri Supreme Court regarding a request for expert funding). *To date, Mr. Bucklew has been unable to obtain any funding for experts, but given the imminence of the execution, his counsel have been fortunate enough to locate an expert, Dr. Zivot, who was willing to review the case and render opinions in the hope of receiving court funding at a later date.*

In the event the funding is granted, and Mr. Bucklew is afforded a fair opportunity to litigate his claims, he believes he will be readily able to establish that lethal injection, under Missouri's protocol, poses a very substantial risk that he will hemorrhage, choke or suffocate during the execution, and will almost certainly suffer excruciating, even torturous pain. *See Baze v. Rees,* 550 U.S. 35, 50 (2008); *Brewer v. Landrigan*, 131 S. Ct. 445 (2010).

7

# I.    Mr. Bucklew's Medical History: Additional Facts

Mr. Bucklew has suffered from the symptoms of congenital cavernous hemangioma his entire life, including frequent hemorrhaging through his facial orifices, disturbances to his vision and hearing, pain and pressure in his head, constant headaches, dizziness and episodes of loss of consciousness.  (Exh. E 202, 60, 732, 1295, 1898, 2207, 2238, 2227).   He bleeds through his mouth, nose and ears, and has sometimes bled even through his eyes.   When he is actively bleeding, he keeps gauze and biohazard bags handy.  (Exh. E 2502, 2227).

Because of the large size of Mr. Bucklew's vascular tumors – described as "very massive" – various attempts at medical treatment have failed, and Mr. Bucklew's condition is considered inoperable. (Exh. E 202, 1748).   Indeed, a specialist who examined Mr. Bucklew concluded that surgery would be "mutilating and very risky as far as blood loss." (Exh. E at 202, 140).  Mr. Bucklew has been treated with both radiation therapy and sclerotherapy – with little success.  He stopped radiation therapy when it burned his mouth, and the sclerotherapy provided no appreciable benefit.  (Exh. E at 1898, 2257).

The hemangiomas, which fill the right side of Mr. Bucklew's face, head and throat, displace healthy tissue and steal blood flow from adjacent tissues, depriving those tissues of necessary oxygen.  (Exh. D at ¶13).  It is in the nature of cavernous

Case 4:14-cv-08000-BP   Document 6   Filed 05/14/14   Page 8 of 39

hemangiomas to continuously expand, and Mr. Bucklew's have done so. (Exh. D at ¶13; Exh. E at 140, 732, 2207-08). One physician, examining Mr. Bucklew's mouth, noted the intrusion of the hemangioma into Mr. Bucklew's oral cavity, observing that the soft palate and uvula had become "impossible to visualize." (Exh. E 2207). Although the hemangioma has been "present for 20-plus years, [it] has increasingly grown larger and larger." (Exh. E 2207). Another doctor, interpreting an MRI in June 2010, described the vascular tumors as a "large complex right facial mass" that extended into pharynx, and as a result, Mr. Bucklew's airway had become "*severely compromised*." (Exh. E at 1295) (emphasis added).

Mr. Bucklew takes several medications designed to ease nerve pain, prevent seizures and ease anxiety. (Exh. E at 1898, 2240, 2238, 2516). During episodes of extreme pain, Mr. Bucklew's blood pressure spikes; his medical records also document bouts of intense shaking and loss of consciousness. (Exh. E at 2506; 2238).

## II.    Missouri's Lethal Injection Protocol

Missouri's lethal injection protocol calls for the administration of 5 grams of pentobarbital, administered through an IV line into the execution chamber, where the prisoner is alone and strapped to a gurney. (Exhs. G, H). No medical personnel

Case 4:14-cv-08000-BP   Document 6   Filed 05/14/14   Page 9 of 39

are close at hand, and the prisoner is monitored remotely from the "execution support room." (Exhs. G at 2; Exh. H).  Although medical personnel insert the IV lines at the outset, the lethal drug itself is injected by non-medical personnel pushing syringes into the IV line at a pre-determined flow rate.  (Exh. G; Exh. H at 4).

The procedure itself begins with the insertion of the IV lines – one in each arm (or a central line in the femoral, jugular or subclavian vein if venous access in the arms is limited).  (Exh. G).  About 15 to 30 minutes before the lethal drug is injected, a saline solution, which includes methylene blue, is injected into the prisoner to determine if the lines are clear.  (Exh. H at 3; Exh. L).  The gurney is positioned so medical personnel can remotely observe the prisoner's face, directly, "or with the aid of a mirror."  (Exh. H at 2).

Non-medical personnel administer the lethal drug through syringes into the IV lines. (Exh. G, H).  After the administration of the initial 5 grams of pentobarbital, the non-medical personnel flush the IV lines with saline and methylene blue.  (Exh. G, L).  Shortly thereafter, the execution chamber's curtains are closed and medical personnel check the prisoner to see if he is dead. (Exh. G at 2).

If the prisoner is not dead, then non-medical personnel then inject an additional 5 grams of pentobarbital through two additional syringes. (Exh. G at 2).

During the administration of the lethal drug, no one is in the execution chamber other than the prisoner, and no medical personnel are at hand. (Exhs. G, H). The prisoner is monitored only remotely from the "execution support room." (Exh. H at 2 ). The members of the execution team only enter the execution chamber when the curtains are closed and only to determine if the prisoner has died. (Exh. H). They check after administration of the first 5 grams of pentobarbital, and then again after the administration of the second 5 grams of pentobarbital. (Exh. G at 2).

If the prisoner does not die after the administration of 10 grams of pentobarbital, Missouri's protocol provides no further guidance. The protocol is completely silent on what procedures to follow in the event the lethal drugs do not properly enter the prisoner's body or do not properly circulate within the body. (Exh. G).

If the prisoner is not killed by the execution, there is no protocol nor equipment for resuscitating the prisoner. (*See* Exh. G). If the execution is halted, and the prisoner remains alive, the State of Missouri must resume medical care of

the prisoner, as it is obligated to do so under the Eighth Amendment of the United States Constitution. Missouri's protocol is completely silent on this point.

An execution in Oklahoma was recently halted because the lethal drugs did not properly enter the prisoner's body and did not cause death. (Exhs. C, K). The prisoner, Clayton Lockett, reportedly died of a heart attack after the attempt to execute him failed. (Exhs. C, K). After Mr. Lockett groaned and writhed and it was clear he was still alive, Oklahoma officials hastily dropped the blinds on the execution chamber. (Exhs. C, K). They reportedly considered taking Lockett to the hospital to resuscitate, but it was too late. (Exh. K).

Mr. Bucklew's medical condition creates a substantial risk that the execution will not proceed as intended, and that the lethal drug will not properly circulate in Mr. Bucklew's body, leading to a prolonged and excruciating execution or perhaps even a repeat of what happened to Mr. Lockett. Further, the weak, malformed veins in Mr. Bucklew's head and throat could easily rupture – leading to bleeding, choking and suffocation. (Exh. D ¶¶9-28).

There is no aspect of Missouri's execution protocol that addresses how to handle the risks posed by a prisoner's unique medical or physical condition, particularly a congenital vascular condition such as Mr. Bucklew's, which creates very grave risks.

Although Mr. Bucklew's medical records run into the thousands of pages, the "Pre-Execution Summary of Medical History" – to be reviewed by medical personnel on the execution team – is one short page, asking such simplistic questions as whether the "offender recently had a cold or flu" or suffered from "back pain." (Exh. F). There is no consideration of adverse medication interactions, and "yes" answers to any of the screening questions are to be answered in three lines at the bottom of the page. (Exh. F).

Missouri's protocol is grossly inadequate to address the significant risks posed to Mr. Bucklew during an execution – risks that could cause a prolonged and excruciating procedure, in which Mr. Bucklew bleeds through his mouth, nose or ears, and possibly chokes or suffocates on his own blood.

No medical assistance will be at hand – instead the "medical personnel" will be watching from the "execution support room," unable to lend any aid to Mr. Bucklew.

### III. Risks to Mr. Bucklew During Lethal Injection

After review of his medical records and imaging studies, Dr. Zivot has identified the risks to Mr. Bucklew as:

- ■ Hemorrhaging in his face, mouth or throat and bleeding into his airway, resulting in coughing, choking and a feeling of suffocation;

13

- Experiencing a spike in blood pressure – a side effect of the methylene blue, which is administered with the IV fluids – which heightens the risk of rupture in the unstable vascular tumors;

- Struggling to breathe or suffocating because of the partial blockage in his airway;

- Suffering adverse medication interactions, which may have the effect of increasing pain; and

- Suffering a prolonged, excruciating execution because of the failure of the lethal drugs to properly enter or circulate in Mr. Bucklew's body due to the vascular malformations.

(*See* Exh. D at ¶¶ 9-28).

These risks are not speculative or hypothetical; they are based on extensive documentation in Mr. Bucklew's medical records, covering many exams by many physicians who have treated complications from Mr. Bucklew's large, unstable hemangiomas.

Dr. Joel Zivot is a board-certified anesthesiologist who teaches at the Emory University School of Medicine, and serves as Medical Director of the Cardio-Thoracic Intensive Care Unit at Emory University Hospital. (Exh. D at ¶¶2-5).

14

Dr. Zivot has reviewed Mr. Bucklew's medical records as well as Missouri's Execution Protocol and related documents. (Exh. D at ¶¶6-8). Dr. Zivot identifies several substantial risks arising from any attempt to execute Mr. Bucklew under Missouri's protocol. All of these risks create a great likelihood that Mr. Bucklew will suffer an excruciating and torturous execution characterized by hemorrhaging, choking and straining to breathe through a constricted airway. These risks also create a great likelihood that the execution will not only be extremely painful, but will also be prolonged because the lethal drug will not circulate properly in Mr. Bucklew's malformed veins. (Exh. D at ¶¶15-19).

Before the lethal drug is even injected, Mr. Bucklew is at risk from the use of methylene blue, which is part of the saline mixture used to check the flow in the IV line. Dr. Zivot notes that methylene blue is a nitric oxide scavenger, which will "cause a spike in blood pressure if injected." (Exh. D, ¶16; *see also* Exh. J at ¶¶6-11).

The use of methylene blue in Mr. Bucklew's execution raises a very substantial risk of hemorrhage, as the hemangiomas are a "plexus of blood vessels that are abnormally weak and can easily rupture, even when the blood pressure is normal." (Exh. 1, ¶17).

If Mr. Bucklew's "blood pressure spikes after the methylene blue injections, the hemangiomas, now further engorged with blood, are likely to rupture, resulting in significant bleeding in the face, mouth and throat." If blood enters Mr. Bucklew's airway, "it would likely cause choking and coughing, which Mr. Bucklew will experience as severe pain and suffocation." (Exh. 1, ¶18).

As a result of his vascular tumors, Mr. Bucklew has a partially obstructed airway. This greatly heightens the risk that Mr. Bucklew could suffocate during the execution. (Exh. D at ¶¶15-18)

There is also a very substantial risk that, because of Mr. Bucklew's vascular malformations, the lethal drug will not circulate as intended. (Exh. D at ¶19). The abnormal circulation will inhibit the effectiveness of the pentobarbital, thereby delaying the depression of Mr. Bucklew's central nervous system. (*Id.*). Another physician, neuroradiologist Gregory Jamroz, M.D., who practices at St. Luke's Hospital in St. Louis, states that Mr. Bucklew's vascular malformations may impair the circulation of the lethal drug, imperiling the ability to bring about the intended rapid death. (Exh. I at ¶¶14-22). Dr. Jamroz notes the likelihood of "marked shunting" of the blood due to the vascular malformations, adding "[r]egardless of the precise quantity of shunting, presence of the vascular malformations *compromises the supply of blood to the brain.*" (Exh. I at ¶21).

The reduced effectiveness of the pentobarbital and the delayed depression of the central nervous system will create a substantial risk of a prolonged and extremely painful execution for Mr. Bucklew. (Exh. D, ¶19). All of these risks are augmented by the fact that Mr. Bucklew takes several medications to manage his medical condition. This creates a substantial risk of adverse events resulting from drug interactions. (Exh. D ¶¶22-25).

Pentobarbital is not an analgesic, but is an *antalgesic* – that is, it tends to exaggerate or worsen pain. The risks arising from drug interactions and the antalgesic effects of pentobarbital are further compounded by the use of the compounded lethal drug, which, unlike a manufactured drug, carries no guarantees of its safety, potency, or purity. (Exh. D at ¶¶23-25; Exh. J, Declaration of Dr. Larry Sasich).

To date, Defendants have given little or no attention to the risks that attend the execution of Russell Bucklew. Belatedly, on May 7, 2014, counsel in the Missouri Attorney General's Office contacted counsel for Mr. Bucklew and inquired about conducting a venous study of Mr. Bucklew's arms. There was no request to conduct any scans of the bloated vascular malformations in Mr. Bucklew's face, head and throat.

Indeed, Defendants have obtained no imaging studies of Mr. Bucklew's cavernous hemangioma since 2010,l when an MRI was performed. The imaging report described Mr. Bucklew's hemangioma as "a large complex right facial mass" and noted that Mr. Bucklew's airway was "severely compromised." (Exh. E at 1295).

In order to evaluate whether Mr. Bucklew can be executed consistently with the Constitution or what precautions must be taken, full and complete imaging studies must be conducted. (Exh. D at ¶¶20-21). The vascular malformation occupies much of the right side of Mr. Bucklew's head, extending into his nose, sinuses, jaw, mouth and throat. (Exh. E at 60, 70, 140, 202, 158-59, 732, 1295, 2207). It puts constant pressure on his face, and may extend into the brain. (*Id*.; *see also* Exh. D at ¶¶10, 20).

To understand the full extent of the cavernous hemangioma, a high resolution scan of Mr. Bucklew's chest, neck, head and brain must be performed, with and without contrast. If the CT scan does not fully characterize the extent of the known soft tissue tumors, then an MRI should be performed. In addition, a venogram and ultrasound evaluation should be performed of Mr. Bucklew's upper extremities to determine venous patency and vascular access locations. (Exh. D at ¶¶20-21).

18

Although there are aspects of the lethal injection protocol that, superficially, appear to draw on medical expertise, lethal injection does not possess any of the safeguards of the practice of medicine and anesthesiology. (Exh. D at ¶¶26-27). Execution team members either lack the necessary training to safely carry out lethal injection – particularly in the case of someone like Mr. Bucklew who has a complex medical condition – or they are acting explicitly contrary to the dictates of safe medical practice. (*Id*.). Because of the numerous and immense risks to Mr. Bucklew during an execution, he should be monitored throughout by a qualified physician who is in the execution chamber for the purpose of being able to revive Mr. Bucklew in the event the execution is unsuccessful. (Exh. D at ¶28). The physician would not be a member of the execution team and would have no role or assignment in any way with the lethal injection. (*Id*.).

*The State of Missouri has no plan for handling an execution that does not proceed as intended. Significantly, there is no equipment or protocol for resuscitating a prisoner who survives an execution.* (Exh. G). The State of Missouri lacks any kind of backup or contingency plan for unanticipated events during an execution. (Exh. G). Contingency plans are especially important given the likelihood of adverse events during an execution of someone like Mr. Bucklew who has a very serious medical condition. The risk of adverse events is further heightened by the use of compounded drugs that are not approved or reviewed by

the FDA and which are not prepared in an FDA-regulated facility. (Exh. J at ¶¶12-20; Exh. D at ¶25). The risk of contaminants, allergens, and improperly adjusted pH levels is particularly substantial with compounded drugs. (Exh. J at ¶¶12-20). Yet, the State of Missouri provides no information whatsoever about its lethal drug and will not even confirm whether the drug is tested for safety, potency or purity. (*See* Doc #397, Motion for Protective Order at 1-2).

The lack of transparency regarding the lethal drug, the flaws in Missouri's lethal injection protocol including its lack of contingency plans, and Mr. Bucklew's severe vascular abnormalities and obstructed airway all create a situation of extreme risk to Mr. Bucklew, where he is highly likely to experience a prolonged, excruciating and torturous execution.

**LEGAL ARGUMENT**

**I.      Standards Governing a Stay of Execution**

Mr. Bucklew is requesting a stay of execution for the purpose of allowing him to undergo necessary medical examinations and testing so that the substantial risks posed by lethal injection may be fully and accurately assessed.

The present lawsuit must be sharply distinguished from the litigation in *Zink v. Lombardi*, Case No. 12-4209, as *Zink* involved a facial challenge to Missouri's lethal injection protocol with regard to *all death row prisoners*. The present

lawsuit, by contrast, involves a challenge to the protocol *as applied* to Mr. Bucklew, based on his unique – and rare – medical condition, which gives rise to specific and grave risks during a lethal injection.

The standards for a stay of execution are well established and well known to this Court. The relevant considerations for granting a stay are: (1) the prisoner's likelihood of success on the merits; (2) the relative harm to the parties; and (3) the extent to which the prisoner has unnecessarily delayed his claim. *See Hill v. McDonough*, 547 U.S. 573, 584 (2006); *Nelson v. Campbell*, 541 U.S. 637, 649-50; *Nooner v. Harris*, 491 F.3d 804, 808 (8th Cir. 2007). All three factors weigh overwhelmingly in Mr. Bucklew's favor.

### A. Mr. Bucklew Is Likely to Prevail on the Merits of His Claims

To prevail on his Eighth Amendment claim that proceeding with his execution would constitute Cruel and Unusual Punishment (Count I), Mr. Bucklew must show that a substantial risk exists that, during the execution, he will suffer severe and needless pain and suffering – an objectively intolerable risk of harm. *See Baze v. Rees,* 550 U.S. 35, 50 (2008); *Brewer v. Landrigan*, 131 S. Ct. 445 (2010).

On the particular facts of this case, the Eighth Amendment standard is easily satisfied. The risks to Mr. Bucklew during an execution are both unprecedented

21

and extreme. Through Dr. Zivot, as well as Dr. Jamroz and Dr. Sasich, Mr.

Bucklew has presented *uncontroverted evidence* that during an execution he will

likely:

- Suffer hemorrhaging in his face, mouth or throat, resulting in bleeding through his facial orifices and/or bleeding into his airway,

- Cough, choke and experience feelings of suffocation as a result of bleeding in his throat and airway;

- Experience a spike in blood pressure, as a result of stress or as a side effect of the methylene blue that is administered with the IV fluid, thus further heightening the risk of a vascular rupture and additional bleeding;

- Struggle to breathe or suffocate because the partial blockage in his airway will be further aggravated by predictable swelling of the hemangiomas and secretions or blood leaking into his airway;

- Suffer adverse medication interactions, which may have the effect of increasing pain; and

- Suffer a prolonged, excruciating execution because of the failure of the lethal drugs to properly enter or circulate in Mr. Bucklew's body, due to the vascular malformations.

(*See* Exh. D at ¶¶ 9-28; *see also* Exhs. I, J).

These risks are not speculative or "spin" from a thin set of facts. They are readily apparent from even a layperson's review of Mr. Bucklew's medical records. The risks are substantial – indeed overwhelming – and they suggest the likelihood of a botched, catastrophic, or failed execution.

Mr. Bucklew's counsel has consulted widely and has been unable to find one other prisoner who has been executed with anything remotely close to the medical complications that Mr. Bucklew has. *Even the gurney itself poses a threat to Mr. Bucklew. Because of his airway obstruction, he cannot sleep lying flat as the airway becomes more constricted. Based on the distortion in his anatomy caused by the hemangiomas, Mr. Bucklew cannot be executed in a recumbent position.* Attempting to make Mr. Bucklew lie flat and securing him with straps is likely to further obstruct his airway, and make him struggle and gasp for air in a state of panic.

The Department of Corrections has given no consideration to this likely scenario, and has not taken any precautions to address this problem.

Similarly, the Department of Corrections has given no apparent thought to Mr. Bucklew's severely compromised airway. His airway is not only largely obstructed, it is also "friable" and will easily tear or bleed if anything is inserted into it. Thus, the standard equipment used by medical personnel to maintain an

open airway will only make Mr. Bucklew's problems worse. He will bleed into his airway, his hemangiomas will swell, and his ability to take in air will become even more compromised. There is a great likelihood that, instead of dying from the lethal drug, he will die from inability to breathe.

Stress or pain typically increases Mr. Bucklew's blood pressure, and the stress of the execution is almost certain to cause Mr. Bucklew's blood pressure to rise. Further aggravating the situation is the Department's use of methylene blue with the saline solution used to confirm a clear IV line. (Exhs. G, H, L). A side effect of methylene blue is that it will cause a spike in blood pressure when injected – increasing the risk of vascular rupture and causing greater bleeding through Mr. Bucklew's facial orifices and in his throat. (Exh. D at ¶¶17-18). The execution protocol has no provision for monitoring blood pressure during the execution or what steps to take should blood pressure spike. (Exh. G).

As Dr. Zivot stated in his affidavit, Mr. Bucklew's cavernous hemangiomas "are a plexus of blood vessels that are abnormally weak and can easily rupture, even when blood pressure is normal." (Exh. D at ¶17). If his blood pressure spikes after injection of the methylene blue, "the hemangiomas, now further engorged with blood, are likely to result in significant bleeding in the face, mouth, and throat." (Exh. D at ¶18). If blood enters Mr. Bucklew's airway, "it would likely cause choking and coughing, which Mr. Bucklew will experience as severe

pain and suffocation." (*Id.*). Again, Missouri's protocol is silent on steps that may be taken to keep Mr. Bucklew's airway open, and, in fact, there may be no means to do it, short of having a surgeon available to perform an emergency tracheostomy.

These are not speculative possibilities based on far-fetched extrapolation. Mr. Bucklew bleeds on a regular basis in the course of daily activities, and has been seen numerous times by doctors for bleeding problems and the pain and pressure in his face caused by the hemangiomas. (Exh. E). When the bleeding becomes more copious, the prison medical office equips him with gauze and a biohazard bag. (Exh. E at 2227).

Mr. Bucklew could also suffer adverse medication interactions during the execution, thereby increasing his pain. (Exh. D at ¶¶22-25). Pentobarbital is not an *analgesic*, it is an *antalgesic* – that is, it tends to exaggerate or worsen pain. (Exh. D at ¶23). It could interact with the other central nervous system depressants that Mr. Bucklew takes daily to manage pain and have the effect of increasing the pain that Mr. Bucklew experiences, thereby creating a substantial risk of an extremely painful death. (Exh. D at ¶24).

Then there is the very troubling likelihood that Mr. Bucklew's vascular malformations will impair or inhibit the proper circulation of the lethal drug,

thereby prolonging the execution and creating a great risk of a torturous death. (Exh. D at ¶19; Exh. I at ¶¶19-23, Jamroz affidavit).   Again, this risk is not speculative.  The failed Lockett execution in Oklahoma showed what can go wrong when the lethal drugs do not properly enter or circulate in the body.  (Exhs. C, K). The midazolam failed to make Mr. Lockett unconscious, and instead he struggled, writhed and groaned in pain.  (*Id.*).  The execution was terminated when officials realized that Lockett had not been rendered unconscious because the drug did not enter his vein, either because of a vein collapse or improper placement of the IV needle.  (*Id.*).   When the execution was terminated, officials discussed whether to have Lockett transferred to a hospital, but then he supposedly suffered a massive heart attack and died.  (*Id.*).

This horrific scenario could repeat itself in Missouri – and perhaps be even worse, with Mr. Bucklew bleeding from his facial orifices and gasping for air. This is a scenario that, presumably, no one wants to see.

Missouri's execution team has no training or qualifications to deal with these possibilities.  The execution is largely carried out by the team's non-medical members – employees of the Department of Corrections – who have no training in how to deal with a medically fragile individual or how to handle complications or adverse events during the course of the execution.  Moreover, there is no attempt to plan for such possibilities or probabilities ahead of time.  The only medical

26

screening for inmates prior to execution is the Pre-Execution Medical History Form – which is short, superficial and useless in the case of someone with extensive and complex medical history – and provides no guidance whatsoever to execution team members. (Exh. F).

Given (1) the complexity of Mr. Bucklew's medical condition; (2) the failure to provide training to execution team members to deal with risks like hemorrhaging, choking or suffocating; (3) the failure of Missouri's protocol to address how to handle the execution of medically compromised individuals; and (4) the lack of appropriate monitoring or the inability to intervene during the execution creates an extraordinarily high risk in Mr. Bucklew's case of a torturous, catastrophic or failed execution. All of these likely outcomes unquestionably violate the Eighth Amendment. Thus, Mr. Bucklew has a great likelihood of succeeding on his Eighth Amendment claim, as stated in Count I of his Complaint. *See Hill v. McDonough*, 547 U.S. 573, 584 (2006).

The great likelihood that Mr. Bucklew will succeed on his Count I claim is further underscored by the Eleventh Circuit's decision in *Siebert v. Allen*, 506 F.3d 1047 (11th Cir. 2007). In that case, the appeals court reversed the district court's denial of a preliminary injunction in an as-applied challenge to Alabama's lethal injection protocol. The prisoner had pancreatic cancer and was terminally ill. In reversing the district court, the Eleventh Circuit relied in significant part on

medical testimony that the prisoner had "very compromised venous access." *Id*. at 1050. The court stated: "The stay previously entered by this Court shall remain in effect until the time that the district court has entered judgment on the merits." *Id*.

With regard to Mr. Bucklew's claim under the Eighth and Fourteenth Amendments as pled in Count II, it is clear that Defendants have been deliberately indifferent to Mr. Bucklew's serious medical needs, including a complete failure to provide appropriate tests and medical care in advance of a known execution date. *See Schaub v. Vonwald*, 638 F.3d 905, 914 (8th Cir. 2011).

As noted above, Defendants purport to provide some medical "screening" in advance of the execution by obtaining a "Pre-Execution Medical History." The one-page form is woefully, indeed absurdly, inadequate to provide any meaningful information to the execution team regarding Mr. Bucklew, whose medical history spans thousands of pages.

Although Mr. Bucklew's execution date has been known for six weeks, Defendants have not taken any steps to provide appropriate examinations or imaging in advance of the execution for the purpose of identifying specific risks or to consider how to ameliorate them. Although Mr. Bucklew's medical records are replete with references to bleeding episodes and his severely obstructed airway, there has been no consideration whatsoever of how to deal with complications

28

during an execution. There are no contingency plans for handling complications, no adjustments to the protocol to reflect Mr. Bucklew's unique medical needs (like his inability to lie flat because of his airway obstruction), no change in the protocol to remove known hazards (such as methylene blue) or to provide for any means to maintain an open airway, even in light of the fact that Mr. Bucklew's airway was once so compromised that doctors performed a tracheostomy in 2000. (*See* Exh. E at 486). The likelihood that Mr. Bucklew will experience secretions in his airway, swelling of his hemangiomas and resultant choking and suffocation is great. Yet, no steps have been taken to address this. Similarly, there has been no consideration of the likelihood that the lethal drug will not circulate properly in Mr. Bucklew's system. Despite knowing this fact – for many years now – Defendants took no steps, despite their constitutional responsibility, to obtain any imaging studies to address this issue. Indeed, no imaging study has been performed on Mr. Bucklew's cavernous hemangiomas since June 2010. (Exh. E at 1295).

Given the potential for a "botch" or a complete failure of the execution, Defendants have also failed to take any reasonable and necessary steps to provide for that eventuality. There is no protocol or equipment for resuscitation, nor any personnel designated to undertake this task. Again, the protocol is completely silent on this point. (Exh. G).

Until Mr. Bucklew is executed, if he survives an attempt at execution, he remains a prisoner of the State of Missouri, under the care and control of the Department of Corrections. As such, the Department of Corrections has an obligation under the Eighth Amendment to provide for his serious medical needs – and, in that regard, they have completely failed. They have taken no steps to identify serious risks associated with an attempt to execute Mr. Bucklew, nor have they made any effort to take any precautions or to provide any special training to their execution team.

To prove an Eighth Amendment claim, Mr. Bucklew must show that the inmate suffered from an objectively serious medical need and that the prison officials knew of the need yet deliberately disregarded it. *Schaub*, 638 F.3d 905, 914. In this case, there is an "obvious risk of harm," and so there is a well justified inference that officials "subjectively disregarded a substantial risk of serious harm to the inmate." *Schaub*, 638 F.3d at 915. When there is potential harm to "future health," the inmate must show deliberate indifference to "conditions posing a substantial risk of serious future harm." *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995).

In this case, the scheduled execution of Mr. Bucklew poses a "substantial risk of serious future harm" in terms of unconstitutional pain and suffering during the execution. Yet, the Defendants have taken no steps to prepare for and attempt

30

to ameliorate that harm by obtaining appropriate medical examinations and imaging studies, or by making appropriate adjustments to the execution protocol or by providing the means for resuscitation should the execution fail.

Defendants have violated not only the Eighth Amendment, they have also violated Mr. Bucklew's right to substantive due process. Thus, he satisfies *Hill*'s requirement that he show a substantial likelihood of success on the merits of these claims.

Finally, with regard to Count III, Mr. Bucklew also has a very substantial likelihood of success on his First Amendment claim. The total lack of any information concerning the safety, purity and potency of the lethal drug poses *unique* risks to Mr. Bucklew. Even the methylene blue – regarded as a benign substance when used in previous executions – poses a risk of a spike in blood pressure, which could cause Mr. Bucklew's fragile and malformed blood vessels to rupture. (Exh. D at ¶¶16-18; *see also* Exh. J at ¶¶6-11). Plaintiff's expert pharmacologist, Dr. Larry Sasich, also cites a host of other dangerous possibilities resulting from the use of an unknown drug that is not even confirmed to have gone through laboratory testing. He states that the risks to Mr. Bucklew are "substantial and include the presence of cross-contaminants …[as well as] allergens that can cause immediate severe allergic reactions, improperly adjusted pH (acidity), contamination with live bacteria or fungi, and bacterial endotoxins." (Exh. J at

31

¶19).  There is also the possibility with any compounded drug "that the product is sub potent or super potent."  (*Id.*).   All of these unknowns – which create risks for any prisoner – create especially grave risks for Mr. Bucklew, whose malformed vessels are friable and rupture easily, leading to hemorrhaging and other potentially catastrophic complications.  (*See* Exh. D at ¶¶9-25).

Because of the secrecy surrounding the lethal drug and complete lack of disclosure concerning the drug's safety, purity and potency, Mr. Bucklew is deprived of his right under the First Amendment to petition the government for redress of his grievances.  As the Eighth Circuit has recognized, the right to petition the government for redress of grievances, as guaranteed by the First Amendment, is "among the most precious of the liberties safeguarded by the Bill of Rights."  *United Mine Workers v. Illinois State Bar Association*, 389 U.S. 217, 222 (1967); *see also Harrison v. Springdale Water & Sewer Comm'n,* 780 F.2d 1422, 1427-28 (8th Cir. 1986).  Clearly, the right of access to the courts is a critical aspect of that First Amendment right, as well as an essential component of Due Process under the Fourteenth Amendment.  *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

Absent disclosure of adequate information about the lethal drug – including whether it is tested and what the results are – Mr. Bucklew is unable to exercise his right to petition the government for redress of grievances or his right of access to

the courts. Defendants' extreme secrecy – as applied in the unique circumstances of Mr. Bucklew's case – thus violates Mr. Bucklew's rights under the First and Fourteenth Amendments, and there is a very substantial likelihood that he will prevail on this claim.

## B.  The Factor of Relative Harm to the Parties Weighs Strongly in Mr. Bucklew's Favor

Mr. Bucklew would suffer irreparable harm without a stay. Of course, the death penalty is "obviously irreversible." *Evans v. Bennett*, 440 U.S. 1301, 1306 (1979) (Rehnquist, J., granting stay as a Circuit Justice). Conversely, the harm to Defendants is the mere administrative inconvenience of seeking another execution warrant once the medical examinations and imaging of Mr. Bucklew have been completed. Thus, the balance of harms weighs overwhelmingly in Mr. Bucklew's favor.

## C.  Mr. Bucklew Has Timely Asserted His Claims

The Missouri Supreme Court set an execution date on April 9, 2014. Since that time, Mr. Bucklew's counsel – uncompensated at present based on denials of CJA funding – have worked constantly and unceasingly in an effort to secure appropriate medical examination and testing for Mr. Bucklew. It is essential to point out, however, that counsel's current efforts are not the first. *Indeed, the*

Case 4:14-cv-08000-BP   Document 6   Filed 05/14/14   Page 33 of 39

*effort to obtain court funding for experts to examine Mr. Bucklew dates back to*

*2008. Counsel have now filed eight different requests with the federal courts and*

*Missouri state courts to authorize funds for the examination and testing of Mr.*

*Bucklew.* Indeed, an immense and unfair burden has been imposed on counsel to

accomplish what they believe the Rules of Professional Conduct and the ABA

Model Rules for Capital Representation[1] require in terms of zealous and effective

representation – yet, they have been totally denied the means to procure necessary

medical consultation, testing and examination.

The experts presently assisting in the representation of Mr. Bucklew – Dr.

Joel Zivot, Dr. Gregory Jamroz, and Dr. Richard Wetzel (a neuropsychologist

assisting with clemency) – are all providing services in the absence of any

compensation from the court. Mr. Bucklew's family has very limited means, and

the only possibility of funding is a small payment to one of the experts to

compensate for a small portion of the many hours that have been required to

review records and render opinions.

---

[1] *See* American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (*Rev. ed. 2003), available at: http://www.americanbar.org/content/dam/aba/uncategorized/Death_Penalty_Repre sentation/Standards/National/2003Guidelines.authcheckdam.pdf.

As stated, counsel has litigated the issue of funding for experts persistently and constantly since 2008, first raising it in *Bucklew v. Luebbers*, Case No. 03-3721 (denial in sealed order), then raising it in several mandamus actions, captioned *Bucklew v Robinson,* in Missouri State Courts, including Cole County in 2009 (Case No. 09AC-CC0076), the Missouri Court of Appeals in 2010 (Case No. 72984), and the Missouri Supreme Court on three occasions in 2009, 2010, and 2011 (Case Nos. 90198, 90924, 91556).   Further, a request for CJA funding was denied in this court, in *Bucklew v. Luebbers*, in February 2012 (Case No. 01-8000), and counsel have worked without any compensation for themselves or for their experts.

Finally, a request for funding filed in 2014, after the execution date, was again denied in Case No. 01-8000, and the Eighth Circuit just issued an order on May 13, 2014, stating it lacked jurisdiction to review this order.  *Bucklew v. Luebbers*, Case No. 14-2020.

Counsel has thus worked under very adverse circumstances, not only being denied compensation while trying to handle the rest of their practice, but also paying for out of pocket costs themselves, including travel, photocopying and costs for obtaining medical records.

At the point the execution was imminent, counsel was fortunate enough to locate experts who were willing to either review records for no fee, or were willing to go ahead and do the work on the hope that either the Court at some point would authorize funding or that Mr. Bucklew's family would be able to come up with a small amount of money to partially pay for the expert's time.

As these facts show, counsel has been raising the issue of Mr. Bucklew's hemangiomas since 2008, and has repeatedly and persistently sought funding for experts to render opinions. In the meantime, Mr. Bucklew's condition has grown worse – his hemangiomas are larger, his pain is more severe and constant, and his airway is more severely obstructed.

In the meantime, the party with the resources and the constitutional obligation to carry out these responsibilities of providing appropriate medical care and providing for appropriate testing and examinations prior to the execution date has utterly failed to do so. It was not until May 7, 2014, that counsel for the DOC or Attorney General's office even proposed any type of imaging whatsoever – and at that point, they proposed only a venous study of Mr. Bucklew's arms. Clearly, state officials have acted with deliberate indifference toward Mr. Bucklew's medical needs for a very long time.

On the other hand, Mr. Bucklew and his counsel have been exceptionally diligent in seeking funding for experts and in trying to prove that Mr. Bucklew's fragile medical condition poses immense and troubling risks during any attempt to execute him by lethal injection. And it was only in the past several weeks – when an execution was imminent – that it became clear that despite the pending lethal injection that Defendants did not plan to take any steps whatsoever to properly care for Mr. Bucklew's serious medical needs and assess his risks in advance of the execution.

Under all of these circumstances, Mr. Bucklew has been exceptionally diligent in attempting to raise and prove his claims. Thus, this third factor under *Hill v. McDonough* also weighs in his favor. *Hill*, 547 U.S. at 584.

## CONCLUSION

Based on the foregoing facts regarding Mr. Bucklew, it is absolutely clear that lethal injection is not a one-size-fits-all procedure. Based on the severity of Mr. Bucklew's medical condition and the immense risks posed during any attempt to execute him, he is entitled to a stay of execution until appropriate medical examinations and imaging have been conducted. The First, Eighth and Fourteenth Amendments require that Mr. Bucklew at least be afforded a fair opportunity to establish that, in his present medical condition, executing him in the absence of

adequate testing and information violates the First, Eighth and Fourteenth

Amendments.

Respectfully Submitted

MORGAN PILATE, LLC
 /s/    Cheryl A. Pilate
Cheryl A. Pilate Mo. # 42266
Lindsay J. Runnels Mo. 62075
926 Cherry Street
Kansas City, MO 64106
Telephone: 816-471-6694
Facsimile: 816-472-3516
cpilate@morganpilate.com
lrunnels@morganpilate.com

**CERTIFICATE OF SERVICE**

I, Cheryl A. Pilate, hereby certify that the above and foregoing was served

on all counsel of record via the Court's electronic filing system on May 14, 2014.

     /s/  Cheryl A. Pilate