# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

RUSSELL BUCKLEW,                    )
      *Plaintiff*,                )
v.                                  )    **Case No. 14-08000**
GEORGE A. LOMBARDI,                 )
DAVID A. DORMIRE,                   )
And                                 )
TERRY RUSSELL,                      )
      *Defendants.*               )

## THIRD AMENDED COMPLAINT

Plaintiff Russell Bucklew, by and through his counsel, files his Third Amended Complaint, requesting this Court declare and enforce his rights under the First and Fourteenth Amendments and issue an injunction under 42 U.S.C. § 1983 and the Eighth Amendment commanding defendants not to carry out any execution by lethal injection on him. Because of Mr. Bucklew's medical condition, Missouri's execution procedures will almost certainly cause him to suffer a bloody, prolonged and excruciating death.

Mr. Bucklew suffers from a rare disease – cavernous hemangioma – that is unique, severe, and progressive. Since Mr. Bucklew filed the present lawsuit in May 2014, his condition has grown worse, with the blood-engorged, unstable tumors in his head and throat causing daily pain, regular bleeding, and an ever-enlarging obstruction to his airway, causing him to struggle for air when he lies

1

flat. The blood-filled tumors are prone to rupture under stress or any rise in blood pressure. When this occurs, Mr. Bucklew bleeds through his facial orifices and in his throat, further obstructing his airway and causing him to choke.

Any attempt to execute Mr. Bucklew under Missouri's present protocol, or by *any* means of lethal injection, will almost inevitably lead to a prolonged and tortuous execution, with Mr. Bucklew hemorrhaging, struggling to breathe and suffocating.

The severe risks posed to Mr. Bucklew by lethal injection are further heightened by the Department of Corrections' use of a secret drug of unknown origin that could inflict additional pain and suffering. The DOC is using either a compounded form of pentobarbital, which carries a variety of risks including bacterial contamination and sub-potency, or it is using a manufactured drug of unknown origin.[1] Although FDA-approved pentobarbital manufactured for human use is not available for sale to prison systems, compounding pharmacies (that prepare individual batches of drugs upon prescription) have moved into the vacuum and have prepared individually compounded lethal doses of pentobarbital for prison systems in various states, including Texas, Georgia and Missouri. Although Texas and Georgia have experienced severe problems with maintaining

---

[1] Although Missouri has maintained since October 2013 that its lethal drug is a 5 gram dose of *compounded* pentobarbital, it has recently hedged about this, stating in its brief in opposition to the petition for writ of certiorari in *Zink v. Lombardi*, Case No. 14-9223, that it "does not admit or deny the chemical now used is compounded as opposed to manufactured [pentobarbital]." Brief in Opposition (filed April 30, 2015).

2

an adequate supply of pentobarbital and other states cannot obtain it at all (leading to experimentation with alternative drug protocols), Missouri alone seems to have access to a steady supply of pentobarbital and has built up a large inventory of the drug. Missouri's drug inventory has accumulated even as some other states have stopped conducting executions because they can no longer obtain access to pentobarbital.

Missouri's ability to readily procure pentobarbital remains unexplained, as the Missouri Department of Corrections provides no information as to the origin of its lethal drugs. Interestingly, in a recent filing in the United States Supreme Court, the State of Missouri hinted that it may no longer be using *compounded* pentobarbital, but may be using *manufactured* pentobarbital, a drug whose distribution is tightly controlled by manufacturers, who bar its sale for use in executions. It is, however, widely available from non-FDA approved sources, the black market, and from veterinary suppliers. In its Brief in Opposition to the Petition for Writ of Certiorari filed in *Zink v. Lombardi*¸ the defendants stated that the State of Missouri "does not admit or deny that the chemical now used is compounded as opposed to manufactured." *Zink v Lombardi,* Case No. 14-9223 (filed April 30, 2015).

Putting aside the issue of the drug's origin, Mr. Bucklew's medical condition is so grave and the risks of hemorrhage and airway obstruction are so

3

great that execution by lethal injection with _any_ drug creates a very substantial risk that Mr. Bucklew will suffer a tortuous and prolonged execution, in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.

With regard to the issue of an "alternative method," that method would have to be determined by the State of Missouri, which presently authorizes execution only by lethal injection or lethal gas.  Mo. Rev. Stat. § 546.720.1.  It is therefore up to the executive and legislative branches of the State of Missouri to determine which alternative methods of execution are both "feasible" and "readily implemented."  (_See_ Order of March 18, 2015 at 1).  Mr. Bucklew recognizes that other methods of execution that the State could choose would be constitutional, but that is an issue for the elected leaders of the State of Missouri to determine.

## INTRODUCTION

1.  Mr. Bucklew suffers from a dangerous, and, at times, debilitating congenital condition – cavernous hemangioma – that causes clumps of weakened, malformed vessels to grow in his head, face, neck, and throat, displacing healthy tissue and rupturing under stress.  Mr. Bucklew has had this condition since birth, and his vascular malformations have grown progressively worse throughout adulthood, causing constant facial pain and pressure and labored breathing.

2.  Mr. Bucklew's vascular malformations have proved resistant to any form of medical or surgical treatment.  Surgery has been rejected because the results

4

would be both disfiguring and disabling, and the only medical treatment for the past several years has been pain management.

3. Mr. Bucklew's vascular tumors are massive, occupying his nose, throat, and airway passages. He hemorrhages on a regular basis, and sometimes experiences a major rupture with extensive bleeding.

4. The size of Mr. Bucklew's tumors and the weakness of his distended vessels create a very substantial risk that he will suffer excruciating, even tortuous pain during an execution.

5. Because the vascular tumors partially obstruct Mr. Bucklew's airway, he is at high risk of choking during an execution, particularly if the distended vessels in his mouth or throat rupture and bleed. This will cause gasping, coughing and choking that Mr. Bucklew will experience as suffocation.

6. There is also a grave risk that, because of Mr. Bucklew's severe vascular malformations, the lethal drug will not circulate as intended, delaying the suppression of the central nervous system and prolonging the execution – which will likely cause excruciating pain to Mr. Bucklew. These grave risks – which create a substantial risk that any execution by lethal injection would violate Mr. Bucklew's rights under the Eighth Amendment – are heightened even further by the use of a drug, pentobarbital, in the absence of any disclosure about the drug's

origin or its safety, purity and potency. In fact, the Missouri Department of Corrections will not even disclose whether the drug is subject to any laboratory testing whatsoever, a troubling omission that raises serious questions about the source of the drug.

7. Because of his unique condition, Mr. Bucklew cannot be executed under Missouri's protocol without inflicting cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

8. Mr. Bucklew's medical condition is well documented in the Department of Corrections' own records, which describe the hemangiomas as "very massive" and "extensive" with "bulging lesions." As repeatedly documented, the hemangiomas cause chronic facial pain, recurrent bleeding, frequent headaches and spells of dizziness and even loss of consciousness. Mr. Bucklew also suffers from impaired hearing and vision.

9. Various therapies to treat the hemangiomas – including chemotherapy, radiation therapy and sclerotherapy – have all failed, and doctors have stated that any effort to remove them surgically would be "mutilating and very risky as far as blood loss." Mr. Bucklew is presently on a regimen of daily narcotic pain medication.

10. Mr. Bucklew's vascular tumors have grown throughout his adult life, including his 19 years in prison, and have continued to grow progressively larger in the last year. Despite the progressive nature of his condition and Missouri's obligations under the Eighth Amendment, the Department of Corrections (DOC) has obtained no diagnostic imaging (CT scans or MRI) in the past five years. This is significant because the imaging studies are necessary to guide proper medical care and day-to-day management of Mr. Bucklew's condition. They also are essential to provide the information that Mr. Bucklew needs to litigate his present claims. Indeed, even though Mr. Bucklew has made clear for more than a year his need for up-to-date imaging, the Department of Corrections still has not arranged such diagnostic testing, despite its constitutional obligation to do so.

11. By the mid-1990s, doctors noted that the hemangiomas were impinging on Mr. Bucklew's airway. In 2010, an MRI established that the large degree of airway obstruction was beyond dispute. Following an MRI in June 2010 – the last diagnostic imaging provided to Mr. Bucklew, the treating physician issued a report describing Mr. Bucklew's tumors as a "large complex right facial mass" that extended through the right-side nasal passages, sinuses, pharynx, jaw, palate and throat. As a result of the large mass, Mr. Bucklew's *"airway is severely compromised."* (Emphasis added).

12.    Two highly trained, board-certified physicians – an anesthesiologist who teaches at the Emory University School of Medicine and a neuroradiologist who practices at St. Luke's Hospital in St. Louis – have provided sworn statements stating that Mr. Bucklew's vascular malformations create a significant risk that the lethal drug will not circulate properly during an execution.  This will create a great risk of prolonging the execution and causing Mr. Bucklew to suffer excruciating pain.

13.  Both doctors state in their affidavits that an examination of Mr. Bucklew and his vascular malformations is necessary to evaluate the specific risks to Mr. Bucklew during an execution.

14.  Dr. Joel Zivot, the Emory anesthesiologist, has reviewed Mr. Bucklew's medical records and imaging studies and has also examined him at the prison.  Dr. Zivot has focused on the substantial degree of airway obstruction, and concluded that during an execution, Mr. Bucklew is at a very high risk of coughing, choking and suffocating to death.

15. Dr. Zivot states, in his expert opinion, that:

-- a substantial risk exists that Mr. Bucklew will suffer from "extreme or excruciating pain as a result of hemorrhaging or abnormal circulation of the lethal drug, leading to a prolonged execution";

8

-- Mr. Bucklew's airway, partially obstructed by unstable and blood-engorged tumors, creates a very substantial risk that Mr. Bucklew could choke, cough and gasp for air during an execution;

-- any increase in Mr. Bucklew's blood pressure during an execution greatly increases the risk that Mr. Bucklew will suffer hemorrhaging in his face, mouth and throat, leading to further coughing and choking and increasing the risk of suffocation; and,

-- Mr. Bucklew's multiple medications create a substantial risk of an adverse drug interaction during an execution.

(*See* Zivot Declaration of May 8, 2014, Exhibit 1 at ¶¶ 15, 17, 18).

16.  To monitor the delivery of the drug and flush the intravenous lines, the training regimen for defendants' execution has provided for the use of methylene blue as a dye in the IV line.   (Exhibit 1 at ¶ 17)   As Dr. Zivot noted, however, methylene blue tends to cause a rise in blood pressure – a dangerous side effect that would likely prompt Mr. Bucklew's hemangiomas, already engorged with blood, to "rupture, resulting in significant bleeding in the face, mouth and throat." If blood enters Mr. Bucklew's airway, "it would likely cause choking and coughing, which Mr. Bucklew will experience as severe pain and suffocation." (Ex. 1 at ¶18).  Moreover, the use of methylene blue creates a great risk of a

dangerous drug interaction with the regular medications that are prescribed to Mr. Bucklew, including those that are necessary to treat his psychiatric condition.

17. Mr. Bucklew brings this lawsuit, as the sole plaintiff, because his situation is unique and the risks to him during an execution are grave. The claims raised in this suit are based on his particular medical condition and are separate and distinct from those raised in *Zink v. Lombardi*, Case No. 12-4209 (W.D. Mo).

18. Unlike the Eighth Amendment claims in the Zink case, which specifically challenge the use of compounded pentobarbital, Mr. Bucklew's claims rest on his specific and unique medical condition. Although the risks to Mr. Bucklew are heightened further by the use of a compounded drug of unknown origin, purity and potency, lethal injection by *any* drug creates a very substantial risk that Mr. Bucklew will suffer hemorrhaging, choking and suffocation during the execution, thereby inflicting cruel and unusual punishment in violation of the Eighth Amendment.

19. Thus, it is clear that the claims of Mr. Bucklew are wholly separate from the claims raised in *Zink*, and it is clear from the stay of execution granted by the United States Supreme Court that Mr. Bucklew's ability to prevail on his claims bears no relationship to the ability of the other *Zink* petitioners to prevail on theirs.

Indeed, the two cases rest on completely separate and distinct facts and legal theories.

20.   Mr. Bucklew recognizes that this Court has directed him to identify a "feasible and readily implemented alternative procedure that will *significantly* reduce a substantial risk of severe pain that the State refuses to adopt."  Order of March 18, 2015 at 1 (emphasis in original).  Further, Mr. Bucklew acknowledges and agrees that "other methods of lethal injection the Department [of Corrections] could choose to use would be constitutional."  *See Hill v. McDonough*, 547 U.S. 573, 580 (2006).

21.   In the unique circumstances presented here, any alternative method of execution would have to be a method other than lethal injection.  Such a method would necessarily have to be determined by the State of Missouri, which presently authorizes only lethal injection or lethal gas.  Mo. Rev. Stat. §546.720.1.  It is therefore up to the executive and legislative branches of the State of Missouri to determine which alternative methods of execution are both "feasible" and "readily implemented."

22.   To proceed with his Eighth Amendment claims – supported primarily at this point by a physician who has not been granted access to conduct a full

Case 4:14-cv-08000-BP   Document 46   Filed 06/18/15   Page 11 of 57

examination – Mr. Bucklew needs a complete medical exam complete with appropriate imaging studies.

23.  To properly identify and evaluate the risks that are unique and specific to Mr. Bucklew – and therefore to provide the further factual underpinning for his Eighth Amendment claims – Mr. Bucklew must be provided a high resolution CT scan of his chest, head, neck and brain.   As is the case with any other litigant, Mr. Bucklew seeks access to the discovery tools afforded by the Federal Rules of Civil Procedure so that he can meet his burden of proof, establishing that execution by lethal injection creates a "substantial risk of serious harm" and an "objectively intolerable risk of harm" and is "sure or very likely to cause serious illness and needless suffering." *Baze v. Rees*, 553 U.S. 35, 50-52 (2008).

24.  Further, Mr. Bucklew needs the opportunity to conduct discovery to ascertain what other methods of execution would be regarded as both "feasible" and "readily implemented" by the State of Missouri.   Certainly, there are other methods of execution, including lethal gas (authorized by Mo. Rev. Stat. §546.720.1), and Mr. Bucklew needs to be able to conduct necessary discovery concerning these methods.

25.  Mr. Bucklew and his counsel lack medical and scientific expertise, and also lack full and complete information regarding both Mr. Bucklew's condition

and the capabilities of the Missouri Department of Corrections. Any attempt to satisfy the *Baze* standard, absent discovery, would necessarily involve speculation rather than facts grounded in good faith investigation, as required by the Federal Rules of Civil Procedure. Mr. Bucklew cannot plausibly propose a "feasible and readily implemented alternative procedure" absent adequate discovery. Therefore, as will be explained in upcoming motions for discovery and for the appointment of experts, Mr. Bucklew intends to seek the information that would be necessary for him to litigate this case under the standard set forth by this Court.

## JURISDICTION AND VENUE

26. Jurisdiction is conferred by 28 U.S.C. §1331 and §1343, which provide for original jurisdiction of this Court in suits based respectively on federal questions and authorized by 42 U.S.C. §1983, which provides a cause of action for the protection of rights, privileges or immunities secured by the Constitution of the United States. Jurisdiction is further conferred by 28 U.S.C. §2201 and §2202, which authorize actions for declaratory and injunction relief.

27. Venue is proper in the Western District of Missouri under 18 U.S.C. §1391(b)(1)-(3) in that defendant Lombardi resides in the territorial jurisdiction of this district, and defendant Lombardi's decisions regarding Missouri's execution protocol are made within this court's territorial jurisdiction.

13

## PARTIES

28.  Plaintiff Russell Bucklew is a resident of the State of Missouri and presently resides at Potosi Correctional Center in Mineral Point, Missouri.  He is sentenced to death, and was scheduled to die by lethal injection on May 21, 2014, but obtained on that date a stay of execution from the United States Supreme Court, pending the outcome of his appeal to the Eighth Circuit Court of Appeals, *Bucklew v Lombardi*, Case No. 14-2163.  Mr. Bucklew has exhausted his claims administratively through Potosi's grievance procedures.

29.  Defendant George Lombardi is the Director of the Department of Corrections (DOC) of the State of Missouri.  His office is located at the DOC's central office at 2729 Plaza Drive, Jefferson City, Missouri.

30.  A Missouri statute, Mo. Rev. Stat. §536.720 authorizes and directs the Director of the DOC to prescribe and direct the means by which the Department carries out executions within the statutorily prescribed methods of lethal gas or lethal injection.  Director Lombardi fulfills that statutory role and carries out those responsibilities.

31.  Defendant David R. Dormire is the Director of the Division of Adult Institutions at the Department of Corrections of the State of Missouri.  His office is also at the DOC's central office in Jefferson City, Missouri.

14

32. Defendant Dormire is the chief executive officer of the Division of Adult Institutions, and has command-and-control authority over the DOC officials, officers and employees who are involved, directly or indirectly, with carrying out executions.

33. Defendant Terry Russell is the Warden of the Eastern Reception and Diagnostic & Correctional Center (ERDCC), 2727 Highway K, Bonne Terre, Missouri. The State of Missouri has conducted its executions at ERDCC since April 2005.

34. By virtue of his authority over the staff at ERDCC, defendant Russell is responsible for the manner in which executions are conducted in Missouri.

35. All defendants are sued in their official and individual capacities. All actions taken by them are taken under color of state law.

## FACTUAL BACKGROUND

### **Russell Bucklew's Medical Condition**

36. Mr. Bucklew has suffered from the symptoms of congenital cavernous hemangioma his entire life, including frequent hemorrhaging through his facial orifices, disturbances to his vision and hearing, difficulty breathing, pain and pressure in his head, constant headaches, dizziness, and episodes of loss of

consciousness. He frequently bleeds through his mouth, nose and ears, and has sometimes bled even through his eyes.

37. The hemangiomas—which are clumps of weak, malformed vessels – fill Mr. Bucklew's face, head, neck and throat, displacing healthy tissue and stealing blood flow from normal adjacent tissues, depriving those tissues of necessary oxygen.

38. The hemangiomas are vascular tumors, and, by their nature, these tumors continuously expand. Although the tumors are classified as benign, their growth is locally invasive and destructive.

39. Over the years, Mr. Bucklew's doctors have noted recurrent episodes of bleeding and associated hospitalizations. One doctor consulted about the bleeding stated: "I have real concerns that this I/M [inmate] may have future *uncontrollable bleeding*." (Emphasis added). Another doctor noted the "increasing frequency of bleeding [in the] oral cavity and nose."

40. Mr. Bucklew's hemangiomas grow throughout his head, neck and throat, protruding even into his airway, causing labored breathing and requiring him to sleep with his upper body elevated. Doctors have repeatedly noted the looming threat from the growing obstruction in Bucklew's airway. A specialist examining Bucklew in 2010 stated that a "complex right facial mass" extended to

16

the parapharyngeal space and occupied a large area with the "oropharynx and hypopharynx" right above the epiglottis. As a result, Mr. Bucklew's airway, partially obstructed for many years, was now *"severely compromised."* (Emphasis added). In the last five years, Mr. Bucklew has particularly suffered from labored breathing and cannot sleep lying flat as the tumor then fully obstructs his airway.

41. Over the years, doctors have attempted treatment on many occasions, only to conclude that the available treatments – chemotherapy, sclerotherapy, radiation therapy and surgery – hold no appreciable chance of success.

42. In 1991, a specialist who examined Mr. Bucklew and treated his hemangioma for many years noted that any attempt to surgically remove the vascular tumor "would require extensive surgery which would be mutilating and *very risky as far as blood loss."* (Emphasis added).

43. Over the years, various attempts at other therapies -- sclerotherapy, chemotherapy and radiation therapy -- have all failed. An April 2012 report notes the minimal success of the treatments and states: "The large size makes the hemangioma not amenable to sclerotherapy." The report also notes that surgery would result in "large concomitant disability and disfiguration."

44. Doctors have described the hemangiomas as "very massive," "extensive" and a "large complex…mass." In March 2003, a doctor caring for

Mr. Bucklew wanted him examined immediately by a specialist because of the progression of the vascular tumor, which the doctor believed "could be *potentially fatal to the patient*." (Emphasis added).

45.  In 2011, a doctor described the alarming expansion of the hemangioma, stating it encompassed "the entire soft palate and uvula, which are impossible to visualize due to the expansion of the lesion."  The doctor further noted: "This lesion also extends into the right cheek and entire right maxilla.  *This has been present for 20 plus years but has increasingly grown larger and larger.*" (Emphasis added).

46.  Throughout the medical records, doctors repeatedly warn of the ongoing expansion of the vascular tumor.  There are also many references to "recurrent bleeding," pain associated with bleeding, and increasing frequency of oral and facial hemorrhages.

47.  The possibility of another attempt at treatment was dismissed in April 2011, when Mr. Bucklew's doctor observed "there was minimal benefit from the previous sclerotherapy" and that the "large size" of the hemangioma precluded effective treatment with sclerotherapy.

48.   A physician's report in 2011 noted Mr. Bucklew's increasing anxiety regarding the growth of the hemangiomas and the obstruction of his airway: "He is

also afraid that the hemangioma will occlude his throat and he cannot breathe." Subsequent reports document difficulty with "bleeding management," and a report in March 2013 describes an episode of severe pain, with lightheadedness and loss of consciousness. Doctors ordered narcotic drugs for pain.

49. Periodically, the blood-filled tumors rupture, and Mr. Bucklew bleeds in his throat and through his facial orifices. Medical personnel provide gauze and biohazard bags so that he can collect the bloody discharge.

50. Mr. Bucklew frequently suffers from nausea, dizziness and bouts of excruciating pain. He is treated with narcotic pain medication, which he must take three times per day.

51. In recent months, Mr. Bucklew's condition has continued to worsen, a course long predicted by his doctors given the progressive nature of cavernous hemangioma. He is experiencing increased episodes of pain and dizziness and has ongoing problems with balance and coordination. The bleeding in his nasal and oral cavities has grown worse, and the bloody tumors are now pressing into Mr. Bucklew's right eye, causing problems with his vision.

52. Along with the tumor growth, Mr. Bucklew has also experienced a vast array of new and deeply troubling psychiatric symptoms in recent months.

Case 4:14-cv-08000-BP   Document 46   Filed 06/18/15   Page 19 of 57

Although he previously suffered from extreme anxiety and mood swings, Mr. Bucklew's mental issues have grown dramatically worse since May 2014.

53.  Following his return to Potosi Correctional Center from the death house at Bonne Terre (where he came within hours of execution), Mr. Bucklew has suffered from auditory and visual hallucinations, flashbacks, nightmares, and episodes of uncontrollable crying.  In a short period of time, he lost 20 pounds and suffered constant insomnia.  A prison psychiatrist diagnosed him with "stress-induced psychotic reaction."  For the past 10 months, Mr. Bucklew has been on a heavy regimen of psychiatric drugs, including medication used to treat psychosis, schizophrenia and bipolar disorder.

**Missouri's Lethal Injection Protocol.**

54.  Missouri's lethal injection protocol calls for the administration of 5 grams of pentobarbital, divided into two syringes, and administered through an IV line into the execution chamber, where the prisoner is alone and strapped to a gurney.  No medical personnel are close at hand, and the prisoner is monitored remotely from the "execution support room."  Although medical personnel insert the IV lines at the outset, the lethal drug itself is injected by non-medical personnel pushing syringes into the IV line at a pre-determined flow rate.

20

55.  The procedure itself begins with the insertion of the IV lines – one in each arm (or a central line in the femoral, jugular or subclavian vein if venous access in the arms is limited).  About 15 to 30 minutes before the lethal drug is injected, a saline solution, which has historically been colored with methylene blue (or another dye), is injected into the prisoner to determine if the lines are clear. The gurney is positioned so medical personnel can remotely observe the prisoner's face, directly, "or with the aid of a mirror."   Medical personnel "monitor" the prisoner remotely during the execution.

56.  Non-medical personnel administer the lethal drug through syringes into the IV lines.  After the administration of the initial 5 grams of pentobarbital, the non-medical personnel flush the IV lines with saline and methylene blue.  Shortly thereafter, the execution chamber's curtains are closed and medical personnel check the prisoner to see if he is dead.

57.  If the prisoner is not dead, then non-medical personnel then inject an additional 5 grams of pentobarbital through two additional syringes.

58.  During the administration of the lethal drug, no one is in the execution chamber other than the prisoner, and no medical personnel are at hand.  The prisoner is monitored only remotely from the "execution support room."  The members of the execution team only enter the execution chamber when the

curtains are closed and only to determine if the prisoner has died. They check after administration of the first 5 grams of pentobarbital, and then again after the administration of the second 5 grams of pentobarbital.

59. If the prisoner does not die after the administration of 10 grams of pentobarbital, Missouri's protocol provides no further guidance. The protocol is completely silent on what procedures to follow in the event the lethal drugs do not properly enter the prisoner's body or do not properly circulate within the body.

60. If the prisoner is not killed by the execution, there is no protocol or equipment for resuscitating the prisoner.

61. If the execution is halted, and the prisoner remains alive, the State of Missouri must resume medical care of the prisoner, as it is obligated to do under the Eighth Amendment of the United States Constitution. Missouri's protocol is completely silent on this possible scenario.

62. A 2014 execution in Oklahoma was halted because the lethal drugs did not properly enter the prisoner's body and did not cause death. The prisoner, Clayton Lockett, reportedly died of a heart attack after the attempt to execute him failed. After Mr. Lockett groaned and writhed and it was clear he was still alive, Oklahoma officials hastily dropped the blinds on the execution chamber. They reportedly considered taking Lockett to the hospital to resuscitate, but it was too

late.  A subsequent review of the botched execution concluded that an improperly placed intravenous line allowed the drugs to perfuse surrounding tissue rather than flowing directly into Lockett's bloodstream.  The problems with the Lockett execution could easily repeat themselves – in an even more horrific fashion – with an attempt to execute Mr. Bucklew, given his gross vascular abnormalities and the risk of venous rupture.

63.  Mr. Bucklew's unique vascular malformations create a substantial risk that the execution will not proceed as intended, and that the lethal drug will not properly enter or circulate in Mr. Bucklew's body, leading to an ugly, prolonged and excruciating execution.  The weak, malformed veins in Mr. Bucklew's head and throat could easily rupture – leading to facial bleeding, internal hemorrhaging, choking and suffocation.

64.  The risk that the lethal drug will not properly enter Mr. Bucklew's veins is heightened by the apparent abandonment – at least at present – of the use of any dye in the IV line.  Although the execution team training records show that they have been trained to carry out their tasks aided by the use of a dye in the IV line – which helps team members determine if the solution is flowing properly into the prisoner's veins as opposed to diffusing in the surrounding tissue  -- records recently obtained through a request under Missouri's Sunshine Act, Mo. Rev. Stat. 610.010 *et seq*., show that the Department of Corrections has not possessed either

methylene blue or indigo carmine since February 2015. There is nothing in the protocol that specifically addresses the use of dye or how team members – including its non-medical members – can safely run the IV line and inject the lethal drug in the absence of a visual indicator that the line is flowing properly

65. Further, there is no aspect of Missouri's execution protocol that addresses how to handle the risks posed by a prisoner's unique medical or physical condition, particularly a congenital vascular malformation such as Mr. Bucklew's, which creates very grave risks. The last-minute protocol adjustments proposed by the State of Missouri in May 2014, as discussed below, not only fail to ameliorate any potential risks to Mr. Bucklew, they actually increase the risk of an extended, excruciating procedure that will be visually horrifying to witnesses and tortuous for Mr. Bucklew.

66. Although Mr. Bucklew's medical records run into the thousands of pages, the "Pre-Execution Summary of Medical History" – to be reviewed by medical personnel on the execution team – is merely one page, asking such simple questions as whether the "offender recently had a cold or flu" or suffered from "back pain."

67.  There is no consideration of adverse medication interactions or serious chronic conditions or grave illness.  A "yes" answer to any of the screening questions must be answered in three lines at the bottom of the page.

68.  Missouri's protocol is grossly inadequate to address the significant risks to Mr. Bucklew during an execution – risks that could cause a prolonged and excruciating procedure, in which Mr. Bucklew hemorrhages through his mouth, nose, eyes or ears, and chokes or suffocates on his own blood.

69.  No medical assistance will be at hand – instead the "medical personnel" will be watching from the "execution support room," unable to lend any aid to Mr. Bucklew.

**Affidavit of Dr. Gregory Jamroz**

70.  Gregory Jamroz, M.D. is board-certified radiologist.  He practices in the specialty of neuroradiology at St. Luke's Hospital in St. Louis, Missouri.

71.   After reviewing the medical records of Mr. Bucklew, Dr. Jamroz concluded to a reasonable degree of scientific certainty that the use of a blood-borne sedative or other drug would not likely bring about a rapid, humane death for Mr. Bucklew, given his unique medical condition.  (Exhibit 2 at ¶ 23).  Dr. Jamroz stated that Bucklew's vascular malformations cause "shunting" of the blood, which would likely affect the circulation of the lethal drug to the brain.

25

72.  Dr. Jamroz opined that an examination was essential to determine the precise quantity of shunting.  But regardless of the "quantity of shunting, [the] presence of vascular malformations compromises the supply of blood to the brain." (Exhibit 2 at ¶ 21).  These malformations have been present in Mr. Bucklew's head and neck since infancy. (Exhibit 2 at ¶ 14).  The hemangiomas are "tangle[s] of arteries and veins" with "low vascular resistance," which leads to "shunting" of the blood and decreased blood flow to the brain.   (Exhibit 2 at ¶¶ 15-19)

73.  Dr. Jamroz concluded: "[I]t is my opinion to a reasonable degree of scientific certainty that reliance on a blood-borne sedative or other substance to bring about a rapid and painless death in Mr. Bucklew's case is questionable, and that in light of the pre-existing medical condition discussed in this declaration, examination of the vascular malformations is indicated…."  (Exhibit 2 at ¶ 23).

**Affidavit of Dr. Joel Zivot**

74.  Dr. Joel Zivot is a board-certified anesthesiologist who teaches at the Emory University School of Medicine and serves as Medical Director of the Cardio-Thoracic Intensive Care Unit at Emory University Hospital.

75.  Dr. Zivot has reviewed Mr. Bucklew's medical records as well as Missouri's Execution Protocol and related documents.  Also, in May 2014, he examined Mr. Bucklew at Potosi Correctional Center, although a full exam could

not be conducted because of the inadequate lighting, limited facilities and restrictions imposed by the DOC.

76.    Based on his review of Missouri's execution protocol and Mr. Bucklew's medical records, Dr. Zivot opines that a "substantial risk exists that, during [an] execution, Mr. Bucklew will suffer from extreme or excruciating pain as a result of hemorrhaging or abnormal circulation of the lethal drug, leading to a prolonged execution." (Exhibit 1 at ¶15).

77. Dr. Zivot identifies unique dangers arising from Mr. Bucklew's partially obstructed airway, including "a very substantial risk that during an execution he could suffocate." (Exhibit 1 at ¶15).   Dr. Zivot also observes that Mr. Bucklew is prescribed several medications, including medications for pain, and there a "substantial risk he will suffer an adverse event from drug interactions." (Exhibit 1 at ¶15).  Since Dr. Zivot issued his initial Declaration, the number and dosage of Mr. Bucklew's medications have increased, creating an even greater risk of adverse medication interactions, as discussed further below.

78.   Before the lethal drug is even injected, Mr. Bucklew is at risk from the use of methylene blue, which occupies a critical role in Missouri's execution procedures.  Methylene blue (the dye previously used by the DOC) is part of the saline mixture supposedly used to check the flow in the IV line and to ensure that

27

the lethal drug is properly flowing into the vein rather than simply spreading into the surrounding tissues. Although methylene blue would not pose a risk to most inmates, it poses a unique and grave risk to Mr. Bucklew. Methylene blue is a nitric oxide scavenger and will likely "cause a spike in blood pressure if injected." (Exhibit 1, ¶16; *see also* Exhibit 3 at ¶¶ 8-9, 20, Declaration of Dr. Larry Sasich).

79.   Blood pressure is not monitored during lethal injection. Yet, any spike in blood pressure raises a great risk of hemorrhage for Mr. Bucklew, as the hemangiomas are a "plexus of blood vessels that are abnormally weak and can easily rupture, even when the blood pressure is normal." (Exhibit 1, ¶17).

80.   If Mr. Bucklew's "blood pressure spikes after the methylene blue injections, the hemangiomas, now further engorged with blood, are likely to rupture, resulting in significant bleeding in the face, mouth and throat." If blood enters Mr. Bucklew's airway, "*it would likely cause choking and coughing, which Mr. Bucklew will experience as severe pain and suffocation.*" (Ex. 1¶ 18) (Emphasis added). The suffocation risk is further heightened by the fact that Mr. Bucklew's airway is severely obstructed, and any further swelling of the hemangiomas or rupturing of the tumors would likely cause Mr. Bucklew to gasp and struggle for air.

81.  Mr. Bucklew's vascular malformations also give rise to a great risk that the lethal drug will not circulate as intended.  The cavernous hemangiomas create "alternative low-resistance pathways to injected drugs."  It is highly likely "that this abnormal circulation will inhibit the effectiveness of the pentobarbital…." (Exhibit 1 at ¶ 19).

82.  The "reduced effectiveness of the pentobarbital and the delayed depression of the central nervous system will create a substantial risk of a prolonged and extremely painful execution for Mr. Bucklew."  (Exhibit 1 at ¶19).

83.  All of these risks are further augmented by the fact that Mr. Bucklew takes several medications to manage his medical condition, including narcotic pain medication and several psychiatric medications.  This creates a substantial risk of adverse events resulting from drug interactions.  (Exhibit 1 at ¶ 22).  The risk of a dangerous drug interaction has increased greatly in the last year, as additional, potent drugs have been prescribed to address Mr. Bucklew's worsening psychiatric problems, including stress-induced psychotic reaction and post-traumatic stress disorder.  The need for a thorough evaluation of all of Mr. Bucklew's medications is addressed further below, and will require consultation with experts as well as additional discovery from the Department of Corrections.

84.   The lethal drug itself poses additional problems.  Pentobarbital is not an analgesic (pain reducer), but is, in fact, an *antalgesic*, that is, it tends to exaggerate or worsen pain. (Exhibit 1 at ¶ 23).   Mr. Bucklew's medications may interact with pentobarbital – an antalgesic – in a manner that increases pain, causing a substantial risk that Mr. Bucklew will experience an extremely painful death. (Exhibit 1 at ¶ 24).

85.   The risks arising from drug interactions and the antalgesic effects of pentobarbital are further exacerbated by the use of a compounded drug, which, unlike a manufactured drug, carries no guarantees of its safety, potency, or purity. (Exhibit 1 at ¶¶23-25; Exhibit 3 at ¶¶ 12-20, Declaration of Dr. Larry Sasich).

86.   To date, Defendants have accorded little or no attention to the risks that attend the execution of Russell Bucklew, other than proposing hasty, last minute changes to the protocol aimed at rushing Mr. Bucklew into the execution chamber when he faced a May 21, 2014 execution date.

87.   Just two weeks before that scheduled date, on May 7, 2014, counsel in the Missouri Attorney General's Office contacted counsel for Mr. Bucklew and inquired about conducting a venous study of Mr. Bucklew's arms.  There was no request to conduct any scans of the engorged and unstable vascular malformations in Mr. Bucklew's head, neck and throat.

88.  Indeed, the Department of Corrections has obtained no imaging studies of Mr. Bucklew's cavernous hemangioma since 2010 when an MRI was performed.  The imaging report described Mr. Bucklew's hemangioma as "a large complex right facial mass" and noted that Mr. Bucklew's airway was "severely compromised."

89.  In contrast to the indifferent conduct of the Missouri Department of Corrections, counsel for Mr. Bucklew endeavored to obtain a timely examination of Plaintiff in May 2014.  Although hindered by a lack of resources and the inability to examine Mr. Bucklew in a properly equipped medical setting, Dr. Zivot was able to conduct at least a limited visual examination and medical interview.

90.  Following that examination, on May 12, 2014, Dr. Zivot provided a supplemental affidavit stating additional opinions and observations.  (*See* Exhibit 4).

91.  Dr. Zivot noted that during the examination that Mr. Bucklew's blood pressure was elevated, 140/100 on both arms, representing severe hypertension. (Exhibit 4 at ¶ 4).  Certainly, an increase in blood pressure was not surprising, given the stress of the then-scheduled execution and Mr. Bucklew's fear and discomfort.

92.  Examining the interior of Bucklew's mouth and throat, Dr. Zivot noted a "very large vascular mass" that arises "through the hard palate, extends into the upper maxilla on the right, and fully encompasses the uvula and distorts the anatomy of Mr. Bucklew's airway." (Exhibit 4 at ¶ 4).

93.  Mr. Bucklew's airway is "severely compromised or obstructed due to the hemangiomas." The airway "is also friable, meaning it is weak and could tear or rupture. If you touch it, it bleeds." (Exhibit 4 at ¶ 6).

94.  Dr. Zivot observed that if Mr. Bucklew were his patient, "managing his airway would be a top priority during any medical procedure" and would require the "highest level of vigilance from a medical team." (Exhibit 4 at ¶ 7). Indeed, the only way to properly perform a medical procedure on Mr. Bucklew would be to perform it in a hospital with a fully equipped surgical suite and the ability to do an emergency tracheostomy if necessary. (Exhibit 4 at ¶ 8).

95.  During an execution, Mr. Bucklew will be at "great risk of choking and suffocating because of his partially obstructed airway and complications caused by the hemangiomas." (Exhibit 4 at ¶ 9). At the same time, the use of any tube or other standard airway equipment typically used to maintain an open airway will only create more problems "as the placement of any device in the pharynx will

cause instant bleeding" and such bleeding would further constrict the airway and also impair the visibility of it. (Exhibit 4 at ¶10).

96. Executions are conducted on a gurney, and the risks arising from Mr. Bucklew's airway are even greater if he is lying flat. (Exhibit 4 at ¶ 11). Because of the hemangiomas, Mr. Bucklew is unable to sleep in a normal recumbent position because the tumors cause greater obstruction in that position. (Exhibit 4 at ¶ 11). "Mr. Bucklew's airway tumors are of a dynamic nature. That is, they worsen when he is recumbent, even when recumbent for only a few moments." (Exhibit 4 at ¶ 11).

97. Dr. Zivot further opines that any increase in Mr. Bucklew's blood pressure, such as from stress, will only further aggravate the vascular tumors and increase the risk of airway obstruction. If any secretions enter the airway or he starts breathing hard – because of stress or any other cause – his airway will become even more constricted. (Exhibit 4 at ¶ 12). This will likely start a "dangerous cycle in which more strenuous attempts to breathe by Mr. Bucklew will only increase the degree of his airway obstruction....[T]he harder he tries to breathe, the less air he will get." (Exhibit 4 at ¶ 12).

98. Any effort to prevent such a gruesome scenario for Mr. Bucklew in any medical setting would require physicians experienced in airway management to be

at arm's length proximity to Mr. Bucklew and prepared to perform an emergency tracheostomy. (Exhibit 4 at ¶ 14).

99.  Missouri's execution protocol provides no contingency for a failed execution or any situation in which a prisoner starts gasping for air or experiences hemorrhaging. (Exhibit 4 at ¶ 13).

100.  Based on Mr. Bucklew's unique and severe condition, there is no way to proceed with Mr. Bucklew's execution under Missouri's protocol "without a substantial risk to Mr. Bucklew of suffering grave adverse events during the execution, including hemorrhaging, suffocating or experiencing excruciating pain." Exhibit 4 at ¶ 16).

101.  Under any scenario or with any type of lethal drug, execution by lethal injection poses an enormous risk that Mr. Bucklew will suffer extreme, excruciating and prolonged pain – all accompanied by choking and struggling for air.

102. Mr. Bucklew's condition is inoperable and incurable.  Indeed, it is steadily progressive and will likely ultimately cause his death.  There is no medical procedure that will allow his blood-engorged tumors to be excised or reduced in size.  Therefore, any execution of Mr. Bucklew by lethal injection, regardless of

the drug used, violates the Eighth Amendment's prohibition on cruel and unusual punishment.

## Nature of Mr. Bucklew's Claims: Separate and Distinct from *Zink*

103.  Because Mr. Bucklew's claims concern the specific and unique risks posed to *him* by lethal injection, and those risks exist regardless of the drug used, his claims are entirely separate and distinct from those raised in *Zink v. Lombardi*, Case No. 12-4209.

104.  Mr. Bucklew understands that if both cases had not been dismissed, that it might have been efficient to consolidate them for discovery purposes, given the general subject matter and common parties.  The *Zink* discovery was limited, however, and no discovery has yet occurred in the *Bucklew* case.

105.  When Mr. Bucklew filed his suit on May 9, 2014, the *Zink* case was still pending before this Court and was not finally dismissed as to all claims until May 16, 2014.  (Case No. 12-4209).  Had this Court wished to consolidate the two cases, it could have done so.   Similarly, the two cases could have been consolidated in the Eighth Circuit, and they were not.   Moreover, the Eighth Circuit granted relief to Mr. Bucklew while denying relief to the other *Zink* plaintiffs, clearly suggesting that Mr. Bucklew is situated differently than the other prisoners challenging Missouri's execution procedures.   *Zink v. Lombardi*, Case

35

No. 14-2220 (March 6, 2015) (affirming dismissal of case); *Bucklew v. Lombardi*,

Case No. 14-2163 (reversing and remanding for further proceedings).

106.   Further, as is apparent, entirely different facts and legal theories

support Mr. Bucklew's claims as compared with the plaintiffs' claims in *Zink*.

None of the *Zink* plaintiffs challenged Missouri's execution protocol based on their

unique medical condition. To the contrary, their claims were almost entirely based

on the variety of risks posed by the use of compounded pentobarbital.  While those

risks are not wholly irrelevant to Mr. Bucklew's case, Mr. Bucklew's claims under

the Eighth Amendment exist regardless of the particular drug used.   The great

likelihood that Mr. Bucklew will suffer extreme and tortuous pain during an

execution is based on the dangers caused by his abnormal circulatory system, his

malformed veins, the blood-engorged tumors that fill his head and throat, and the

severe obstruction of his airway.   These physical conditions, by themselves and

irrespective of the drug used, place Mr. Bucklew at grave risk during an execution

by lethal injection.

### Mr. Bucklew's Condition Worsening in the Past 12 Months

107.  Since Mr. Bucklew filed the present lawsuit in May 2014, his medical

condition has significantly worsened, with the blood-filled tumors growing larger

and more unstable and causing additional pain, balance problems, impairment to his vision and problems with breathing.

108. Mr. Bucklew's medical records from May 2014 to the present refer to increased dizziness, episodes of stumbling and falling, increased facial pain, bleeding from his mouth, and pressure on his right eye from an encroaching hemangioma.

109. Even more pronounced than the physical changes have been the changes in Mr. Bucklew's mental state. His psychiatric condition has markedly deteriorated, and he is presently on an extensive regimen of drugs used to treat psychosis, schizophrenia and bipolar disorder.

110. One of the prison psychiatrists who treated Mr. Bucklew documented an array of alarming psychiatric symptoms that developed in the wake of Mr. Bucklew's near execution in May 2014. Although Mr. Bucklew's previous mental problems primarily involved General Anxiety Disorder, Mr. Bucklew began suffering from flashbacks, nightmares of being injected with poison, and auditory and visual hallucinations. He lost 20 pounds and had episodes of uncontrollable crying.

111. The psychiatrist diagnosed him with "stress-induced psychotic reaction," and prescribed an array of psychiatric drugs, most of which are not

typically taken together and many of which pose a risk for adverse drug interactions during an execution.

112.    The medications currently prescribed to Mr. Bucklew include Clonazepam (Klonipin), Fluphenazine (Prolixin), Hydroxyzine Pamoate (Vistaril), Mirtazapine (Remeron), Olanzapine (Zyprexa), Perphenazine (Trilafon) and Tramadol. All of the drugs, except for Tramadol, are psychiatric drugs used to treat mood disorders, psychosis, schizophrenia or bipolar disorder.

113.  In a recent psychiatric visit, Mr. Bucklew reported ongoing auditory hallucinations and/or "intrusive thoughts."  His psychiatric records contain several references to a potential diagnosis of Post-Traumatic Stress Disorder.

114.    Mr. Bucklew's medication regimen gives rise to a number of potentially troubling side effects, including "Serotonin Syndrome," for which he is already at risk, as documented in his medical records. Serotonin Syndrome results from a buildup of high levels of serotonin in the brain and features an array of troubling side effects, including twitching, lethargy, confusion, delirium, agitation, and seizures.

115. Significantly, the use of methylene blue during an execution poses an additional and severe threat to an individual already at risk for Serotonin Syndrome. In 2011, the FDA issued a "Safety Announcement," indicating that

except in emergency circumstances, methylene blue should *never* be administered to an individual at risk for Serotonin Syndrome or taking certain psychiatric drugs, including Mirtazapine (Remeron). Mr. Bucklew is presently taking Mirtazapine daily for treatment of one of his severe psychiatric conditions.

116. Any plan to move forward with an execution of Mr. Bucklew must include not only a complete physical examination of him, including imaging studies, but must also include a thorough evaluation of his medications and the potential for adverse interactions during an execution.

## Missouri's On-the-Fly Adjustments to Protocol Insufficient

117. In May 2014, as Mr. Bucklew faced an execution date and raised the issues addressed in this lawsuit, the Missouri Department of Corrections hastily attempted some last-minute, ill-considered changes to the execution protocol that would actually have the effect of *increasing* the risk to Mr. Bucklew.

118. The DOC, in response to concerns raised regarding methylene blue, stated it would not use methylene blue, but would instead use indigo carmine. (Documents obtained through a Missouri Sunshine Act request revealed that when the DOC offered this adjustment, it had already been using indigo carmine for four months, with no disclosure to counsel for any of the prisoners). When counsel for Mr. Bucklew pointed out that indigo carmine posed the same (or worse) risks as

39

methylene blue, the DOC stated it would forego the use of *any* dye, even though the execution team (which includes non-medical members) is trained only to carry out executions with the use of a medical dye in the intravenous lines.

119. The use of dye is essential to ensure that the IV line is flowing properly. It also provides a telling visual indicator if the saline infusion is not entering the bloodstream but is in fact dispersing in surrounding tissues, as it did in Oklahoma's botched execution of Mr. Lockett. Absent the use of a dye, the non-medical members of the execution team, who do the actual pushing of the syringes, will have no way of determining whether the saline solution and the lethal drug are entering Mr. Bucklew's bloodstream. Given the risks already posed by Bucklew's vascular malformations and the likelihood the drug will not circulate properly, the increased risk posed by using *no dye* – a method for which the team has received no training – poses a constitutionally intolerable threat to Mr. Bucklew.

120. The risks to Mr. Bucklew are further increased by the use of a compounded drug, pentobarbital, which, unlike a manufactured drug, carries no guarantees of its safety, potency, or purity. (Exhibit 1 at ¶¶23-25; Exhibit 3 at ¶¶ 12-20, Declaration of Dr. Larry Sasich).

121. Because the State of Missouri improperly refuses to provide any information about the safety, purity or provenance of its lethal drug – or even

confirm whether or not the drug is tested – Plaintiff is left to draw inferences about the precise nature of the drug being used. Given the seeming ease with which Missouri apparently procures what is alleged to be pentobarbital when other states are stymied in their efforts to obtain a reliable supply of the drug, one can logically infer that perhaps Missouri's drug comes from a dubious, non-FDA approved source or even a veterinary source.[2] Indeed, pentobarbital that is approved for use in animals, but not humans, is readily available from veterinary suppliers. That said, regardless of the particular drug used, execution by lethal injection poses a very substantial risk that Mr. Bucklew will suffer prolonged and tortuous pain in violation of the Eighth Amendment.

122. In May 2014, the DOC also proposed a second adjustment in its protocol, offering to adjust the gurney so that Mr. Bucklew is not lying completely prone. Although the stated intent was to reduce the choking risk to Mr. Bucklew, the DOC has obtained no imaging studies of Mr. Bucklew since 2010, and has no information on which to base any decisions about the angle of the gurney. As a practical matter, no adjustment would likely be sufficient, as the stress of the execution may unavoidably cause Mr. Bucklew's hemangiomas to rupture, leading

---

[2] The DOC has taken the position that providing an answer to the question of whether or not the drug is tested would tend to reveal the source of the drug. Plaintiff finds the DOC's position perplexing, as it tends to suggest that the drug might not be approved for use in humans or was obtained from a non-FDA approved source.

to hemorrhaging, bleeding in his throat and through his facial orifices, and coughing and choking on his own blood.

### **Diagnostic Imaging Studies Essential to Evaluate and Establish Risks**

123.  In order to fully evaluate and establish the risks to Mr. Bucklew from execution by lethal injection, a full and complete set of imaging studies must be conducted.  This is necessary to allow Plaintiff to prove his claims.

124.  Mr. Bucklew's vascular malformations occupy much of the right side of his head, extending into his nose, sinuses, jaw, mouth and throat – and, more recently, his right eye.  The blood-engorged tumors put constant pressure on Bucklew's face and brain, and may even extend into the brain.

125.   To identify the "full extent of the tumor's involvement with Mr. Bucklew's airway and brain, a repeat high resolution CT of Mr. Bucklew's chest, neck, head and brain should be performed."  (Exhibit 1 at ¶ 20).  The CT study should be performed with and without contrast to characterize the extent of the anticipated abnormal intracranial structures.   The CT scan is necessary to characterize the location and extent of the tumor and to assess the severe degree of compromise of Mr. Bucklew's airway."  (Exhibit 1 at ¶ 20).

126.   If the CT scan does not fully characterize "the extent of the known soft tissue tumors, then an MRI should be performed.  In addition, a venogram and

42

ultrasound evaluation should be performed of Mr. Bucklew's upper extremities" to determine venous patency and vascular access locations. (Exhibit 1 at ¶ 21). In addition, an angiogram would also be necessary to further establish the risks to Mr. Bucklew, and would also help determine the degree of vascularity of Mr. Bucklew's hemangiomas. (Exhibit 4 at ¶ 17).

127.   Although there are aspects of the lethal injection protocol that, superficially, appear to draw on medical expertise, lethal injection does not possess any of the safeguards of the practice of medicine and anesthesiology. (Exhibit 1 at ¶ 26).

128.   Execution team members either lack the necessary training to safely carry out lethal injection – particularly in the case of someone like Mr. Bucklew who has a complex medical condition – or they are acting explicitly contrary to the dictates of safe medical practice. (Exhibit 1 at ¶ 27).

129.  If an execution by lethal injection goes forward, the enormous risks to Mr. Bucklew necessitate monitoring by a qualified physician who is in the execution chamber for the purpose of being able to revive Mr. Bucklew in the event the execution is unsuccessful. The physician would not be a member of the execution team and would have no role or assignment in any way with lethal injection. (Exhibit 1 at ¶28).

43

130.  The State of Missouri has no plan for handling an execution that does not proceed as intended.  Significantly, there is no equipment or protocol for resuscitating a prisoner who survives an execution.

131.  The State of Missouri lacks any kind of back up or contingency plan for unanticipated events during an execution.  Contingency plans are especially important given the likelihood of adverse events during an execution of someone like Mr. Bucklew who has a very serious medical condition.  The risk of adverse events is furthered heightened by the use of compounded drugs that are not approved or reviewed by the FDA and which are not prepared in an FDA-regulated facility.  The risk of contaminants, allergens, and improperly adjusted pH levels is particularly substantial with compounded drugs. These risks are heightened further in Mr. Bucklew's case because of his weak, distended and malformed veins.   Yet, the State of Missouri has provided no information whatsoever about its lethal drug and will not even confirm whether the drug is tested for safety, potency or purity.

132.  Regardless of the drug used, however, Mr. Bucklew's severe vascular abnormalities, standing alone, create a situation of extreme risk to Mr. Bucklew, as he is highly likely to experience a prolonged, excruciating and tortuous execution.

133.   Mr. Bucklew is mindful of the Court's directive to allege a "feasible and readily implemented alternative procedure that will *significantly* reduce a

substantial risk of severe pain that the State refuses to adopt." Order of March 18, 2015 at 1 (emphasis in original). Complying fully with this directive will clearly require at least some discovery.

134.   In the event that an execution by lethal injection proceeds despite the grave risks arising from Mr. Bucklew's condition, the Department of Corrections should not proceed in the absence of a full and proper evaluation of Bucklew's present medical condition. To properly identify and evaluate these unique risks, it is essential that Mr. Bucklew receive a thorough medical examination, including all of the medical imaging studies described above. Absent a physical exam and up-to-date imaging, any attempt to reduce the risks to Mr. Bucklew during lethal injection would be based on nothing more than speculation.

135.   Given the complexity of Mr. Bucklew's medical condition, it is essential that the parties be able to obtain expert guidance from qualified professionals. At present, both sides are hampered by their lack of access to qualified medical professionals. Mr. Bucklew has no appointed expert. Further, the DOC's expert for many years, Dr. Mark Dershwitz, has informed all the states that he was advising on lethal injection, including Missouri, that he will no longer fulfill that role. Dr. Dershwitz announced his decision to terminate his role in June 2014, indicating that statements made by the State of Ohio in connection with a

particular execution could jeopardize his standing with the American Board of Anesthesiology.

136.  Obviously, Mr. Bucklew cannot further identify or quantify the risks posed by lethal injection absent counsel's consultation with a qualified medical expert.  Thus, Mr. Bucklew plans to seek the appointment by this Court of Dr. Joel Zivot.

137.  Further, with regard to "alternative methods," Mr. Bucklew needs the opportunity to conduct at least limited discovery to ascertain what other methods of execution the State of Missouri would regard as "feasible" or "readily implemented."  The devising and implementing of such alternative methods is in the hands of Missouri's elected leaders, not Mr. Bucklew or his counsel.  Given the Court's pleading requirement, however, Mr. Bucklew seeks the opportunity to conduct appropriate discovery in this area.  Mr. Bucklew has already served a Sunshine Act request on the DOC regarding execution alternatives, and awaits the DOC's response.

138.  Mr. Bucklew has complied with the requisites of the Court's pleading requirements, to the extent he is presently able.  Certainly, the stay of execution, issued by the Supreme Court on May 21, 2014, provides a strong basis for inferring that Mr. Bucklew has satisfied standards for pleading an Eighth

Amendment claim. To obtain a stay of execution, Plaintiff had to demonstrate, *inter alia*, a "likelihood of success on the merits." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). The factual allegations Plaintiff had raised to that point, which are further augmented here, were sufficient to merit a stay of execution pending the outcome of Plaintiff's appeal. Had the allegations been insufficient on their face, it is reasonable to assume the Supreme Court would not have issued a stay of execution. Thus, Plaintiff believes he has alleged all that is necessary, or even possible at this point, to be permitted to proceed further in this litigation.

139. Mr. Bucklew's claims, while fully ripe, did not accrue until it was clear that his airway obstruction would likely cause choking and suffocation during any execution. Indeed, the very substantial risk that Mr. Bucklew would suffocate to death during any execution by lethal injection is the core of his Eighth Amendment claim. That claim did not accrue until May 2014, when Dr. Zivot was able to examine Plaintiff's medical records and examine him in person, thereby identifying the grave risk posed by Mr. Bucklew's obstructed airway. Until May 2014, the Department of Corrections was in sole possession of evidence necessary to raise Mr. Bucklew's Eighth Amendment claim and had the sole ability to procure and obtain necessary diagnostic assessment and medical imaging. Prior to May 2014, when Mr. Bucklew's counsel were able – under the press of an execution date -- to persuade Dr. Zivot to undertake Mr. Bucklew's case, Plaintiff

47

had no ability to assert a viable Eighth Amendment claim and litigate a well-supported motion for stay of execution.

140.   Although Mr. Bucklew's counsel sought court funding no less than eight times in six years for the purpose of obtaining an expert opinion on Mr. Bucklew's medical condition, those requests – to the United States District Court, the Eighth Circuit and every level of the Missouri state courts – were repeatedly denied.   Because the State of Missouri repeatedly and effectively opposed Mr. Bucklew's efforts to obtain expert funding (in those instances when the requests were filed in open court, rather than *ex parte*), Respondents here should be estopped from arguing that Mr. Bucklew failed to timely assert his claims.  Indeed, it is State of Missouri that is largely responsible for Mr. Bucklew's inability, since 2008, to obtain the necessary expert services.

141.  By June 2010, the blood-engorged tumor in Mr. Bucklew's throat had grown to a sufficiently large size as to create a dangerous blockage to Mr. Bucklew's airway.  It was in the June 2010 imaging report that Mr. Bucklew's physician reported that the "large complex facial mass" had extended into multiple cavities and that Mr. Bucklew's airway was now "severely compromised."

142.  Despite the grave report issued by Mr. Bucklew's physician, the DOC obtained no further diagnostic tests or imaging of Mr. Bucklew's vascular tumors.

Since June 2010, the DOC has failed to assess or monitor the growth of Mr. Bucklew's tumors, and medical care has been restricted to the provision of medications intended to treat pain and anxiety.

143.  Under these circumstances, when the DOC had exclusive custody and control over Mr. Bucklew and exclusively held the ability to obtain appropriate testing, no claim based on Mr. Bucklew's medical condition could accrue.  At the earliest, such claim accrued at the point that Mr. Bucklew's counsel were able to obtain, with no promise of payment, the expert services and opinions of Dr. Zivot.

## Count I

### Claim Against All Defendants Under the Cruel and Unusual Punishment Clause of the Eighth Amendment Based on the Use of Missouri's Lethal Injection Protocol on Mr. Bucklew

Plaintiff realleges the foregoing and further states as follows:

144.  Execution by lethal injection poses unique and specific risks to Mr. Bucklew that arise from his lifelong and severe medical condition.

145. Executing Mr. Bucklew by lethal injection will cause extreme and needless suffering to Mr. Bucklew, including but not limited to hemorrhaging during the execution; coughing, choking and suffocating; and suffering a prolonged and excruciating execution because the lethal drug fails in its intended effect or fails to circulate properly in Mr. Bucklew's body.

146.    Mr. Bucklew's unique and severe medical condition is further exacerbated by his deteriorating psychiatric condition.  He suffers from extreme anxiety and has been diagnosed with stress-induced psychotic reaction disorder. He experiences intrusive thoughts, flashbacks and auditory and visual hallucinations.  The stress that he would almost certainly experience during an execution poses an extreme and additional risk to Mr. Bucklew, both because of the psychiatric drugs he takes which give rise to adverse interactions with methylene blue, and because the stress he experiences is likely to cause a rise in blood pressure, thereby triggering hemorrhaging.   Plaintiff knows of no steps that have been taken or will be taken to ameliorate the grave and specific risks attendant to executing Mr. Bucklew by lethal injection.

147.   If Missouri proceeds with its execution of Mr. Bucklew, it will be conducting an unregulated experiment on a human subject, as there are no studies that support Defendants' use of Missouri's lethal injection protocol on an individual suffering from vascular malformations and prone to hemorrhaging and choking or suffocating to death.

148.    Missouri's lethal injection protocol, _as applied_ to Mr. Bucklew, presents a substantial risk of causing excruciating or tortuous pain and inflicting needless suffering.

149.  Absent a thorough physical examination and complete imaging studies, it is not possible to further address whether any specific changes or adjustments would reduce the very substantial risk that Mr. Bucklew will suffer extreme and excruciating pain during an execution by lethal injection.

150.  Defendants' intended actions under their protocol, as set forth in this Third Amended Complaint, will inflict extreme, tortuous and unnecessary pain on Mr. Bucklew and will therefore violate the Cruel and Unusual Punishments Clause of the Eighth Amendment of the United States Constitution.

## Count II

**Claim Against All Defendants for Failure to Take Reasonable and Necessary Precautions with Regard to Mr. Bucklew's Execution, thereby Acting with Deliberate Indifference to Plaintiff's Serious Medical Needs in Violation of the Eighth and Fourteenth Amendments of the United States Constitution**

Plaintiff realleges the foregoing and further states as follows:

151.  Defendants have taken no reasonable and necessary steps to assess the risks to Mr. Bucklew during an execution.  They have not conducted a thorough physical examination nor obtained up-to-date imaging studies to determine whether or how Mr. Bucklew may be executed without violating the Eighth Amendment of the United States Constitution.

152. Defendants' failure to take reasonable and necessary steps to assess and monitor Mr. Bucklew's condition constitutes deliberate indifference to Mr.

51

Bucklew's serious medical needs, as Mr. Bucklew has a right to appropriate medical care up to the moment of his death.

153. As long as Mr. Bucklew is a prisoner within the custody and control of Defendants, they have a constitutional obligation to provide for his serious medical needs. Although they have the right to carry out a death sentence, Defendants may only do so consistently with the dictates of the United States Constitution, including the Eighth Amendment.

154. Defendants have not only failed to take reasonable and necessary steps to determine whether or how Mr. Bucklew may be executed within the parameters of the Constitution, they have made no contingency plan in the event the lethal drugs fail to kill Mr. Bucklew. The Missouri protocol is completely silent on such a possibility. There is no equipment or protocol for resuscitation.

155. Instead, Mr. Bucklew, an individual with a largely obstructed airway and distended, malformed vessels, will be alone in the execution chamber, monitored only remotely by medical personnel who are not tasked with providing any assistance in the event of a botched execution.

156. Even if such an eventuality did not previously occur in the State of Missouri, the botched execution of Clayton Lockett in Oklahoma establishes that an execution can go tragically wrong when the lethal drugs either do not properly

enter the prisoner's body or fail for some other reason. Despite the Oklahoma failure, an event of nationwide prominence, Defendants have made no changes to their execution protocol to address unforeseen or unintended events.

157.  Defendants' failures and omissions constitute deliberate indifference to the serious medical needs of Mr. Bucklew, in violation of the Eighth Amendment.

158.  Defendants' actions have caused, and will continue to cause, needless harm and extreme suffering to Mr. Bucklew, who faces undergoing lethal injection in the absence of necessary precautions or any assessment of whether he may be executed without violating the prohibition on cruel and unusual punishment. Defendants' actions therefore violate the Eighth Amendment of the United States Constitution as well as the Due Process Clause of the Fourteenth Amendment.

## Count III

### Claim Against All Defendants for Violation of Mr. Bucklew's First Amendment Right to Petition the Government for Redress of Grievances and His Rights to Due Process and Access to the Courts Under the Fourteenth Amendment

Plaintiff realleges the foregoing and further states as follows:

159.  Defendants' execution practices and its use of a lethal drug are shrouded in secrecy.

Case 4:14-cv-08000-BP   Document 46   Filed 06/18/15   Page 53 of 57

160.  Defendants refuse to provide any information whatsoever regarding the purported pharmacist or the pharmacy that prepares the drug, or how or when the drug is prepared, or where or when the active pharmaceutical ingredient is obtained, or whether the pharmacy is registered with or has ever been inspected by the Food and Drug Administration or even whether the drug has been subjected to any testing for safety, potency or purity.

161.  Defendants' utter failure to provide a single relevant fact about the provenance or safety of the execution drug prevents Mr. Bucklew, an individual whose vessels are abnormally weak and prone to rupture, from petitioning the government for redress of grievances.

162.  Absent basic information about the provenance, purity, potency and safety of the drug, any allegations by Mr. Bucklew about the drug are vulnerable to being labeled "speculation."

163.  To effectively petition the government for redress of grievances, as is his right under the First Amendment, and to exercise his right of access to the courts under the Due Process Clause of the Fourteenth Amendment, Mr. Bucklew needs access to information about the safety, purity, potency and origins of the drug.  Such information is now completely withheld, as Defendants refuse to even state whether the drug is subjected to any laboratory testing.

54

164.   Defendants' practice of shrouding the execution drug in extreme secrecy violates Mr. Bucklew's rights under the First and Fourteenth Amendments, causing him to be subjected to experimental and dangerous drug protocols with no ability to effectively challenge the drug protocol in court or to petition any agency of the federal, state or local government for redress.

165.   In addition, any requirement that Mr. Bucklew plead a "feasible, alternative method" with any greater specificity than he has in this Third Amended Complaint violates his right to due process, fundamental fairness and access to the courts.  Mr. Bucklew cannot allege any "alternative" when he is denied essential information about the method presently being used or what methods may be regarded as "feasible" or "readily implemented" by the State of Missouri. Moreover, requiring Mr. Bucklew to allege how he may be put to death deprives him of the ability to fairly litigate his claims without being burdened by pleading and proof requirements that may, under present circumstances, be impossible to satisfy.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Bucklew requests the following relief:

1.   That this Court assume jurisdiction of this cause and set this case for a hearing on the merits.

2. That this Court issue a declaratory judgment declaring and enforcing the rights of Plaintiff Bucklew, as alleged above, and further issue a temporary restraining order or preliminary or permanent injunction to enforce Plaintiff's rights under the First, Eighth and Fourteenth Amendments, commanding defendants to provide necessary information about the provenance, safety, potency and purity of the drug so as to permit Plaintiff to petition for redress of grievances, and, further to permit Plaintiff access to the courts, consistent with the requirements of the Due Process Clause.

3. That this Court issue a declaratory judgment declaring and enforcing Plaintiff's rights under the Eighth Amendment and, further, issue a temporary restraining order or a preliminary or permanent injunction directing Defendants to not carry out any execution by lethal injection on Mr. Bucklew until such time as Plaintiff has conducted discovery, reasonable and necessary medical tests have been performed, and reasonable and necessary steps have been taken to determine whether and how Mr. Bucklew may be executed by lethal injection without violating the prohibition on cruel and unusual punishment of the Eighth Amendment.

56

4. Mr. Bucklew also seeks this Court's order under 42 U.S.C. ¶1988 awarding him a reasonable attorneys' fee and costs, and such further relief as this Court deems just and proper.

WHEREFORE, Plaintiff Bucklew prays this Court for its order and judgment as stated above.

Respectfully Submitted,

MORGAN PILATE, LLC
  /s/    Cheryl A. Pilate
Cheryl A. Pilate Mo. # 42266
Lindsay J. Runnels #62075
926 Cherry Street
Kansas City, MO 64106
Telephone: 816-471-6694
Facsimile: 816-472-3516
cpilate@morganpilate.com
lrunnels@morganpilate.com

CERTIFICATE OF SERVICE

I hereby certify that, on June 18, 2015, I served the foregoing Third Amended Complaint on all counsel of record via the Court's ECF filing system.

 **/s/ Cheryl A. Pilate**

57