# United States District Court for the Western District of Missouri

RUSSELL BUCKLEW,

Plaintiff,

v.

GEORGE LOMBARDI, et al.,

Defendants.

## REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**JOSHUA D. HAWLEY**
Attorney General

**Michael J. Spillane**
Assistant Attorney General
Missouri Bar No. 40704
P.O. Box 899
Jefferson City, MO 65102
Telephone: (573)751-1307
Facsimile: (573)751-3825
Attorneys for Defendants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

ANSWER TO BUCKLEW'S "STATEMENT OF UNDISPUTED FACTS" ...... iii

ARGUMENT ....................................................................................1

I.    Bucklew has not created a genuine dispute of fact on whether he is sure or very likely to suffer serious illness or needless suffering from all methods of lethal injection because of his hemangioma..........................2

II.   Bucklew has not created a genuine issue of fact on whether there is a feasible and readily implemented alternate method of execution, specifically gas, that will significantly reduce a substantial risk of pain. ................................................................................................6

III.  Bucklew has not refuted the claim preclusion or statute of limitations defenses. ...................................................................................8

IV.   Bucklew's evidence defeats Article III jurisdiction..................................8

CONCLUSION.................................................................................9

CERTIFICATE OF SERVICE ....................................................... 10

Case 4:14-cv-08000-BP   Document 200   Filed 05/30/17   Page 2 of 35

# TABLE OF AUTHORITIES

## Cases

*Jones v. Kelley*, 854 F.3d 1009 (8th Cir. 2017) ........................................ xix, 2, 7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) ......... 1

*McGehee v. Hutchinson*, 854 F.3d 488 (8th Cir. 2017) ................... iv, xxiii, 2, 7

*Paine v. Jefferson Nat. Life Ins. Co.,* 594 F.3d 989 (8th Cir. 2010) .................. 1

*Ringo v. Lombardi*, 2011 WL 3584476 (W.D. Mo. 2011) ................................. ix

*Spencer v. Kemna*, 523 U.S. 1 (1998) ................................................. 8

*Torgeson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (en banc) .......... 1

*Williams v. Kelley*, 2017 WL 1437964 (E.D. Ark 2017) .................................. 8

*Williams v. Kelley*, 854 F.3d 998 (8th Cir. 2017)................................... 2

*Zink v. Lombardi*, 783 F.3d 1089 (8th Cir 2015) (*en banc*) ............................. 2

## Statutes

Mo. Rev. Stat. §546.720 ................................................................ xxii

## Other Authorities

Aleman, Williams, and Madigan, "Cerebral and Brainstem Electrophysiologic
Activity During Euthanasia with Pentobarbital Sodium in Horses", Journal
of Veterinary Internal Medicine, Volume 29, 663–72 ................................ xiii

**ANSWER TO BUCKLEW'S "STATEMENT OF UNDISPUTED FACTS"**

1.      Both parties agree that, given his unique medical condition, Mr. Bucklew will experience pain and suffering under Missouri's lethal injection protocol, however, they dispute: (1) the length of time he will suffer, and (2) how long is it acceptable for someone to suffer. Antognini Dep. Tr. 247:7-249:8; Zivot Dep. Tr. 84:22-85:11, 88:14-89:3; Zivot Suppl. Report at 11 (¶ VI.J.).

**Answer:**      Defendants do not agree that Bucklew will endure pain and suffering during his execution. Despite the evidence to the contrary or the complete absence of supporting evidence, Bucklew speculates that he will choke and bleed during an execution because he will allegedly be lying flat, stressed, and his hemangioma will not allow the proper circulation of the lethal injection chemical.  But his conjecture is refuted by the record.  His own expert admits there is no evidence that Plaintiff's hemangioma will slow the circulation of pentobarbital (Dr. Zivot Deposition 65–66), and the other expert opines that it will not (Dr. Antognini Supplemental Report Paragraphs 13, 14, 26). Contrary to his assertions that he cannot lay supine for a period of time, Bucklew recently tolerated lying flat for an hour during medical imaging (Dr. Antognini Deposition 142–50, Dr. Zivot Supplemental Report 8), and the gurney would not necessarily be required to be flat during an execution but may be adjusted accordingly. (Director Dormire Deposition 52). Bucklew's expert attempts to distinguish Bucklew's proven ability to tolerate lying supine by explaining that Bucklew was awake during the

medical imaging but will not be awake during an execution once the pentobarbital takes effect (Dr. Zivot Deposition 79–81), although he will not say how long Bucklew could sense discomfort after the pentobarbital takes effect and he is no longer awake (Dr. Zivot Deposition 85–89). The defense expert opined that this period would be around ten seconds (Dr. Antognini Deposition 247–49). In short, there is no reason to believe that Bucklew will lose consciousness any slower than any of the multiple persons executed rapidly and painlessly by Missouri using pentobarbital (Witness Statements from earlier executions, which are Exhibit 4 to Dr. Antognini Deposition).

Bucklew also speculates that because he has poor peripheral veins in his hands and arms; therefore, the medical team member anesthesiologist will make multiple unsuccessful attempts to use those veins before using a central vein. That is speculative, not material, and outside the scope of the complaint.

In sum, Bucklew does not really present evidence that it is *sure or very likely* that he will suffer at all during his execution. And he does not present evidence that it is *sure or very likely* that if any discomfort at all occurs that it would not be limited to a matter of a few seconds. *See McGehee v. Hutchinson*, 854 F.3d 488 (8th Cir. 2017) (en banc) (per curiam) (Court holds that a petitioner must show that it is sure, or very likely, that the method of execution will cause serious illness or needless suffering, and that equivocal

evidence that inmate might have some level of consciousness and therefore, suffer pain, during the execution process, does not meet this standard).

2.      The ability to insert an IV in difficult veins or to insert a central line depends on the skill of the medical team member performing the procedure. Antognini Dep. Tr. 81:18-82.25; Open Portion Protocol at 1 (*see* ¶ C).

**Answer:**      This fact is not material based on the allegations raised in Bucklew's Fourth Amended Complaint. This Court summarized the Fourth Amended Complaint as alleging that execution by lethal injection will cause Bucklew's tumors to rupture because lethal injection relies on the circulatory system and (1) the chemicals will not travel through the body as intended, delaying unconsciousness, and (2) the ruptured tumors in Bucklew's throat can cause him to choke; and that lethal gas will significantly reduce the risk of rupture and needless suffering because gas does not rely on the circulatory system). Document 105 at 2. This Court further held that Bucklew specifically "disclaimed the possibility that any utilization of lethal injection will reduce the risk of pain and suffering." *Id.* at 6.

To the extent an answer is required, Defendants admit that the insertion of an intravenous line depends on the skill of the anesthesiologist, but note that Bucklew's own expert testified that all anesthesiologists become proficient in inserting intravenous lines as part of their training (Dr. Zivot Deposition 22–24).

3. Mr. Bucklew has poor peripheral veins, meaning they are small and difficult to find, which makes it more challenging to establish intravenous access and detrimentally impacts how quickly drugs can be injected in those veins. Antognini Dep. Tr. 77:3-10; 84:14-25; Zivot Dep. Tr. 69:25-70:6.

**Answer:** This allegation is not material for the reasons discussed in Answer to Paragraph 2. Bucklew did not actually plead that his poor peripheral veins were a reason his execution would violate the Eighth Amendment.

To the extent an answer is required, Defendants do not agree that Bucklew has poor peripheral veins in general, only that he has poor peripheral veins in his hands and arms. To evaluate this fact, one must assume that the anesthesiologist would choose to make multiple unsuccessful attempts at establishing a line in visibly poor peripheral veins in the hands and arms, rather than using a large central vein for the primary I.V. line.

4. In an individual like Mr. Bucklew with difficult-to-access peripheral veins, it is sometimes necessary to make several, even as many as ten, unsuccessful attempts to access a peripheral vein before attempting a central line. Antognini Dep. Tr. 99:14-20; Zivot Dep. Tr. 70:2-6, 74:6-25.

**Answer:** This allegation is not material for the reasons discussed in Answer to Paragraph 2.

To the extent an answer is required, Defendants do not agree that it would be necessary to make as many as ten attempts to find a peripheral vein in Bucklew's hands or arms before deciding to use a central vein. This is

purely conjecture. Whether that has occurred in some clinical case or may occur in some hypothetical case is not material.

5. Repeated unsuccessful attempts to insert an IV in difficult veins will increase Mr. Bucklew's pain and discomfort. Antognini Dep. Tr. 100:1-12; Zivot Suppl. Report at 10 (¶ VI.G); Zivot Dep. Tr. 70:2-6, 74:12-25.

**Answer:** This allegation is not material for the reasons discussed in Answer to Paragraph 2.

To the extent an answer is required, Defendants do not agree that repeated unsuccessful attempts to insert an I.V. "will" increase Bucklew's pain and discomfort. The premise of the assertion is that there will be multiple failed attempts to insert an I.V. line. That is speculation.

6. The stress of undergoing multiple attempts to set an IV will increase the likelihood of heavy, rapid breathing. Antognini Dep. Tr. 100:10-12; Zivot Suppl. Report at 10 (¶ VI.G.).

**Answer:** This allegation is not material for the reasons discussed in Answer to Paragraph 2.

To the extent an answer is required, Defendants do not agree that multiple attempts to set an I.V. "will" increase the likelihood of rapid and heavy breathing. The premise of the assertion is that there will be multiple failed attempts to establish an I.V. line. That is speculation.

7. Mr. Bucklew is at an increased risk of having a vein blow because he has poor peripheral veins. Antognini Dep. Tr. 87:13-24; Zivot Dep. Tr. 78:12-19.

**Answer:**    This allegation is not material for the reasons discussed in Answer to Paragraph 2.

To the extent an answer is required, Defendants do not agree that Bucklew is at increased risk of having a vein blow because he has poor peripheral veins. There is no evidence that Bucklew has any poor veins except the peripheral veins in his hands and arms, and it is pure conjecture that the anesthesiologist would establish the primary line in visibly poor veins in the hands or arms, especially when there is no evidence any other veins are poor. *See* (Dr. Zivot Deposition 78, 82) (Dr. Zivot testifies that his views on the possibility of a blown vein are limited to the peripheral veins in the hands and arms).

8.    If a vein blows, pentobarbital would leak into and destroy the surrounding tissue causing extreme pain. Antognini Dep. Tr. 77:11-78:3.8.

**Answer:**    This allegation is not material for the reasons discussed in Answer to Paragraph 2.

To the extent an answer is required, Defendants agree that if a vein carrying pentobarbital were to blow, the pentobarbital would damage tissue. But whether such an accident would occur is immaterial speculation. Moreover, the testimony of Bucklew's own expert indicates that it is implausible that a central vein used in an execution would blow. (Dr. Zivot Deposition 26).

9.     If the execution team cannot set an IV in a peripheral vein, they will attempt to gain venous access by means of a cutdown procedure to set a central line. Dormire Dep. Tr. 26:21-27:2; Steele Dep. Tr. 28:19-22; Antognini Dep. Tr. 94: 24-95:6.

**Answer:**    This allegation is not material for the reasons discussed in Answer to Paragraph 2.

To the extent an answer is required, Defendants do not agree that the anesthesiologist will necessarily use a "cut down" to access a central vein if he does not use a peripheral vein. Testimony indicated that the normal first option is to access a central vein without a "cut down" before using a "cut down" (Dr. Antognini Deposition 94–95).

10.     If the technician performing a central line does not exercise skill and caution, there is a risk of accidentally injecting the drugs into a neighboring artery. Antognini Dep. Tr. 90:22-91:1.

**Answer:**    This allegation is not material for the reasons discussed in Answer to Paragraph 2.

To the extent an answer is required, Defendants do not agree that a "technician" as opposed to the anesthesiologist will establish the I.V. line. That is speculation. *See Ringo v. Lombardi*, 2011 WL 3584476 at *2 (W.D. Mo. 2011) (noting that the anesthesiologist M3 usually establishes the I.V. line). And it is speculation that the anesthesiologist would mistakenly establish the I.V. line in an artery as opposed to a vein as intended. This

allegation really has nothing to do with Bucklew's hemangioma, and is speculation that could be made about any execution by lethal injection.

11.    A cutdown procedure is typically performed while the patient is lying in a supine position. Antognini Dep. Tr. 94:7-13.

**Answer:**    This allegation is not material for the reasons discussed in Answer to Paragraph 2.

To the extent an answer is required, Defendants agree that while in a clinical setting a cut down procedure is performed while the patient is supine. But Bucklew does not allege he must be supine.

12.    A cutdown procedure is not typically used by physicians to access a femoral vein. Antognini Dep. Tr. 98:8-11, 20-25.

**Answer:**    This allegation is not material for the reasons discussed in Answer to Paragraph 2.

To the extent an answer is required, Defendants agree that a cut down is not typically done to access a femoral vein. This allegation is also inconsistent with Bucklew's claim in Paragraph 10 and demonstrates Bucklew's understanding that the anesthesiologist, not a "technician," would do a cut down to access a central vein if needed.

13.    Mr. Bucklew suffers from a unique medical condition: cavernous hemangioma. ECF 182-14, Defs.' Ex. 10, McKinney Dep Tr. 12:9-14; Zivot Dep. Tr. 31:6-14.

**Answer:**    Defendants agree that Bucklew has a cavernous hemangioma.

14.    There is no known cure for Mr. Bucklew's cavernous hemangioma. McKinney Dep. Tr. 36:15-18; Zivot Suppl. Report at 3 (*see* ¶ III.A).

**Answer:**    Defendants agree that Bucklew's hemangioma is incurable.

15.    Mr. Bucklew's condition is progressive and places him at risk of choking and strangulation. Zivot Dep. Tr. 31:6-22; Zivot Suppl. Report at 3, 6, 8-9 (*see*¶¶ III.A., IV.E., V.B.10., VI.A); Antognini Dep. Tr. 72:3-16; McKinney Dep. Tr. 49:5-11.

**Answer:**    Defendants agree that Bucklew's condition is progressive. Defendants do not necessarily agree that Bucklew is currently at a constant risk of choking and strangulation, but do agree that there is evidence that if *not* executed Bucklew will eventually be strangled to death by the hemangioma (Dr. Zivot Deposition 29–32, 90–91).

16.    Mr. Bucklew experiences discomfort when forced to lie flat. Zivot Suppl. Report at 10 (see ¶ VI.H.); Antognini Dep. Tr. 146:13-147:6.

**Answer:**    Defendants agree that Bucklew told both experts that he experienced discomfort while lying flat for one hour for medical imaging, but take no position on the veracity of the self-report.

17.    The increased stress that Mr. Bucklew will experience from being forced to lie in a supine position while the execution team attempts to establish IV access in his poor peripheral veins increases the likelihood that Mr. Bucklew will experience choking sensations before the lethal injection is administered. Antognini Dep. Tr. 212:3-213:19.

**Answer:**    Insofar as the "fact" is based on assertion that Bucklew will have to lie supine during an execution such an allegation is not material for the reasons discussed in Answer to Paragraph 2.

To the extent an answer is required, Defendants do not agree that Bucklew will be forced to lie supine before an execution while the execution team attempts to access poor peripheral veins, or that if this did occur it would necessarily increase the risk of choking before the lethal chemical is administered for the reasons discussed in Answer to Paragraph 1. Further, Bucklew told both experts that he was able to adjust his breathing to tolerate being supine for an hour during medical imaging, and Bucklew's expert distinguished that from an execution because Bucklew would not be awake after the pentobarbital took effect, making it impossible to consciously regulate breathing (Dr. Antognini Deposition 142–50, Dr. Zivot Supplemental Report at 8).

18.    Mr. Bucklew's hemangiomas are friable such that normal acts like eating or swallowing can cause bleeding. Zivot Suppl. Report at 4-8 (*see* ¶¶ III.F, V.A.4., V.B.8.); Antognini Dep. Tr. 121:25-122:11.

**Answer:**    Defendants agree that Bucklew self-reports that he experiences bleeding from his hemangioma during normal activities, and that there is documentation of reported bleeding in medical records. But Defendants note that the treating physician, Dr. McKinney, who has been treating Bucklew since 2005, has never seen bleeding in examinations of Bucklew. *See* (Dr. McKinney Deposition at 72) (when Dr. McKinney was asked whether he aware of instances where strenuous activity had caused

Bucklew to bleed Dr. McKinney stated, "No, I think it's amazing I've been treating this guy since 2005 and I've never seen him with a bleed.").

19. Even vibrations from snoring can trigger bleeding from Mr. Bucklew's hemangiomas. Antognini Dep. Tr. 103:6-15.

**Answer:** Defendants agree that Bucklew has self-reported that when he wakes in the morning some bleeding from the hemangioma occurred during the night.

20. Choking is a form of suffering. Antognini Dep. Tr. 23:4-7.

**Answer:** Defendants agree that choking is a form of suffering, with the qualifier that the choking occurs when one is conscious and aware of the choking. Defendants do not agree that Bucklew will suffer when he is unconscious from pentobarbital and stops breathing.

21. Any length of time in which an individual is awake and choking would be painful or result in suffering. Antognini Dep. Tr. 211:22-25.

**Answer:** Defendants agree that a period of time when one is awake and choking can be defined as pain or suffering. But this abstract assertion is not material. Defendants do not agree that any period of time, no matter how tiny, when a person has difficulty breathing, is pain or suffering. Defendants also do not agree that Bucklew has presented any evidence that it is sure or very likely that he will not be able to breathe while he is awake, or that he will not be awake, but nevertheless, will suffer pain anyway during an execution.

22.     A person may appear unconscious but still be able to experience pain and suffering. Antognini Dep. Tr. 165:23-166:21.

**Answer:**     Defendants do agree that a theoretical person may appear unconscious and still be able to experience pain or suffering. But this statement is not material. It is not sure or very likely that Bucklew will be conscious for more than a matter of seconds after receiving pentobarbital, and it is the loss of consciousness from pentobarbital, while being supine, that Bucklew's expert defines as the event that may prevent Bucklew from regulating his breathing.

23.     Mr. Bucklew will be conscious for at least 20 to 30 seconds after the pentobarbital enters his venous system. Antognini Dep. Tr. 196:12-22.

**Answer:**     Defendants agree that Bucklew will be conscious for at least 20-30 seconds after the pentobarbital is injected.

24.     Mr. Bucklew would be alive for several minutes after the injection. Antognini Dep. Tr. 45:8-15; Dormire Dep. Tr. 41:16-20.

**Answer:**     Defendants do not necessarily agree that Bucklew will be alive "for several minutes after the injection." The study relied on by Dr. Zivot, Bucklew's expert, places "brain death" in horses injected with a similar amount of pentobarbital per weight at 73-261 seconds, although measurable brain electrical activity stops before that, within 52 seconds. Aleman, Williams, and Madigan, "Cerebral and Brainstem Electrophysiologic Activity During Euthanasia with Pentobarbital Sodium in Horses", Journal of

Veterinary Internal Medicine, Volume 29, 663–72 (loss of EEG, measuring brain electrical activity, occurred within 2 to 52 seconds after infusion with a median of 18 seconds; brain death, meaning cessation of brain stem function, occurred 73-261 seconds after infusion). Bucklew will not be pronounced dead for several minutes because a waiting period occurs before Bucklew will be examined for pronouncement of death, and then death is pronounced. (Director Dormire Deposition at 28) (offender is normally checked to confirm death after about seven minutes have passed). That does not necessarily mean Bucklew will be alive but unconscious for several minutes, or that he will be aware of any sensations while he is unconscious.

25.    An individual's unique medical condition can affect the working of intravenous medication. Antognini Dep. Tr. 31:8-17, 33:1-17.

**Answer:**    Defendants do not disagree with the abstract statement that a person's unique medical condition can affect the working of intravenous medication. But there is no evidence in this case that Bucklew's hemangioma will interfere with the circulation of pentobarbital. Indeed, both experts agree that there is no evidence that Bucklew's hemangioma will interfere with the circulation of pentobarbital. *See* (Dr. Zivot Deposition 65–66; Dr. Antognini Supplemental Report paragraphs 13, 14, and 26).

26.    Mr. Bucklew's hemangioma affects his airway. Antognini Dep. Tr. 107:3-13, 108:13-14 (Q: "Does Rusty have a Mallampati 4?" A: "Yes.").

**Answer:** Defendants agree that Bucklew's hemangioma affects his airway.

27.    Mr. Bucklew is at risk of having a hemorrhagic event causing him to aspirate his own blood during the execution procedure. Antognini Dep. Tr. 114:17-22, 216:5-14.

**Answer:** Defendants admit that there is some risk that Bucklew may bleed during an execution. But there is no evidence that it is sure or very likely he will have significant bleeding during an execution, let alone that he will be conscious and aware of it, or suffer pain from it. This is speculative.

This allegation is not material because it does not help establish that it is sure or very likely Bucklew will suffer serious illness or unnecessary suffering during an execution.

Defendants also note there is some risk of bleeding even if Bucklew is not executed. Eventually, if he is not executed, he will strangle to death and will definitely bleed during the process. (Dr. Zivot Deposition at 29–32, 90–91).

28.    Mr. Bucklew's hemangiomas may bleed such that blood would come out of his orifices even after he is unconscious. Antognini Dep. Tr. 216:15-25.

**Answer:** This allegation is not material for the reasons discussed in Answer to Paragraph 2.

To the extent an answer is required, Defendants agree that Bucklew might bleed after he is unconscious, but he might bleed at any time.

29. The speed at which an intravenous drug is injected impacts how long it takes for an inmate to become unconscious. Antognini Dep. Tr. 56:11-23.

**Answer:** This allegation is not material for the reasons discussed in Answer to Paragraph 2.

To the extent an answer is required, Defendants agree that the speed of injection impacts when the pentobarbital takes effect. But testimony indicated that the injection would have to occur at an absurdly low speed for the impact to be meaningful. (Dr. Antognini Deposition at 56–57).

30. Mr. Bucklew has difficulty breathing when lying flat, which he is able to alleviate when he is awake by consciously adjusting his breathing pattern. Antognini Dep. Tr. 143:23-144:12, 188:4-9 ("He's going to have more difficulty, absolutely, than somebody else would."), 149:2-20.

**Answer:** Insofar as it assumes Bucklew will be forced to lie flat during an execution this allegation is not material for the reasons discussed in Answer to Paragraph 2. Defendants agree that Bucklew has stated to both experts that he has difficulty breathing while lying flat and that he is able to alleviate the difficulty by adjusting his breathing pattern.

31. As of May 17, 2010, Mr. Bucklew's tumor compromised Bucklew's airway, but did not disrupt Bucklew's quality of life or interfere with Bucklew's Activities of Daily Living. McKinney Dep. Tr. 42:2-20.

**Answer:** Defendants agree that Bucklew's tumor compromises his airway. Defendants agree that Dr. McKinney concluded, that although

Bucklew does not breathe completely normally, his condition is not impairing his daily activities and is not limiting him (Dr. McKinney Deposition at 43).

32. As of April 12, 2012, Mr. Bucklew was at a low risk of life-threatening hemorrhage. McKinney Dep. Tr. 44:19-45:14.

<u>Answer:</u> Defendants agree that Bucklew has a low risk of a life threatening hemorrhage at this time according to Dr. McKinney (Dr. McKinney Deposition at 44).

33. In October, 2013, Mr. Bucklew's treating physician observed that Mr. Bucklew's hemangioma had increased in size. McKinney Dep. Tr. 47:17-48:11.

<u>Answer:</u> Defendants agree that in October 2013, Dr. McKinney noted that hemangioma had increased in size.

34. In November 2015, Mr. Bucklew's treating physician again observed that Mr. Bucklew's hemangioma had increased in size. McKinney Dep. Tr. 48:16-49:4.

<u>Answer:</u> Defendants agree that in November 2015, Dr. McKinney noted that the hemangioma had increased in size.

35. In May 2014, Mr. Bucklew was examined by Dr. Zivot, who concluded that Mr. Bucklew's hemangiomas "severely compromised or obstructed" Mr. Bucklew's airway and that Mr. Bucklew's "dangerously compromised" airway put him at "great risk of choking and suffocation." ECF 182-1, Defs.' Ex. 1 at 183-85 (hereinafter, "5/14/14 Suppl. Aff. of Zivot"; *see* ¶¶ 6-7, 9).

<u>Answer:</u> Defendants agree that Dr. Zivot concluded that Bucklew is at great risk of choking and suffocation from a compromised airway during an execution. But Dr. Zivot does not opine here that this is sure or very likely

to occur during an execution. *See Jones v. Kelley*, 854 F.3d 1009 (8th Cir. 2017) (finding in as-applied challenge to execution method that Dr. Zivot's testimony of risk, that a plaintiff would suffocate and be aware of it during an execution, did not meet sure or very likely standard).

36.    The current execution protocol has only been in effect since October 18, 2013. Lombardi Dep. Tr. 66:16-19; Open Portion Protocol at 2.

**Answer:**    Defendants agree that the current protocol for lethal injection has been in place since October 2013.

37.    All executions under the current protocol have been conducted while the inmate is in a supine position. Lombardi Dep. Tr. 80:22-81:8; Dormire Dep. Tr. 35:11-16; Steele Dep. Tr. 29:4-6, 15-17.

**Answer:**    Defendants agree that in previous lethal injection executions the offender has been lying flat on a gurney. But Defendants do not agree that this must be so, or that there was any reason to vary the position in past executions (Director Dormire Deposition at 52).

38.    [REDACTED]

**Answer:**    Defendants are without sufficient information to admit or deny the contents of paragraph 38 as this paragraph is redacted from the copy of the pleading available to Defendants, and as of this writing Defendants have not been provided with an unredacted copy. To the extent an answer is required, Defendants deny.

39.    The execution protocol does not contain instructions for dealing with or remedying an irregularity during an execution. Dormire Dep. Tr.

32:10-33:5; 35:17-36:18; ECF 182-11, Defs.' Ex. 7, Precythe Dep. Tr. 36:11-37:9.

**Answer:** This fact is not material for the reasons discussed in Defendants' Answer to Paragraph 2.

To the extent an answer is required, Defendants agree that there is not a contingency plan for a failed execution beyond administering a second dose of pentobarbital. Defendants also note that witness statements establish that all Missouri executions using pentobarbital appeared to have been rapid and painless (Exhibit 4 to Dr. Antognini Deposition).

40.    The execution protocol does not contain provisions instructing the execution team on how to respond if an inmate begins choking or hemorrhaging during the execution. Pl.'s Ex. 3, Defs.' Resp. to Pl.'s Req. for Admis. (see Defs.' Resp. to Nos. 2-3). *See also* Dormire Dep. Tr. 36:5-11; Precythe Dep. Tr. 36:11-37:9.

**Answer:** This fact is not material for the reasons discussed in Defendants' Answer to Paragraph 2.

To the extent an answer is required, Defendants agree.

41.    The only medical information provided to the execution team regarding an inmate's existing health conditions are contained in a single page document. Dormire Dep. Tr. 43:20-44:6; Precythe Dep. Tr. 27:20-29:10. Mr. Bucklew's medical one-pager, dated May 2, 2014, listed Mr. Bucklew's "most recent vital signs," current medications, and the following "medical problems": "Gunshot wound to head 1996, Cavernous hemangioma – right half of maxilla (upper jaw) and upper lip present for 20 plus years, hard of hearing." Pl.'s Ex.4, Doc. No. 9900038, Pl.'s 5/2/14 Pre-Execution Medical Summary.

**Answer:** The allegations contained in this paragraph are not material to Bucklew's Fourth Amended Complaint that any means of lethal injection would be cruel and unusual based on his hemangioma for the reasons discussed in Answer to Paragraph 2.

To the extent an answer is required, Defendants deny that the only information that has been or will be provided to the anesthesiologist about Bucklew's condition is necessarily in the one page summary referenced in this paragraph.

42. No individual suffering from cavernous hemangioma has been executed under Missouri's current lethal injection protocol. Defs." Resp. to Pl.'s Req. for Admis. (see Defs.' Resp. to No. 4).

**Answer:** Defendants agree to Defendants' knowledge.

43. The execution team cannot consult with an inmate's treating physicians regarding any atypical or unique medical conditions the inmate may have. McKinney Dep. Tr. 22:10-21.

**Answer:** This allegation is not material for the reasons discussed in Answer to Paragraph 2.

To the extent an answer is required, Defendants agree that medical team member members cannot "consult with an inmate's treating physicians," to perform the execution. This does not establish that the anesthesiologist cannot be provided with additional relevant medical information about Bucklew.

44. The execution team members do not have enough information to determine if an inmate is fit for execution. Precythe Dep. Tr. 31:3-8.

**Answer:** Defendants deny that the execution team does not have enough information to determine if Bucklew is "fit for execution" or that this assertion is material. If the execution can be conducted consistently with the Eighth Amendment, which it can, Bucklew's subjective views on fitness are not material. *See* Paragraph 2.

45. The state of Missouri authorizes the use of lethal gas for executions. Dormire Dep. Tr. 45:4-9; Breisacher Dep. Tr. 47:6-10.

**Answer:** Defendants agree that Mo. Rev. Stat. §546.720 states that the method execution shall be by lethal gas or lethal injection. Defendants do not agree that Missouri is capable of carrying out executions by lethal gas, and testimony in fact, indicates that the former General Counsel for the Department of Corrections was forced to give up research into the subject because his research "hit a wall" due to lack of necessary research articles and lack of expert opinions on the matter (Matthew Briesacher Deposition at 46–58).

46. If administered correctly, nitrogen hypoxia could cause less pain and suffering than lethal injection. Antognini Dep. Tr. 235:1-11.

**Answer:** Defendants deny that "nitrogen hypoxia could cause less pain and suffering than lethal injection." But even if taken as true, this general assertion is not material. Defendants' expert opined that nitrogen

hypoxia would *not* be more humane than lethal injection (Dr. Antognini Deposition 129, 231–36). Bucklew's expert indicated there was insufficient research to establish it would be more humane (Dr. Zivot Deposition 38–40), and the former General Counsel who researched the matter found there was insufficient research available to proceed (Matthew Briesacher Deposition 46–58). This is consistent with Eighth Circuit precedent teaching that nitrogen hypoxia cannot be categorized as a feasible and readily available alternative that will significantly reduce a risk of unnecessary pain when nitrogen hypoxia has never been used in an execution. *See McGehee v. Hutchinson*, 854 F.3d 488 (8th Cir 2017) (noting that as nitrogen hypoxia has no track record of successful use in executions, it is not likely to emerge as a more than marginally safer method of execution).

47. If administered correctly, the use of nitrogen gas in an execution would quickly achieve hypoxia and cause an inmate to become quickly unconscious. Antognini Dep. Tr. 234:12-21.

**Answer:** Defendants agree that Dr. Antognini stated that nitrogen gas can quickly cause hypoxia and that hypoxia can quickly cause unconsciousness. But this general statement is immaterial. Pentobarbital quickly causes unconsciousness and has, unlike nitrogen hypoxia, which has never been used in an execution, reliably done so in many executions. There is no real evidence that nitrogen hypoxia is feasible and readily available as a method of execution or that it would significantly reduce a substantial risk of

pain. Bucklew does not explain why his arguments that he might suffer while unconscious do not apply to nitrogen hypoxia, nor does he argue that his unconsciousness from nitrogen hypoxia would be as quick or as deep as from pentobarbital, or that his death from nitrogen hypoxia would be quicker.

# ARGUMENT

To defeat a motion for summary judgment, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgeson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) *quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). The non-moving "may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Paine v. Jefferson Nat. Life Ins. Co.,* 594 F.3d 989, 992 (8th Cir. 2010) (modification in original). "A genuine issue of fact exists 'if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case.'" *Paine v. Jefferson Nat. Life Ins. Co.,* 594 F.3d 989, 992 (8th Cir. 2010). Conversely, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgeson,* 643 F.3d at 1042. (internal citations and quotations omitted).

Bucklew bears the burden of proving both elements of his Eighth Amendment method-of-execution claim. To do so he must prove that any lethal injection procedure is "sure or very likely to cause serious illness and needless suffering," and he must prove "that another execution procedure

1

exists that is feasible and readily implemented, and that an alternative method will significantly reduce a substantial risk of severe pain." *Zink v. Lombardi*, 783 F.3d 1089, 1102–03 (8th Cir 2015) (*en banc*). In his response, Bucklew does not demonstrate specific facts, material to the elements of these claims that are disputed. Rather, he does nothing more than present speculative conclusions and immaterial matters that do not support the elements of his claim. He has not sustained his burden.

**I.**     **Bucklew has not created a genuine dispute of fact on whether he is sure or very likely to suffer serious illness or needless suffering from all methods of lethal injection because of his hemangioma.**

In rejecting the sufficiency of Dr. Zivot's testimony in *McGehee v. Hutchinson*, 854 F.3d 488, 492–93 (8th Cir. 2017) (en banc) (per curiam), the United States Court of Appeals for the Eighth Circuit emphasized that the capital defendant's burden that must be proved is "sure or very likely," and that showing a significant possibility based on equivocal evidence is not enough. The Eighth Circuit noted that if there is not a consensus, or is a paucity of evidence, a petitioner may be unable to meet his burden. *Id*.; *see also Jones v. Kelley*, 854 F.3d 1009, 1015 (8th Cir 2017) (Dr. Zivot's testimony that the petitioner would likely suffocate during his execution due to unique medical conditions did *not* meet the "sure or very likely" standard); *see also Williams v. Kelley*, 854 F.3d 998, 1001 (8th Cir. 2017) (Dr. Zivot's testimony

that Arkansas execution protocol would likely maim the petitioner due to his unique medical condition did *not* meet the "sure or very likely" standard).

Dr. Zivot's testimony falls short here as well. To survive summary judgment Bucklew must establish that there is a disputed issue of material fact that it is *sure or very likely* he will suffer serious illness or needless suffering if he is executed by any lethal injection procedure. The Eighth Circuit's recent cases reflect that Bucklew has not done that. In an attempt to avoid summary judgment, Bucklew seeks to create additional "facts" based on his speculation that there is some risk that something may go wrong during his execution, if and only if, a series of contingencies occur, such as his having to lie flat during the execution, and his losing consciousness and therefore losing his ability to regulate his breathing, but still being aware. He also postulates that the anesthesiologist will make a series of bad choices or otherwise failed attempts in selecting a vein and starting an I.V. But Bucklew's evidence offered in support of his claim is weaker than the evidence rejected by the Eighth Circuit in *McGehee*, *Jones,* and *Williams*.

Bucklew's sole surviving claim in his Fourth Amended Complaint, as summarized by this Court, is that *any* lethal injection violates the Eighth Amendment because lethal injection relies on the circulatory system and Bucklew's hemangioma interferes with his circulation. Specifically, Bucklew claims that any lethal chemical will not travel through the body as intended

3

and the hemangioma will rupture during an execution causing Bucklew to choke, making any method of lethal injection execution cruel and unusual punishment (Document 105 at 2). But the record refutes this allegation.

Following imaging of the hemangioma, Dr. Antognini concluded that the hemangioma is not the type of tumor that will interfere with the circulation of pentobarbital and Dr. Zivot admitted that there is no evidence that it is. Dr. McKinney, who has been treating Bucklew since 2005 and has never seen the hemangioma bleed, indicates that it does not interfere with Bucklew's daily activities and indicates that Bucklew has a low risk of a life threatening hemorrhage at this time. Based on this evidence, there is no reason to believe the hemangioma will delay the circulation of the chemical or that the hemangioma is on the verge of rupture.

Perhaps recognizing the evidence wholly refutes his allegation, Bucklew attempts to identify other risks. Bucklew alleges that he has difficulty sleeping in a completely supine position and props himself on a pillow, and speculates he would choke if he had to remain supine during an execution. But there is no real reason he would have to be completely supine during an execution. And Bucklew admits he was able to remain supine recently for an hour during imaging of his hemangioma and was able to regulate his breathing during that period.

4

Bucklew seeks to distinguish these facts by alleging that after the pentobarbital takes effect, he will no longer be conscious and therefore, will not be able to regulate his breathing, and may choke while being supine. Assuming this would even occur, the time period of potential awareness would be very brief. Dr. Antognini indicated that Bucklew can be expected to be in a coma-like state within 20–30 seconds, and the period when he could be aware of discomfort after the pentobarbital takes effect will be around 10 seconds. Dr. Zivot countered that a study on horses indicated unconsciousness would take longer (the study itself indicated cessation of measurable brain electrical activity in 2 to 52 seconds, and brain death in 73–261 seconds), and there would be some period, the length of which Dr. Zivot would not quantify, when the pentobarbital had taken effect, interfering with the regulation of breathing due to lack of consciousness, and Bucklew would still be able to sense discomfort. But the risk of discomfort Bucklew alleges here is both speculative and contingent on the procedures used, and does not create a genuine issue of material fact that he is sure or very likely to suffer serious illness or unnecessary suffering from any form of lethal injection.

Bucklew also speculates that the I.V. will not be placed properly which will lead to a series of events that cause him to suffer. During Bucklew's physical examinations, Dr. Zivot and Dr. Antognini both noted that Bucklew has poor peripheral veins in his hands and arms, but noted no other problems

5

with central veins or with peripheral veins in other parts of his body. Bucklew claims that the anesthesiologist will make multiple failed attempts to set an intravenous line in the visibly poor veins on both sides before choosing another location, and that the stress from this will aggravate Bucklew's hemangioma, causing bleeding and choking. Because Bucklew did not really plead this poor-vein scenario in his complaint, Defendants do not consent to his belated argument and oppose an amendment to Bucklew's fourth amended complaint or the Court's consideration of the poor-vein claim at this late date. Even if the Court considered his belated claim, his argument about the veins is both speculative and contingent on a series of events that will not necessarily occur.

In sum, Bucklew has not shown a genuine issue of material fact here that it is sure or very likely he will suffer serious illness or needless suffering from any lethal injection procedure.

## II. Bucklew has not created a genuine issue of fact on whether there is a feasible and readily implemented alternate method of execution, specifically gas, that will significantly reduce a substantial risk of pain.

The Eighth Circuit recently reaffirmed that "an inmate raising an as-applied challenge still must identify a 'feasible readily implemented alternative that would significantly reduce the substantial risk of pain'" to satisfy the second-prong of the Eighth Amendment test. *Jones*, 854 F.3d at

1016. In *McGehee*, the Eighth Circuit rejected the petitioner's claim that nitrogen hypoxia is a feasible and readily available method that would significantly reduce a substantial risk of pain. *McGehee*, 854 F.3d at 493. In so doing, the appellate court noted that nitrogen hypoxia has never been used in an execution and has no track record of successful use. *Id.* Like the petitioners in *McGehee,* Bucklew also relies on nitrogen hypoxia. But *McGehee* controls. His claim must be denied.

Dr. Zivot appears to be in agreement with the Eighth Circuit. Here, Dr. Zivot opined that there are insufficient studies to determine that nitrogen hypoxia will not be a cruel method of execution. Dr. Antognini opined that the use of gas would not impact the risk of this inmate suffering and that there could be more or less suffering. Matthew Briesacher, former General Counsel of the Department, testified that his attempts to research gas as a method of execution "hit a wall" due to a lack of research articles and experts on the matter. Bucklew's "evidence" is a conclusory statement that nitrogen gas can quickly cause hypoxia, and hypoxia can quickly result in unconsciousness. That does not come close to creating a genuine issue of material fact on the issue that nitrogen hypoxia or any other form of execution by gas is a feasible and readily available alternate method of execution that would significantly reduce a substantial risk of pain to Bucklew.

7

## III. Bucklew has not refuted the claim preclusion or statute of limitations defenses.

Bucklew provides no good reason why he could not have brought his as-applied challenge to his execution, along with the facial challenge in the *Zink* litigation to which he was a party. Therefore, Bucklew's claim is barred by claim preclusion. *See Williams v. Kelley*, 2017 WL 1437964 (E.D. Ark 2017) (Williams could and should have brought his as-applied challenge along with the facial challenge in *McGehee* in which he was a party). Nor has Bucklew overcome Defendants' assertion that Bucklew's claim is barred by the statute of limitations. As the Eighth Circuit recognized *sua sponte* on appeal and what has now been shown by the record here is that Bucklew knew the general basis of the claim in 2008, but did not assert it. Bucklew attempts to avoid the statute of limitations defense by claiming that the limitations period did not accrue until he was examined by Dr. Zivot. This argument is not reasonable. If that were the law, plaintiffs could largely ignore statutes of limitations simply by putting off medical examinations until they chose to bring suit. That is untenable.

## IV. Bucklew's evidence defeats Article III jurisdiction.

Bucklew must also establish an 1) injury in fact, 2) caused by the defendants, that 3) this Court can redress, in order to establish Article III jurisdiction over the case. *See Spencer v. Kemna*, 523 U.S. 1, 8 (1998) (at

8

every stage of the litigation the plaintiff must have suffered or be threatened with an actual injury, traceable to the defendant, that is likely to be redressed by a favorable judicial decision). Dr. Zivot opines there is no question that unless Bucklew is executed or dies of some unforeseen cause he *will* die of strangulation by the hemangioma at some future time. According to Dr. McKinney, the treating physician, there is a low risk that the hemangioma will result in serious bleeding now; and there is at most in the record before this Court, equivocal evidence and speculation that *if* certain contingencies occur, Bucklew *might briefly* be aware of discomfort during his execution. The risk of brief discomfort during the execution is small compared to the certainty of discomfort that will result from prolonged painful strangulation in the absence of an execution. There is no constitutional injury in fact, caused by Defendants that this Court can redress here.

## CONCLUSION

This Court should grant Defendants' motion for summary judgment.

Respectfully submitted,

*/s/ Michael Spillane*
MICHAEL SPILLANE
Assistant Attorney General
Missouri Bar #40704

David Hansen
Assistant Attorney General
Missouri Bar #40990

Caroline Coulter
Assistant Attorney General
Missouri Bar #60040

P.O. Box 899
Jefferson City, MO 65102
(573) 751-1307
(573) 751-2096 (Fax)
mike.spillane@ago.mo.gov

ATTORNEYS FOR DEFENDANTS


## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of May, 2017, I electronically filed the pleading, and this Court's electronic filing system should serve counsel for Bucklew.


*/s/ Michael Spillane*
Assistant Attorney General

10