IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RUSSELL BUCKLEW, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 14-8000-CV-W-BP |
| ) | |
| GEORGE A. LOMBARDI, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## ORDER AND OPINION GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pending is Defendants' Motion for Summary Judgment, which seeks summary judgment on the Eighth Amendment Claim presented in Count I[1] of the Fourth Amended Complaint. Defendants contend that the undisputed facts demonstrate (1) they are entitled to judgment as a matter of law on the merits, (2) Plaintiff's claim is barred by the statute of limitations, and (3) Plaintiff's claim is barred by principles of claim preclusion.[2] As discussed below, the Court agrees that the undisputed facts in the Record establish that Plaintiff cannot prevail on his Eighth Amendment claim, and for that reason the motion, (Doc. 181), is **GRANTED.**[3]

---

[1] Counts II and III were previously dismissed by the Court. (Doc. 63.)

[2] Defendants also contend the Court should dismiss the case because it lacks jurisdiction. (Doc. 182, pp. 9-10.) The argument has been presented before, and the Court rejects it for the reasons previously stated. (*See* Doc. 101.) To the extent that Defendants' argument has shifted to contend that the Court lacks jurisdiction because the Record now proves that Plaintiff will not suffer a redressable injury, the Court rejects this argument as well. Defendants' argument relates to Plaintiff's ability to prove his claim, not to the Court's jurisdiction, and crediting Defendants' argument would essentially require dismissal (without prejudice) for lack of jurisdiction anytime a plaintiff fails to prove his claim. It "is important not to conflate the injury and traceability requirements of a standing analysis with the plaintiff's ultimate burden of proof as to the issues of damages and causation at a trial on the merits," *Brown v. Medtronic, Inc.,* 628 F.3d 451, 457 (8th Cir. 2010), and this observation applies equally when the merits are considered at the summary judgment stage.

[3] The Court does not address the statute of limitations or claim preclusion arguments. These issues were not addressed before the first appeal, and the Court of Appeals declined to address them in the first instance. *Bucklew v. Lombardi*, 783 F.3d 1120, 1122 n.1, 1128-29 (8th Cir. 2015) (en banc). Following remand Defendants sought dismissal on these grounds, but the Court denied the request without prejudice because the Record was not yet

## I. BACKGROUND

### A. Procedural History

Plaintiff Russell Bucklew was convicted in state court of first degree murder, kidnapping, burglary, forcible rape, and armed criminal action. He was sentenced to death for the murder and various terms of years on the other crimes. *State v. Bucklew,* 973 S.W.2d 83 (Mo. 1998) (en banc), *cert. denied,* 525 U.S. 1082 (1999). His requests for postconviction relief and habeas relief were denied. *Bucklew v. State,* 38 S.W.3d 395 (Mo.) (en banc), *cert. denied*, 534 U.S. 964 (2001); *Bucklew v. Luebbers*, 436 F.3d 1010 (8th Cir.), *cert. denied,* 549 U.S. 1079 (2006).

Plaintiff filed this suit in May 2014. The Court dismissed the case, but the dismissal was reversed and the case was remanded. *Bucklew v. Lombardi*, 783 F.3d 1120, 1128 (8th Cir. 2015) (en banc). After the Mandate was issued, Bucklew filed a series of Amended Complaints. The latest – the Fourth Amended Complaint – is the operative pleading, and as noted earlier Count I is the only remaining count. Count I asserts an Eighth Amendment challenge, contending that Missouri's method of execution is unconstitutional as applied to Plaintiff because of his unique medical condition.

### B. Facts

Plaintiff suffers from a congenital condition known as cavernous hemangioma. The disease causes clumps of weak, malformed blood vessels and tumors to grow throughout his body, including his head, face, neck and throat. The tumors are very susceptible to rupture. The

---

sufficiently developed and various legal complexities (some of which had been identified by the Court of Appeals, 783 F.3d at 1122 n.1) had not been addressed. The Court's Order explained some of the difficulties involved in determining whether these doctrines apply. (Doc. 63, pp. 9-13.) The Supreme Court has since discussed the doctrine of claim preclusion when an as-applied challenge follows an unsuccessful facial challenge. *Whole Woman's Health v. Helerstedt,* 136 S. Ct. 2292, 2305 (2016). In reasserting these arguments Defendants have not addressed any of these factual or legal issues; they have merely cited general principles without explaining how they apply in this unique situation, and cited to the same facts that were earlier deemed to be incomplete and therefore insufficient. Given the Court's ruling on the merits there is no need to further delay resolution of this case to provide Defendants another opportunity to address these issues.

disease also affects Plaintiff's circulatory system, resulting in (among other effects) compromised peripheral veins in his hands and arms. The tumors in his throat also make it difficult for him to breathe, and that difficulty is exacerbated when he is in a supine position. Plaintiff's condition is incurable, and surgery to alleviate the tumors is not possible due to the risk of severe bleeding.

Missouri's death penalty protocol has not been succinctly described, but the parties implicitly agree (and the Record demonstrates, (*e.g.,* Doc. 182-1, pp. 135-36; Doc. 197-1; Doc. 182-7, pp. 7-9)),[4] that it involves the intravenous administration of pentobarbital in dosages sufficient to cause unconsciousness and eventually death. In terms of the IV's placement, the protocol provides as follows:

> Medical personnel shall determine the most appropriate locations for intravenous (IV) lines. Both a primary IV line and a secondary IV line shall be inserted unless the prisoner's physical condition makes it unduly difficult to insert more than one IV. Medical personnel may insert the primary IV line as a peripheral line or a central venous line (e.g., femoral, jugular, or subclavian) provided they have appropriate training, education and experience for that procedure. The secondary IV line is a peripheral line.

(Doc. 182-1, p. 1.) The parties seem to agree that because of the cavernous hemangioma Plaintiff's peripheral veins cannot be used in this process because of the risk that they will rupture (assuming that an IV could be placed in them in the first place). However, the portion of the protocol quoted above confirms that a central line in the femoral vein may be used instead of inserting an IV in the peripheral veins. With respect to the risk of Plaintiff's femoral vein rupturing, Plaintiff's expert, (Dr. Joel Zivot), testified that the femoral vein is large and capable of "tak[ing] a fair amount of fluid" when the central line is properly placed, and the risk of that vein rupturing is "unlikely." (Doc. 182-1, p. 26.) Dr. Zivot also denied having any reason to believe that Plaintiff's medical condition made his femoral vein more susceptible to rupture than

---

[4] All page numbers are those generated by the Court's CM/ECF system.

might otherwise be expected, and confirmed that his testimony about the risk of Plaintiff's veins rupturing was limited to Plaintiff's peripheral veins.  (Doc. 182-1, pp. 70-71, 77-78.)  Plaintiff also concedes that there is no evidence in the Record establishing that Plaintiff has any problem with his veins *other* than his peripheral veins, including his femoral vein.  (Doc. 197, p. 9.) Finally, the Record confirms that Plaintiff's medical condition will not affect the flow of chemicals in his bloodstream once they are introduced through the femoral vein, or otherwise affect his expected response to the pentobarbital.  (*E.g.,* Doc. 182-1, pp. 65-66, 213-14, 219.)

An execution is typically conducted with the prisoner lying on his back.  The procedure for inserting a central line is also usually performed with the person in the supine position.  The Record establishes that Plaintiff has difficulty breathing while in that position because the tumors can cause choking or an inability to breathe.  Sometimes the tumors bleed, thereby exacerbating the sensation.  When required to be on his back, Plaintiff can "adjust" his breathing so that he can remain in that position; for instance, Plaintiff was able to lie on his back for approximately one hour while undergoing an MRI.  However, there are factual disputes as to (1) Plaintiff's ability to adjust his breathing once the pentobarbital begins to take effect, (Doc. 181-1, pp. 81-82), and (2) how quickly the pentobarbital will deprive Plaintiff of the ability to sense that he is choking or unable to breathe.  On the latter point Dr. Zivot testified that it could be fifty-two to 240 seconds before the pentobarbital induces a state in which Plaintiff could no longer sense that he is choking or unable to breathe.  (*E.g.,* Doc. 182-1, pp. 84-88.)  Defendants point out that their expert, Dr. Joseph Antognini, opined that Plaintiff would be unconscious within twenty to thirty seconds and at that point would be incapable of experiencing pain.  (Doc. 182-1, pp. 198-99; Doc. 182-5, pp. 60-62.)  However, the Court cannot resolve this dispute between the experts on summary judgment.

4

Defendants also invite the Court to analyze the study Dr. Zivot relied upon to find that fifty-two seconds of awareness is the worst case scenario because that is when brain death occurs. (Doc. 200, p. 15.) Dr. Zivot addressed this issue in his deposition, explaining that the study's use of the term "brain death" was a "misnomer" because the study marked "brain death" before measurable brain activity terminated; he then indicated that pain might be felt until measurable brain activity ceases. (Doc. 182-1, pp. 83-86.)[5] The Court also cannot resolve this factual dispute on summary judgment. Therefore, construing the Record in Plaintiff's favor reveals that it could be fifty-two to 240 seconds before the pentobarbital induces a state in which Plaintiff could no longer sense that he is choking or unable to breathe.[6]

## II. DISCUSSION

A moving party is entitled to summary judgment on a claim only upon a showing that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *See generally Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted). In applying this standard, the Court must view the evidence in the light

---

[5] This may be a generous interpretation of Dr. Zivot's testimony. However, (1) the Record must be construed in the light most favorable to Plaintiff and (2) the Court is not required to resolve the elements of Plaintiff's claim in any particular order. Therefore, the Court deems it appropriate to adopt this interpretation of Dr. Zivot's testimony in order to frame the discussion about Plaintiff's proffered alternative method of execution.

[6] Defendants also suggest that the execution could be performed with Plaintiff in a different position, but there is no evidence whether this has an effect on the procedure as a whole or the procedure for inserting a central line specifically. In light of the Record's silence on these matters, Defendants have not provided the Court with a basis for granting summary judgment based on the possibility of performing the execution with Plaintiff in a sitting (or other) position.

5

most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Tyler v. Harper*, 744 F.2d 653, 655 (8th Cir. 1984), *cert. denied*, 470 U.S. 1057 (1985). A party opposing a motion for summary judgment may not simply deny the allegations, but must point to evidence in the Record demonstrating the existence of a factual dispute. Fed. R. Civ. P. 56(c)(1); *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909-10 (8th Cir. 2010).

In *Glossip v. Gross*, the Supreme Court determined "what a prisoner must establish to succeed on an Eighth Amendment method-of-execution claim." 135 S. Ct. 2726, 2737 (2015). "[D]ecisions in this area have been animated in part by the recognition that because it is settled that capital punishment is constitutional, it necessarily follows that there must be a constitutional means of carrying it out." *Id.* at 2732-33. Moreover, "because some risk of pain is inherent in any method of execution, we have held that the Constitution does not require the avoidance of all risk of pain." *Id.* at 2733. In light of these observations, a prisoner alleging that a particular form of execution is cruel and unusual within the meaning of the Eighth Amendment must first establish that the method to be utilized "presents a risk that is sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers." *Id.* at 2737 (quotations and emphasis deleted). The prisoner must then "identify a known and available alternative method of execution that entails a lesser risk of pain, a requirement of all Eighth Amendment method-of-execution claims." *Id.* at 2731. The alternative must be "feasible, readily implemented, and in fact significantly reduce[ ] [the] substantial risk of severe pain." *Id.* at 2737; *see also Bucklew,* 783 F.3d at 1128. The Court has discretion to decide the order in which it will address these two components of Plaintiff's claim. *Bucklew,* 783 F.3d at 1128.

6

### A. Risk of Serious Illness or Needless Suffering

Defendants contend that the uncontroverted facts demonstrate that Plaintiff is not sure or likely to experience a serious injury or needless suffering. Plaintiff contends that he has demonstrated a serious risk that he will experience needless pain and suffering because (1) the weakness in his peripheral veins precludes using them to administer the pentobarbital, and (2) he will choke or otherwise be unable to breathe for an extended period of time before the pentobarbital takes full effect. The Court concludes that the Record establishes that (1) the use of Plaintiff's femoral vein does not present any risk of serious illness or needless suffering, and (2) the Record does not permit a conclusive determination regarding the risk that Plaintiff will choke and be unable to breathe for a period of time that would violate the Eighth Amendment.

#### *1. Use of Plaintiff's Femoral Vein*

As discussed in Part I.B, there is an apparent consensus that an IV cannot be safely inserted in Plaintiff's peripheral veins. However, the execution protocol allows a central line to be inserted in Plaintiff's femoral vein, and the Record establishes that this can be done without the risk of complications attributable to Plaintiff's congenital condition. The Court also notes that Plaintiff's legal argument does not discuss Defendant's evidence that his femoral vein can be used to administer the execution drugs. (Doc. 197, pp. 34-43.) Plaintiff discusses the use of his femoral vein only in the portion of his Opposition that addresses the facts in the Record, and even in that context he does not present any legal arguments based on those facts. Nonetheless, the Court will briefly discuss these factual issues.

Generally speaking, Plaintiff addresses the potential difficulty in locating the femoral vein and the fact that medical personnel might require multiple attempts to locate it.[7] This, he

---

[7] To the extent Plaintiff contends that there is no evidence demonstrating that Plaintiff's femoral veins are unaffected by his disease, this argument does not change the Court's opinion. If there is no evidence that will establish any

posits, will increase his stress, thereby increasing his breathing rate and making it more likely that he will choke. Plaintiff also suggests that if the procedure is not performed properly the drugs might be injected in an artery instead of the vein. (Doc. 197, pp. 18-20.) However, Plaintiff does not quantify these risks, nor (as stated) does he explain how these facts independently establish that the current protocol presents a risk of serious illness or needless suffering. The possibility that Plaintiff might experience increased stress (or, more precisely, more stress than the situation might otherwise produce) is particularly speculative, as are the effects of that extra stress. Moreover, on several occasions the Court has observed that Plaintiff cannot predicate his Eighth Amendment claim on the bare possibility that a medical procedure might be performed incorrectly.

The uncontroverted facts demonstrate that the lethal injection protocol can be implemented by using Plaintiff's femoral vein, and that doing so will not create a substantial risk of serious injury or needless suffering. Therefore, the fact that Plaintiff's peripheral veins cannot be used will not support the first component of Plaintiff's claim.

### 2. *Plaintiff's Obstructed Airway*

As discussed in Part I.B, the facts construed in Plaintiff's favor would permit a factfinder to conclude that for as long as four minutes Plaintiff could be aware that he is choking or unable to breathe but be unable "adjust" his breathing to remedy the situation. In seeking summary judgment Defendants have not contended that such a situation would not satisfy *Glossip* (and the Court does not hold whether it does or does not); Defendants' sole argument is that Plaintiff would likely experience this sensation for twenty to thirty seconds or, at worst, fifty-two seconds. As discussed before, this is a factual dispute that the Court cannot resolve on summary

---

problems with the use of Plaintiff's femoral vein, then there is no reason to have a trial on the issue. Without evidence, it is a foregone conclusion that Plaintiff cannot prevail on this issue.

8

judgment, and would have to be resolved at trial. Therefore, solely for purposes of further discussion, the Court presumes that there is a substantial risk that Plaintiff will experience choking and an inability to breathe for up to four minutes.

## B. Alternative Measures

Plaintiff contends that death through nitrogen gas-induced hypoxia will significantly reduce the risks of severe pain and suffering. Defendants do not argue that this method of execution is not feasible or readily implemented. Instead, Defendants argue that the Record demonstrates this method of execution will not reduce Plaintiff's risk of pain and suffering. Plaintiff disputes this point and further contends that he is not required to identify an alternative method of execution.

The Court addresses Plaintiff's second point first. He contends that *Glossip* does not apply because that case involved a facial challenge and he presents an as-applied challenge. The Court disagrees. First, *Glossip* set forth the requirements for an Eighth Amendment challenge to an execution method. The Supreme Court did not distinguish between facial and as-applied challenges, and it did not provide a basis for interpreting *Glossip* as creating such a distinction. To the contrary, the Supreme Court specified that the need to "identify a known and available alternative method of execution that entails a lesser risk of pain [is] a requirement of *all* Eighth Amendment method-of-execution claims." *Glossip,* 135 S. Ct. at 2731 (emphasis supplied). Second, the Eighth Circuit clearly directed that Plaintiff must (1) identify at the pleading stage and (2) eventually prove that there is an alternative that will significantly reduce the risk. *Bucklew*, 783 F.3d at 1128. This is the law of the case, and the Court must adhere to it. Third, the Eighth Circuit has explicitly rejected Plaintiff's argument in other cases. *Williams v. Kelley,* 854 F.3d 998, 1001 (8th Cir.), *cert. denied,* 137 S. Ct. 1284 (2017) (citing *Johnson v. Lombardi,*

9

809 F.3d 388, 391 (8th Cir.), *cert. denied,* 136 S. Ct. 601 (2015)).  For these reasons, the Court concludes Plaintiff is required to prove that there is a feasible and readily available alternative that will significantly reduce the risk of suffering that lethal injection will present.

The Court agrees with Defendants that the facts in the Record do not present a triable dispute on this issue.  Given the risk of suffering that the Court identified as potentially supported by the Record, (*see* Part II.A.2, *supra*), the question is whether (1) the use of nitrogen gas will cause Plaintiff to become unaware of his choking and breathing difficulties sooner than he would under the current protocol, and (2) whether that difference in time is sufficient to permit the Court to find that nitrogen gas will make a "significant" difference in Plaintiff's suffering.  Put another way: a finder of fact might conclude that if pentobarbital is used, there is a four minute period of time during which Plaintiff would experience significant suffering.  Given that, could a finder of fact conclude that the use of nitrogen gas will significantly reduce that period of awareness?

Defendants point to their expert's supplemental report, wherein he states that "the use of lethal gas does not hold any advantage compared to lethal injection with respect to pain and suffering.  Both methods would result in minimal pain and suffering."  (Doc. 182-1.)  This requires Plaintiff to identify facts in the Record that create a factual dispute necessitating a trial, but Plaintiff has not identified any such facts.  Dr. Zivot would not address the issue in his deposition, (Doc. 182-1, pp. 38-40), and Plaintiff does not contend that Dr. Zivot's testimony creates a factual dispute.  Plaintiff instead relies on Dr. Antognini's deposition, but the Court has reviewed the cited testimony and finds nothing that supports Plaintiff's position.[8]  Dr. Antognini

---

[8] Plaintiff also attempts to create factual disputes about the Missouri Department of Corrections' efforts to research the viability and effects of executing prisoners with nitrogen gas, but the issue is not relevant under the governing legal principles.

10

was asked to compare the use of pentobarbital to nitrogen gas, but his answer does not indicate that there are any differences between them. (Doc. 182-5, pp. 58-59.) To the contrary, he stated:

> You know, you get – you can get suffering from hypoxia, you know, because somebody can be awake and realize that they're not getting enough oxygen. So depending on – on how it's used, you might get more suffering from nitrogen gas than you would from Pentobarbital. Or you might get less suffering, you know, it depends on how you would use it, I guess.

(Doc. 182-5, p. 59.) As relevant to the claim at issue, Dr. Antognini specifically stated that he believed there would be no difference in the "speed" of lethal gas as compared to pentobarbital. (*Id.*) Plaintiff points to Dr. Antognini's indication that nitrogen gas would "quickly" cause unconsciousness, (Doc. 182-5, p. 59), but this is unavailing for two reasons. First, Dr. Antognini said the same thing about pentobarbital; in his opinion, both would "quickly" cause unconsciousness. Thus, this opinion does not support the proposition that nitrogen hypoxia would cause unconsciousness sooner than pentobarbital. Second, the premise for Plaintiff's claim is that there is a period between unconsciousness and brain death during which he will experience pain. Therefore, establishing the speed with which unconsciousness will be achieved does not support Plaintiff's claim; he must identify evidence establishing how quickly nitrogen-induced hypoxia will cause brain death so that any such evidence can be contrasted with Dr. Zivot's testimony that Plaintiff might be aware that he is choking for up to four minutes. There is no evidence suggesting that nitrogen hypoxia will be faster than pentobarbital, so there is no factual dispute to resolve. In the absence of evidence contradicting Defendants' expert and supporting Plaintiff's theory, there is not a triable issue.

Plaintiff also points to the fact that Louisiana and Oklahoma have approved the use of nitrogen gas in their death penalty protocols. This evidence might be relevant in establishing the feasibility or ready availability of this method of execution, but it does not establish whether

11

nitrogen gas will significantly reduce the risk of suffering Plaintiff has described. Plaintiff cites a report from Oklahoma for the proposition that "high altitude pilots who train to recognize the symptoms of nitrogen hypoxia in airplane depressurizations do not report any feelings of suffocation, choking or gagging." (Doc. 197, p. 48 n.6 (citing Doc. 192-14, p. 78).) Assuming this is competent evidence that can be considered on summary judgment, Plaintiff is not trained to recognize the symptoms of nitrogen hypoxia and it is unlikely that the pilots who were trained to recognize the symptoms of hypoxia also suffered from cavernous hemangioma. Plaintiff additionally refers to a report from Louisiana, which itself cites other materials for the proposition that nitrogen hypoxia allows a person to expel carbon dioxide buildup and thereby reduce suffocation caused by respiratory acidosis. (Doc. 197, p. 48 n.6 (citing Doc. 192-17, p. 19).) Assuming again that this is competent evidence, Plaintiff's theory is that he will experience suffocation due to his tumors, not due to respiratory acidosis. Finally, none of this evidence purports to compare the effects of nitrogen gas hypoxia to the effects of pentobarbital, particularly as related to the speed with which brain death will occur. Therefore, this anecdotal evidence does not conflict with Dr. Antognini's testimony and therefore does not create a factual dispute.[9]

The Record establishes that the use of nitrogen gas will not act faster than pentobarbital. Therefore, nitrogen gas will not significantly reduce the risk of suffering Plaintiff faces if he is executed under Missouri's current protocol.

---

[9] Plaintiff has also provided a "Preliminary Draft" of a document prepared at the request of an Oklahoma State Representative. (Doc. 199-12, pp. 15-28.) The authors' qualifications to opine on medical matters are not established. The report bears the instruction "Do Not Cite." The report generally discusses the feasibility and effectiveness of using nitrogen gas in executions, but it does not purport to answer the questions relevant to the case. For these reasons, this report also does not create a factual dispute.

12

## III.  CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment on Count I is **GRANTED.**

**IT IS SO ORDERED**.

|  |  |
|---|---|
|  | /s/ Beth Phillips |
|  | BETH PHILLIPS, JUDGE |
| DATE:  June 15, 2017 | UNITED STATES DISTRICT COURT |