IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RUSSELL BUCKLEW, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 14-8000-CV-W-BP |
| | ) |
| GEORGE A. LOMBARDI, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**ORDER AND OPINION DENYING PLAINTIFF'S MOTION
TO ALTER OR AMEND JUDGMENT**

On June 15, 2017, the Court granted summary judgment to Defendants on the sole remaining claim from the Fourth Amended Complaint. (Doc. 202.) In that claim, Plaintiff asserted that the State's execution protocol as applied to him would violate the Eighth Amendment's proscription against cruel and unusual punishment. Plaintiff has now filed a Motion to Alter or Amend Judgment pursuant to Rule 59(e). "Rule 59(e) motions serve the limited function of correcting manifest errors of law or fact or to present newly discovered evidence." *United States v. Metropolitan St. Louis Sewer Dist.*, 440 F.3d 930, 933 (8th Cir. 2006). Plaintiff does not seek to present newly discovered evidence. Instead, he contends the Court (1) overlooked certain facts, (2) applied the wrong legal standard, and (3) limited discovery in a manner that deprived him of a fair opportunity to support his claims. The Court discusses each of these issues below and concludes the motion, (Doc. 210), should be **DENIED**.

**I. BACKGROUND**

Placing Plaintiff's arguments in context requires a summary of the law governing Plaintiff's claim and the basis for the Court's June 15 Order. As the Court explained,

> a prisoner alleging that a particular form of execution is cruel and unusual within the meaning of the Eighth Amendment must first establish that the method to be utilized presents a risk that is sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers.  The prisoner must then "identify a known and available alternative method of execution that entails a lesser risk of pain, a requirement of all Eighth Amendment method-of-execution claims.  The alternative must be feasible, readily implemented, and in fact significantly reduce the substantial risk of severe pain.

(Doc. 202, p. 6 (quotations and citations omitted).)  The current execution protocol calls for "the intravenous administration of pentobarbital in dosages sufficient to cause unconsciousness and eventually death."  (Doc. 202, p. 3.)  Plaintiff suffers from a congenital medical condition known as cavernous hemangioma, which "causes clumps of weak, malformed blood vessels and tumors to grow throughout his body, including his head, face, neck and throat."  (Doc. 202, p. 2.)  He alleges that his condition makes it difficult to breathe and that after the pentobarbital takes effect he will experience a choking sensation even after he is unconscious because he will be unable to control his breathing.

In granting Defendants' summary judgment the Court concluded that the Record, construed in the light most favorable to Plaintiff, demonstrated that there is a risk that Plaintiff will experience choking and an inability to breathe for fifty-two to 240 seconds – the time between unconsciousness and brain death.  (Doc. 202, pp. 4-5, 8-9.)  The Court then considered whether Plaintiff's proposed alternative – nitrogen gas – would "cause Plaintiff to become unaware of his choking and breathing difficulties sooner than he would under the current protocol, and (2) whether that difference in time is sufficient to permit the Court to find that nitrogen gas will make a 'significant' difference in Plaintiff's suffering."  (Doc. 202, p. 10.)  The Court reviewed the evidence in the Record and determined that the uncontroverted facts demonstrated that hypoxia induced by nitrogen gas "will not act faster than pentobarbital.

2

Therefore, nitrogen gas will not significantly reduce the risk of suffering Plaintiff faces if he is executed under Missouri's current protocol." (Doc. 202, p. 12.)

## II.  DISCUSSION

### A.  Factual Matters

Plaintiff contends that the Court erred by failing to contrast the effect of him being in a supine position under the State's current execution protocol evidence with his ability to be seated if he is executed with nitrogen gas.  As the Court noted, Plaintiff has difficulty breathing, "and that difficulty is exacerbated when he is in a supine position."  (Doc. 202, p. 3.)  However, there is no evidence in the Record establishing that (1) Plaintiff must be in a supine position after the IV is inserted, or, more importantly, that (2) sitting while nitrogen gas is administered will make an appreciable difference in Plaintiff's ability to breathe.  As the Court explained, "the premise for Plaintiff's claim is that there is a period between unconsciousness and brain death during which he will experience pain" because he will be unable to control his breathing and prevent choking.  (Doc. 202, p. 11.)  Plaintiff does not identify any overlooked evidence establishing that he must remain on his back after the IV is inserted.

He also does not identify any overlooked evidence that there is a significant difference in his ability to breathe when he is unconscious and sitting as compared to when he is unconscious and lying down.  To the contrary, as the Court explained, there is no evidence in the Record establishing that nitrogen gas will cause brain death sooner than pentobarbital, which means that with nitrogen gas Plaintiff could be aware that he is choking for up to four minutes, just as the Record (construed in Plaintiff's favor) suggests would be the case with pentobarbital.  (Doc. 202, p. 11.)  Thus, even if he could not sit upright after the IV is inserted, there is no evidence suggesting this would cause suffering that would be alleviated through the use of nitrogen gas.

3

Plaintiff also contends the Court misinterpreted an Interim Report from a Grand Jury in Oklahoma, which heard testimony from a professor that "high altitude pilots who train to recognize the symptoms of nitrogen hypoxia in airplane depressurizations do not report any feelings of suffocation, choking, or gagging." (Doc. 192-14, p. 78.) The Court noted this information and observed that "[a]ssuming this is competent evidence that can be considered on summary judgment, Plaintiff is not trained to recognize the symptoms of nitrogen hypoxia and it is unlikely that the pilots who were trained to recognize the symptoms of hypoxia also suffered from cavernous hemangioma." (Doc. 202, p. 12.) Plaintiff argues that the Court misapprehended the point of this information, which was to establish that even pilots trained to recognize nitrogen hypoxia do not report choking or suffocation, so it is unlikely that Plaintiff would notice such effects. With this explanation, Plaintiff is correct that his lack of training is not relevant. However, Plaintiff has not overcome the Court's concerns that a professor's testimony to a grand jury about what pilots have reported is not competent medical evidence about the effects of nitrogen hypoxia. Relatedly, it remains unlikely that the pilots suffered from cavernous hemangioma, so their anecdotal reports are not sufficient to satisfy Plaintiff's burden.

Plaintiff's claim required evidence establishing that nitrogen hypoxia produces a shorter time between unconsciousness and brain death than would pentobarbital. There is no such evidence in the Record. There is, however, evidence that the time between unconsciousness and brain death (whatever that interval is) would be the same under both execution methods. Accordingly, there is no basis in fact for altering the Court's judgment.

## B. Interpretation and Application of the Legal Standard

Plaintiff contends the Court has "imposed an impossible standard on Plaintiff" because his unique medical condition makes it impossible for him to produce the "side-by-side

4

comparison between the length of time required to produce unconsciousness by lethal injection versus lethal gas." (Doc. 210, p. 5.) He also believes he was "penalize[d] . . . because his expert would not opine on how to kill Plaintiff with lethal gas." (*Id.*) While Plaintiff argues against the legal standard utilized by the Court, he does not contend that it was wrong. That is, Plaintiff does not argue that the Court failed to follow the governing standard as set forth in such cases as *Glossip v. Gross*, 135 S. Ct. 2726 (2015), and *Bucklew v. Lombardi*, 783 F.3d 1120 (8th Cir. 2015) (en banc), and thus has not demonstrated that the Court committed legal error.

### C. Discovery Issues

Early in the discovery process, the Court issued an Order Regarding the Scope of Discovery. (Doc. 105.) Plaintiff contends that his "ability to prove his Eighth Amendment claim has been crippled by" limits on access to information about and from members of the execution team. (Doc. 210, p. 6.) The Court addressed the issue in the order regarding the scope of discovery, as well as at other times, (*e.g.,* Doc. 183; Doc. 214), and further discussion of the issue is unnecessary.

### III. CONCLUSION

For these reasons, Plaintiff's motion for relief pursuant to Rule 59(e) is **DENIED**.

**IT IS SO ORDERED**.

/s/ Beth Phillips
BETH PHILLIPS, JUDGE
DATE: August 21, 2017   UNITED STATES DISTRICT COURT